MICHAEL D. RAWLINS, ESQ.
Nevada Bar No. 5467
ANDREW S. BLAYLOCK, ESQ.
Nevada Bar No. 13666
SMITH & SHAPIRO, PLLC
3333 E. Serene Ave., Suite 130
Henderson, Nevada  89074
(702) 318-5033
*Attorneys for Defendant*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| TRADE SHOW SERVICES, LTD., a Nevada Corporation, d/b/a PRO-TECT SECURITY SERVICES,<br><br>Plaintiff,<br><br>vs.<br><br>INTEGRATED SYSTEMS IMPROVEMENT SERVICES, INC., an Arizona Corporation; INTEGRATED SYSTEMS IMPROVEMENT SERVICES, INC., d/b/a SPECIAL INTELLIGENCE SERVICE, an Arizona Corporation; DOE INDIVIDUALS I through X, inclusive; and ROE BUSINESS ENTITIES I through X, inclusive,<br><br>Defendants. | CASE NO.:  2:17-CV-01685-JAD-NJK |

**OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendant Integrated Systems Improvement Services, Inc., d/b/a/ Special Intelligence Services ("***SIS***" or "***Defendant***") hereby opposes Plaintiff Trade Show Services, LTD., d/b/a Pro-Tect Security's ("***Pro-Tect***" or "***Plaintiff***") Motion for Summary Judgment (the "***Motion***"). (ECF 73).

\ \ \

\ \ \

\ \ \

1

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Pro-Tect seeks summary judgment on each of its claims against SIS. According to Pro-Tect, it did some work, and according to the Subcontract, Pro-Tect is supposed to get paid for that work. It's not that simple. Pro-Tect ignores a myriad of factual disputes between the parties that preclude summary judgment.

Pro-Tect ignores the fact that the parties had an agreement from the outset that any work they did prior to funding of the All Net project (which has still not been funded) was at each party's risk. Both parties wanted to gain favor of the All Net team and do work before the project was funded, in order to secure lucrative long-term contracts after the project was funded. Pro-Tect's own former director of development, Gene Tosti, testifies of this in his declaration.

There is a genuine dispute about the purpose of the Subcontract document, which describes no specific work to be done by Pro-Tect, describes no terms of payment, and lacks any start or end date. The Subcontract document was not an invitation for Pro-Tect to do any work requested by All-Net at SIS's expense, before the project was funded.

Even if Pro-Tect did work pursuant to the Subcontract for which it was entitled to be paid (which is disputed), there is a dispute over whether the work Pro-Tect did was requested by SIS as required by the contract; there is also a dispute over whether that work was reasonable in scope and quantity. The evidence will show that Pro-Tect was doing work not related to the All Net Project and at the behest of third parties, not SIS.

Finally, even if the forgoing issues of material fact were not present, there would be a dispute over the timing of payments to be made by SIS to Pro-Tect. Because of these genuine issues of material fact, Pro-Tect's Motion should be denied.

/ / /

/ / /

/ / /

/ / /

## II.

## BACKGROUND

### A.   THE ALL NET PROJECT.

Sometime prior to 2014, a businessman and former UNLV and NBA basketball player named Jackie Robinson ("***Robinson***") began efforts to create a new resort/basketball arena on the north end of the Las Vegas Strip (the "***All Net Project***"). The proposed All Net Project is substantial in scope, and would require more than two billion dollars in private funding to be successful. *See* Declaration of Don Wright ("ECF 76-11"). As of the date of this Opposition, efforts to secure funding for the All Net Project are ongoing, but have yet to be fruitful. *See* ECF 76-11.

### B.   SIS & PRO-TECT GET INVOLVED.

Sometime in 2014, SIS and its officer, Don Wright ("***Wright***"), became aware of the All Net Project. *See* ECF 76-11. SIS, which provides security services, began to periodically perform services for the All Net Project. *See* ECF 76-11. SIS was aware that the All Net Project had not been funded, and understood that it would not get paid for its services unless and until the funding was received. *See* ECF 76-11. Nevertheless, SIS was willing to take a chance and provide services in the hopes of securing a long-term contract after the funding was received. *See* ECF 76-11.

SIS' business model involves hiring subcontractors to provide the necessary manpower for security services.  *See* ECF 76-11. In or around the Fall of 2014, SIS told a potential subcontractor, Pro-Tect, about the All Net Project. *See* ECF 76-11; s*ee* Declaration of Gene Tosti ("ECF 76-12"). Pro-Tect was eager to get involved as well. *See* ECF 76-11; ECF 76-12. Like SIS, Pro-Tect was well aware that the All Net Project had no funding and no way to pay for any services, but Pro-Tect stated it also understood that by providing effective services, it stood a chance to convince key decision makers of Pro-Tect's value, and thereby secure a long-term contract that could potentially last for the duration of the proposed resort/arena's construction and beyond. *See* ECF 76-11; ECF 76-12. SIS and Pro-Tect both understood that even upon the All Net Project receiving funding, there was no guaranty that they would receive pay for work

3

already performed. *See* ECF 76-11. The parties were making an investment in the hopes of receiving long-term contracts down the road. *See* ECF 76-11.

SIS made it clear to Pro-Tect that doing any work on the All Net Project until funding was secured was a risk because no contractors/subcontractors would get paid unless and until the All Net Project was funded. *See* ECF 76-11; ECF 76-12. In October 2014, SIS's officers had an email exchange with Pro-Tect's director of development, Gene Tosti ("***Tosti***"), wherein SIS advised Pro-Tect, "I will not move forward and waste more money until the funding comes in. Gene you are more than welcome to accompany Don [to an event] but I would not waste the resources until the funding comes in." *See* ECF 76-1 at p. SIS 66. Tosti responded by saying, "Ok we understand and are willing to supply five of our EP to work . . . . We understand that the funding is not available yet. We're willing to support the project and move forward as planned." *See* ECF 76-1 at p. SIS 66. Pro-Tect fully understood that the All Net Project had not yet received funding, and that Pro-Tect would not be compensated for any services provided on the All Net Project until funding was secured. *See* ECF 76-1 at p. SIS 66; ECF 76-11; ECF 76-12.

The following June, optimism for funding increased. Starting in early June 2015, Pro-Tect started providing security services to Robinson and his family at the family's request. *See* ECF 76-4 at pp. SIS 2-3. On June 8, 2015, Leslie Bruno ("***Bruno***"), the president of Pro-Tect, emailed Luis Vega ("***Vega***"), an officer of SIS, and said "Attached are the 277 Hours of service provided to Jackie and the family." *See* ECF 76-2 at p. PRO-TECT 189. Vega was surprised by the amount of work being done by Pro-Tect and replied, "That's a lot more than I anticipated. We need to make sure that they [the Robinson family] aren't calling the shots on security." *See* ECF 76-2 at p. PRO-TECT 188. After a reply from Bruno, Vega responded by saying, "But any adjustments have to make sure we approve next time. Until we get up and running I don't mind breaking even but I don't want to be in the hole with them. We have given enough before even starting." *See* ECF 76-2 at p. PRO-TECT 188.

Despite the aforementioned email exchange, Pro-Tect continued to provide services throughout June for the Robinson family that appear unrelated to the All Net Project. Pro-Tect did so even before a contract was in place and with full knowledge that funding was still not

finalized. On July 3, 2015, Bruno sent an email to SIS with an invoice for June services along with the note "Hopefully Don's [Wright] trip today is a success for funding and we can celebrate the next time you're out here!" *See* ECF 76-3 at p. PRO-TECT 201. Pro-Tect ultimately generated two invoices for work done in June 2015 in the amounts of $70,390.55 and $1,163.82, for a total of $71,554.37. *See* ECF 76-4 at pp. SIS 2, 8. Pro-Tect continued to provide services in July prior to any written agreement being in place. Based on the supporting documentation provided with the July 2015 invoices, Pro-Tect claims to have done an additional $22,030.27 worth of work prior to July 10, at which time a signed written agreement was sent to Pro-Tect. *See* ECF 76-4 at pp. SIS 12-13, 17-18. Thus, Pro-Tect billed a total of $93,584.64 prior to having a written agreement that was signed by SIS.[1]

C.    **THE SUBCONTRACT.**

In June 2015, at the behest of Pro-Tect, SIS's contracts analyst, Garylene Javier ("***Javier***"), prepared a draft Subcontract Agreement (the "***Subcontract***") between SIS and Pro-Tect. After some negotiations, the Subcontract was executed by Pro-Tect on July 7, 2015. *See* ECF 76-5 at p. PRO-TECT 12. In response to Bruno sending the Subcontract with her signature to SIS, instead of immediately signing and returning the Subcontract, Don Wright ("***Wright***"), SIS's officer, responded by saying "Arriving back in Las Vegas about Midnight tonight and will be with Jackie [Robinson] and Investors starting at 8:00 AM on Thursday. Will let you know when I have updates." *See* ECF 76-6 at p. PRO-TECT 210. A few days later, on July 10, 2015, Javier signed the Subcontract Agreement. *See* ECF 76-5 at p. PRO-TECT 12. SIS's understanding regarding payment being contingent upon funding remained unchanged, and SIS considered the Subcontract to be a placeholder until funding was received. *See* ECF 76-9 at 64:13-17 (wherein Wright testified regarding the Subcontract: "our understanding was that we were providing an outline, a draft of an arrangement, so when we got something from Mr. Robinson, so we would, at

---

[1] Pro-Tect will point out that the Subcontract was ultimately given an "effective date" of June 1, 2015. This does not change the fact that by its own admission, Pro-Tect alleges it provided nearly $100,000 worth of services prior to having any written agreement with SIS. This is further evidence that Pro-Tect knew it was taking a risk, and was still willing to provide substantial services to the All Net Project without assurances of payment because Pro-Tect was hopeful that the ultimate revenue generated would make the risk worthwhile.

5

that point, generate a go forward contract."). Because SIS considered the Subcontract to be nothing more than a placeholder, SIS did not even remember its existence at the time that this lawsuit began. *See* ECF 76-11. However, because SIS also expected funding to occur imminently, SIS did not object to the Subcontract being signed.

The Subcontract does not identify a specific scope of work. Rather, it specifies that Pro-Tect would perform work under the Subcontract "at times and locations determined by SIS." *See* ECF 76-5 at §2. Similarly, the Subcontract states that "SIS shall have the right to inspect and to reject any services which, in its judgment, is not in keeping with this Agreement." *See* ECF 76-5 at §6(d). Thus, the Subcontract gave SIS the right to both (1) determine the work to be done by Pro-Tect and (2) reject any services not in line with the Subcontract.

More noteworthy than what the Subcontract does say is what the Subcontract fails to say. First, Section 3 says that the term of the Subcontract is set forth in Exhibit A, but Exhibit A contains no provision specifying the term of the Subcontract. *See* ECF 76-5. Thus, the Subcontract's start and end date are ambiguous. Further, and most importantly, the Subcontract is silent regarding the timing of payment. Section 9, titled "Invoice and Payment," explains that Pro-Tect must submit invoices within 15 days of the end of each month, and that the invoices must include supporting materials to substantiate the amount sought. *See* ECF 76-5 at §9(a). However, nowhere in Section 9 does it specify when SIS would pay the invoices. *See* ECF 76-5 at §9. Nor does it give a deadline for SIS to reject invoices. *See* ECF 76-5 at §9(b). Thus, the Subcontract is ambiguous as to the timing of SIS processing and either accepting and paying or rejecting invoices received from Pro-Tect.

In essence, the Subcontract contains no scope of work, no terms for payment, and no term. The mere fact that Pro-Tect did some work and generated invoices does not prove it did that work pursuant to the Subcontract or that SIS is liable to pay for that work.

D. **WORK PERFORMED BY PRO-TECT.**

Pro-Tect sent emails to SIS showing security services it had already performed at the request of the Robinson family. *See* ECF 76-7. However, as evidenced by the June 9, 2015, email from Vega, for their work, SIS was not the one "calling the shots on security," as is required by

Section 2 of the Subcontract. *See* ECF 76-2 at p. PRO-TECT 188; ECF 76-5 at §2. Further, the emails summarizing work performed make it clear that the vast majority of the services being provided by SIS had absolutely nothing to do with a resort/basketball arena. *See* ECF 76-7. Rather, Pro-Tect spent nearly all of its man hours providing executive protection to the family of Jackie Robinson. *See* ECF 76-7. For example, on June 13, 2015, Pro-Tect guards travelled to Cimarron High School with the Robinson family, stayed at the high school for the duration of the school day, and accompanied some of the Robinson family to the Red Rock Theater later that night. *See* ECF 76-7 at p. PRO-TECT 306. On June 16, Pro-Tect guards accompanied Ms. Robinson to the gym, ran errands with Ms. Robinson and her children, and "stayed at the house with the kids while Mr. and Mrs. Roberson [sic] ran an errand." *See* ECF 76-7 at p. PRO-TECT 307. On June 26, Pro-Tect guards spent most of the day accompanying Ms. Robinson to the gym, Bed Bath & Beyond, Lowes, and her mother's home. *See* ECF 76-7 at p. PRO-TECT 312. On June 27, Pro-Tect guards accompanied the Robinson family to the water park, the theater, and a restaurant. *See* ECF 76-7 at p. PRO-TECT 313. Nearly every email summarizing Pro-Tect's work is similar to those detailed above. It is difficult to imagine a situation where armed guards escorting the Robinson family to the school, gym, theater, restaurant or water park would provide any benefit even tangentially related to the All Net Project. Frankly, it appears that the Robinsons desired to have personal bodyguards out of fear for their safety unrelated to the All Net Project, and when presented with an opportunity to receive security services for free, they seized upon it.

By August 2015, it became clear to SIS that funding was not as imminent as it had hoped and that the work being done by Pro-Tect at the Robinson family's request was excessive and unnecessary. On August 7, 2015, Wright emailed Bruno to say that he was "On the plane to Dallas to meet privately with Jackie's investors and confirm funds. Luis will call you tonight or early on Saturday to let you know about status and pulling guards." *See* ECF 76-8 at p. PRO-TECT 236. On August 26, 2015, Vega emailed Bruno to say "we should downsize or pull them again until further notice." ECF 76-8 at p. PRO-TECT 238. Nevertheless, Pro-Tect continued to provide services until September 3, 2015. *See* ECF 76-4 at p. SIS 37. Shortly thereafter, Pro-Tect began

demanding payment for its outstanding invoices. On June 16, 2017, Pro-Tect filed the instant lawsuit, seeking payment for the invoices.

For the reasons set forth below, genuine issues of material fact remain, and summary judgment is inappropriate.

## III.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The following constitute the undisputed material facts upon which the present Opposition is based:

1. The All Net Project has not been funded. *See* ECF 76-11 at ¶4.
2. SIS has received no payments related to the All Net Project, either for work that SIS itself performed, or for work performed by Pro-Tect or any other subcontractor or third party. *See* ECF 76-11 at ¶13.
3. In October 2014, Pro-Tect's director of development acknowledged that there was no funding and Pro-Tect was willing to do work anyway. *See* ECF 76-1 at p. SIS 66.
4. Pro-Tect did work with full knowledge that the All Net Project had not been funded. *See* ECF 76-12 at ¶7; ECF 76-3 at p. PRO-TECT 201; ECF 76-6 at p. PRO-TECT 210; ECF 76-4 at pp. SIS 2-9, 11-12, 17-18.
5. Pro-Tect did work for the All Net Project prior to having any written agreement in place. *See* ECF 76-5; ECF 76-4 at pp. SIS 2-9, 11-12, 17-18.
6. SIS repeatedly expressed concern to Pro-Tect about the amount of work being done by Pro-Tect in light of the fact that funding had not been secured. *See* ECF 76-2 at p. PRO-TECT 188; ECF 76-8 at p. PRO-TECT 236-238; ECF 76-9 at 39:15-23; ECF 76-10 at 88:9-14.
7. Pro-Tect provided services until September 3, after SIS had expressed concern and told Pro-Tect to reduce its services. *See* ECF 76-4 at p. SIS 36-37.
8. The Subcontract does not specify the timing of payment or of rejection of invoices, even though it does specify the timing of submitting invoices. *See* ECF 76-5 at §9.

9. Section 3 of the Subcontract says that the period of performance of the Subcontract is set forth in Exhibit A, but Exhibit A contains no provision specifying the period of performance of the Subcontract. *See* ECF 76-5.

10. The Subcontract requires Pro-Tect to "perform its duties under this Agreement at times and locations determined by SIS." *See* ECF 76-5 at §2.

11. The Subcontract gives SIS the right to "inspect and to reject any services which, in its judgment, is not in keeping with this Agreement." *See* ECF 76-5 at §6(d).

12. The Robinson family, not SIS, determined the time and location of much of the work done by Pro-Tect. *See* ECF 76-2 at p. PRO-TECT 188; ECF 76-7; ECF 76-9 at 70:25-71:5.

13. A majority of the services provided by SIS were for executive protection for Robinson and his family. *See* ECF 76-7.

14. SIS did not specifically request any particular services to be performed by Pro-Tect pursuant to the Subcontract Agreement. *See* ECF 76-11 at ¶14.

### IV.

### **ARGUMENT**

A. **LEGAL STANDARD FOR SUMMARY JUDGMENT**.

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which states, in pertinent part:

> (a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.
> ...
> (c) Procedures.
>   (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>     (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>     (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FRCP 56.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986). "On summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." Matsushita Electric Industrial Co Ltd v. Zenith Radio Corporation, 476-11 U.S. 574, 587 (1986) (quotation omitted); see also Windon Third Oil and Gas v. FDIC, 805 F. 2d 342, 346 (10th Cir. 1986) (explaining that the Court must refrain from "determinations of credibility, weighing the evidence, and the drawing of legitimate inferences from the facts" because these are issues to be determined by the jury).

If "properly employed, summary judgment allows the court to dispose of meritless claims before becoming entrenched in a frivolous and costly trial," but "[i]t must, however, be used selectively to avoid trial by affidavit." Donahue v. Windsor Locks Board of Fire Comm'r, 834 F. 2d 54, 58 (2d Cir. 1987). The moving party has the burden of showing that there are no material facts in dispute, and all reasonable inferences are to be drawn in favor of the non-moving party. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). To defeat a motion for summary judgment, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Even if facts are uncontroverted, or the nonmovant has failed to respond, the court has an obligation to determine whether summary judgment is appropriate. In re Kelley, 163 B. R. 27 (Bankr. E.D.N.Y. 1993).

For the reasons set forth below, when construing all pleadings and proof in the light most favorable to the Defendants, it becomes abundantly clear that Plaintiff is not entitled to judgment as a matter of law.

/ / /

/ / /

/ / /

**B.     PRO-TECT IS NOT ENTITLED TO SUMMARY JUDGMENT AGAINST SIS ON ANY OF ITS CLAIMS.**

  **1.     Pro-Tect is Not Entitled to Summary Judgment on its Claim for Breach of Contract.**

   **a.     Legal Standard to Prove Breach of Contract.**

To successfully claim breach of contract, a plaintiff must show the existence of a valid contract, breach of the terms, and damages as a result of the breach. Cohen-Breen v. Gray Television Group, Inc., 661 F.Supp.2d 1158 (D. Nev., 2009). *See also* Saini v. Int'l Game Tech., 434 F.Supp.2d 913, 919-20 (D.Nev.2006) (citing Richardson v. Jones, 1 Nev. 405, 405 (1865)); Bernard v. Rockhill Development Co., 103 Nev. 132, 734 P.2d 1238 (1987).

   **b.     Material Issues of Fact Remain Regarding Pro-Tect's Claim for Breach of Contract.**

The validity of the Subcontract remains a genuine issue of material fact. The evidence is clear that both Pro-Tect and SIS fully understood that unless and until the All Net Project was funded, any services provided were merely an investment in the hopes of receiving long-term contracts sometime in the future. The Subcontract was meant to be "an outline, a draft of an arrangement, so when we got something from Mr. Robinson, so we would, at that point, generate a go forward contract." Contrary of Don Wright ("ECF 76-9") at 64:13-17). If the parties' intent was for the Subcontract to act as an "outline" or a placeholder instead of a genuine contract, a breach of contract claim cannot stand. As such, a material issue of fact regarding the validity of the Subcontract remains.

Even if the Subcontract were valid, a material issue of fact remains regarding whether the services provided by Pro-Tect fall under the purview of the Subcontract. The Subcontract states that Pro-Tect would provide services "at times and locations determined by SIS." *See* ECF 76-5 at §2. There is a material question remaining regarding whether it was SIS or the Robinson family who was determining the times and locations of the services. Pro-Tect has provided no evidence that SIS, as opposed to either Pro-Tect or the Robinson family, was directing the "times and locations" of the work to be done by Pro-Tect. In fact, all available evidence points in exactly the opposite direction. As evidenced by Vega's June 9 email, the amount of work being done was more than SIS thought necessary and Vega was concerned that the Robinsons were "calling the

shots" on the security services being provided. *See* ECF 76-2 at p. PRO-TECT 188. Wright has testified that All Net, not SIS, was managing Pro-Tect's work at that time. *See* ECF 76-9 at 70:25-71:5. Because the Subcontract specifies that SIS will direct the work to be done by Pro-Tect, work done by Pro-Tect that was not directed by SIS would not fall under the Subcontract and cannot be used as a basis for breach of contract. If all reasonable inferences are to be drawn in favor of the non-moving party, as they must on a motion for summary judgment, the identity of the party who determined the "times and locations" of the services to be provided by Pro-Tect is an unresolved issue of fact that must be decided by the factfinder.

Further, as mentioned above, the vast majority of services provided were for the benefit of the Robinson family, such as accompanying the family members to various errands and activities, and did not even tangentially benefit the All Net Project. *See* ECF 76-7. This was not in keeping with the plain language or the intent of the Subcontract, wherein Pro-Tect agreed "[t]o provide security and executive protection for All Net." *See* ECF 76-5 at Exhibit A §1. While Robinson is an All Net executive, his wife and children indisputably are not All Net executives, and any security services provided to his wife and children would not be covered by the Subcontract. An issue of material fact remains regarding the amount of work that Pro-Tect performed for the Robinson family as opposed to Jackie Robinson as an executive of All Net.

Finally, the reasonableness of the amount of work done by Pro-Tect is a remaining issue of fact. On June 9, 2015, SIS expressed concern about the amount of work being done by Pro-TEct considering that the work was being done "before even starting." *See* ECF 76-2 at p. PRO-TECT 188. On July 3, 2015, Pro-Tect admitted that it knew the funding had not yet come through, and a few days later, SIS once again mentioned that conversations with potential investors were still ongoing. *See* ECF 76-3 at p. PRO-TECT 201; ECF 76-6 at p. PRO-TECT 210. On August 7, 2015, SIS again made clear that funding was still a work in progress and mentioned that guards might need to be pulled. *See* ECF 76-8 at p. PRO-TECT 236. On August 26, 2015, SIS once again advised that Pro-Tect "should downsize or pull them again until further notice." *See* ECF 76-8 at p. PRO-TECT 238. Beyond these written communications, both Wright and Vega have testified that they advised Pro-Tect to reduce the amount of services being provided.

*See* ECF 76-9 at 39:15-23; ECF 76-10 at 88:9-14. Despite being repeatedly advised that (1) the All Net Project had not been funded, (2) Pro-Tect was providing excessive services, and (3) Pro-Tect should reduce its workforce unless/until the All Net Project received funding, Pro-Tect continued to provide services until September 3, 2015. *See* ECF 76-4 at p. SIS 37. When these facts are viewed in the light most favorable to SIS, it is clear that there remains a question of fact regarding whether the services provided by Pro-Tect (1) fall under the purview of the Subcontract and (2) were reasonable in amount. Especially considering that the Subcontract gives SIS "the right to inspect and to reject any services which, in its judgment, is not in keeping with this Agreement," a fact finder must be given the opportunity to consider whether Pro-Tect's services were in keeping with the Subcontract. *See* ECF 76-5 at §6(d).

   **c.** **The Parol Evidence Rule Allows For the Admission of Parol Evidence When the Contract Is Ambiguous.**

   Regarding parol evidence, Nevada Courts have held "[w]here a written contract is clear and unambiguous on its face, extraneous evidence cannot be introduced to explain its meaning." Kaldi v. Famers Ins. Exch., 117 Nev. 273, 21 P.3d 16, 21 (2001) (quotation omitted). However, as stated in Pro-Tect's Motion, "parol evidence is admissible to prove a separate oral agreement regarding any matter not included in the contract or to clarify ambiguous terms so long as the evidence does not contradict the terms of the written agreement. Ringle v. Bruton, 120 Nev. 82, 86 P.3d 1032, 1037 (2004). *See also* State ex rel. List v. Courtesy Motors, 95 Nev. 103, 107, 590 P.2d 163, 165 (1979) ("[p]arol evidence is admissible for the purpose of ascertaining the true intentions and agreement of the parties when the written instrument is ambiguous."); D.E. Shaw Laminar Portfolios, LLC v. Archon Corp., 570 F.Supp.2d 1262 (D. Nev., 2008) ("If a contract is ambiguous, the Court should look beyond its express terms to circumstances and conduct of the parties.") When a contract is ambiguous, summary judgment is inappropriate. *See, e.g.*, Dickenson v. State, Dept. of Wildlife, 110 Nev. 934, 877 P.2d 1059 (1994) ("If there is an ambiguity requiring extrinsic evidence to discern the parties' intent, summary judgment is improper."); Agricultural Aviation Engineering Co. v. Board of Clark County Com'rs, 106 Nev. 396, 794 P.2d 710 (1990) (holding that the trial court erred in granting summary judgment and

"should have resolved the ambiguity of the lease by examining the intentions of the parties. To determine the parties' intentions, the credibility of their statements must be decided, which should be an issue for consideration by the trier of fact.")  Courts have gone so far as to say "Parol evidence is admissible to show that, although the parties have executed a written contract, they did not, at the time of its execution, intend it to be a contract, and that it was not, therefore, a contract, and placed neither party under any legal obligation." Schieve v. Warren, 87 Nev. 42, 482 P.2d 303, 305 (1971).

A contract is ambiguous if its terms may reasonably be interpreted in more than one way or if it is "obscure in meaning, through indefiniteness of expression, or having a double meaning." Galardi v. Naples Polaris, LLC, 129 Nev. Adv. Op. 33, 301 P.3d 364, 366 (2013). For example, "if a contract contained a blank space, parol evidence would be admissible to explain what information should have been entered therein". Crockett & Myers v. Napier, Fitzgeralld & Kirby, 440 F.Supp.2d 1184, 1191 (D. Nev., 2006).

        **d.     The Subcontract Contains Ambiguities Which Require the Admission of Parol Evidence.**

In the instant case, the Subcontract has a metaphorical "blank space" regarding not only what services would be provided but also when payment from SIS to Pro-Tect will be made. Even though the Subcontract has a section titled "Invoice and Payment" that specifies the deadline for Pro-Tect to submit invoices, the section is silent as to the timing of payment. *See* ECF 76-5 at §9.  Nor does the Subcontract provide a deadline for SIS to reject invoices which are not in keeping with this Agreement, which is a right given to SIS by the Subcontract. *See* ECF 76-5 at §6(d). Because the Subcontract is ambiguous as to the timing of SIS processing and either accepting and paying or rejecting invoices received from Pro-Tect, parol evidence is admissible. When the Subcontract's ambiguity regarding the timing of payment is considered together with the parol evidence, it is clear that the parties' agreement was that Pro-Tect would not receive payment unless and until the All Net Project was funded. A genuine issue of material fact regarding the parties' intent remains, and summary judgment is inappropriate.

The Subcontract contains another ambiguity regarding the term of the Subcontract. Section 3 says that the period of performance of the Subcontract is set forth in Exhibit A, but Exhibit A contains no provision specifying the term of the Subcontract. *See* ECF 76-5. As such, the Subcontract's start and end date are ambiguous, thus allowing for the admission of parol evidence to determine the term of the Subcontract. The parol evidence demonstrates that the intent was for the term to start at the time funding was received. In light of this ambiguity regarding an important provision of the Subcontract, extrinsic evidence is necessary to discern the parties' intent, and summary judgment is improper.

Based on the remaining issues of fact surrounding the services actually performed, as well as the Subcontract's ambiguities regarding the timing of payment and period of performance, summary judgment should not be granted.

**2.    Pro-Tect is Not Entitled to Summary Judgment on its Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.**

An implied covenant of good faith and fair dealing is recognized in every contract under Nevada law. Consolidated Generator-Nevada, Inc. v. Cummins Engine Co., Inc., 114 Nev. 1304, 971 P.2d 1251, 1256 (1998). Where the terms of a contract are literally complied with but one party to the contract deliberately countervenes the intention and spirit of the contract, that party can incur liability for breach of the implied covenant of good faith and fair dealing. Hilton Hotels Corp. v. Butch Lewis Prods., Inc., 107 Nev. 226, 808 P.2d 919, 923 (1991). The implied covenant of good faith and fair dealing is limited to simply assuring compliance with the express terms of the contract, and cannot be extended to create obligations not contemplated by the contract. Chavez v. California Reconveyance Co., 2010 U.S. Dist. LEXIS 63415, *9 (D. Nev., June 18, 2010) (*quoting* Pasadena Live, LLC v. City of Pasadena, 8 Cal. Rptr. 3d 233 (Ct. App. 2004)).  The scope of the covenant is only as broad as the contract that governs the particular relationship.  Id. (*quoting* Chokel v. Genzyme Corp., 867 N.E.2d 325, 329 (Mass. 2007)). An implied covenant of good faith and fair dealing cannot contradict the terms of the contract from which it stems.  Id. at *11 (*citing* Storek v. Storek, Inc. v. Citicorp. Real Estate, Inc., 122 Cal. Rptr. 2d 267 (2002)).

For all of the reasons mentioned above, the Subcontract is ambiguous and parol evidence should be considered to determine the parties' intent. A claim for breach of the implied covenant of good faith and fair dealing necessary requires "the intention and spirit of the contract" to be considered. Hilton Hotels Corp., 808 P.2d at 923 (1991). In light of the ambiguous Subcontract, a factfinder must be given the opportunity to consider all evidence, including the Subcontract itself, the written and spoken communication between the parties, and the actions taken by the parties, before the intention of the contract can be determined. As such, a genuine issue of material fact regarding the intention of the parties regarding the timing of payment remains, and this claim is not ripe for summary judgment.

### 3. Pro-Tect is Not Entitled to Summary Judgment on its Claim for Unjust Enrichment.

Under Nevada law, the elements of an unjust enrichment claim or, "quasi contract" claim, are (1) a benefit conferred on the defendant by the plaintiff; (2) appreciation of the benefit by the defendant; and (3) acceptance and retention of the benefit by the defendant (4) in circumstances where it would be inequitable to retain the benefit without payment. Kennedy v. Carriage Cemetery Services, Inc., 727 F.Supp.2d 925, 932 (D.Nev. 2010) (*citing* Leasepartners Corp., Inc. v. Robert L. Brooks Trust, 113 Nev. 747, 942 P.2d 182, 187 (1997)). Unjust enrichment is "'the unjust retention … of money or property of another against the fundamental principles of justice or equity and good conscience.'" Topaz Mutual Co. v. Marsh, 108 Nev. 845, 856, 839 P.2d 606, 613 (1992) (*quoting* Nevada Industrial Dev. v. Benedetti, 103 Nev. 360, 363 n. 2, 741 P.2d 802, 804 n. 2 (1987)). An action based on a theory of unjust enrichment is not available when there is an express, written contract, because no agreement can be implied when there is an express agreement. Leasepartners Corp., Inc. v. Robert L. Brooks Trust, 113 Nev. 747, 942 P.2d 182, 187 (1997) (citing 66 Am.Jur.2d Restitution § 6 (1973)). *See also* Lipshie v. Tracy Investment Co., 93 Nev. 370, 379, 566 P.2d 819, 824 (1977) ("To permit recovery by quasi-contract where a written agreement exists would constitute a subversion of contractual principles.").

In this case, if the Subcontract is valid, a claim for unjust enrichment cannot stand. If the Court finds the Subcontract to be invalid, Pro-Tect has the burden of proving that it conferred a benefit upon SIS. The only argument that Pro-Tect makes on this front is that "Pro-Tect provide[d] security services on its behalf with ISIS' full knowledge that Pro-Tect was doing so on reliance of the Subcontract Agreement." *See* ECF 73 at 15:28-16:1. However, there is no dispute that the security services were done for the benefit of someone other than SIS, such as either the All Net Project or the Robinson family. There is also no dispute that SIS has been paid nothing by All Net for the services provided by Pro-Tect. In no way has SIS been enriched or made better off by the efforts of Pro-Tect. As such, Pro-Tect has failed to show that it should prevail on the unjust enrichment claim.

## V.

## CONCLUSION

For the foregoing reasons, the Court should deny Pro-Tect's Motion in its entirety.

DATED this  9th  day of July, 2019.

**SMITH & SHAPIRO, PLLC**

*/s/Michael D. Rawlins*
MICHAEL D. RAWLINS, ESQ.
Nevada Bar No. 5467
ANDREW S. BLAYLOCK, ESQ.
Nevada Bar No. 13666
3333 E. Serene Ave., Ste. 130
Henderson, Nevada 89074
*Attorneys for Defendant*