# EXHIBIT 76-9

# EXHIBIT 76-9

# Condensed Transcript

# **Don Wright**
Volume I

**Date:** January 15, 2019

Trade Show Services, Ltd. v. Integrated Systems Inprovement
Services, Inc., et al.
Case No. 2:17-cv-01685-JAD-NJK

Oasis Reporting Services, LLC
Phone:  702-476-4500
E-mail:  info@oasisreporting.com
Internet:  www.oasisreporting.com

## Page 1

```
 1            UNITED STATES DISTRICT COURT
 2                 DISTRICT OF NEVADA
 3
 4  TRADE SHOW SERVICES, LTD.,  )
    a Nevada Corporation,       )
 5  d/b/a PRO-TECT SECURITY     )
    SERVICES,                   )
 6                              )
         Plaintiff,             )
 7                              )
    vs.                         )  CASE NO.
 8                              )  2:17-cv-01685-JAD-NJK
    INTEGRATED SYSTEMS          )
 9  IMPROVEMENT SERVICES,       )
    INC., an Arizona            )
10  Corporation; INTEGRATED     )
    SYSTEMS IMPROVEMENT         )
11  SERVICES, INC., d/b/a       )
    SPECIAL INTELLIGENCE        )
12  SERVICE, an Arizona         )
    Corporation; DOE            )
13  INDIVIDUALS I through X,    )
    inclusive; and ROE          )
14  BUSINESS ENTITIES I         )
    through X, inclusive,       )
15                              )
         Defendants.            )
16
17
18           DEPOSITION OF DON WRIGHT
19           Taken at the Law Offices of
20      KRAVITZ, SCHNITZER, & JOHNSON, CHTD.
       8985 South Eastern Avenue, Suite 200
21           Las Vegas, Nevada 89123
22              On January 15, 2019
                   At 1:30 p.m.
23
24  Reported by:  JENNIFER M. DALY, CRR, RPR, CCR, CSR
25  License No.:  766
```

## Page 2

```
 1  APPEARANCES:
 2  KRAVITZ, SCHNITZER, & JOHNSON, CHTD.
 3  BY: L. RENEE GREEN, ESQ.
 4      rgreen@ksjattorneys.com
 5      8985 South Eastern Avenue
 6      Suite 200
 7      Las Vegas, Nevada 89123
 8      702.352.6666
 9          On behalf of the Plaintiff;
10
11  SMITH & SHAPIRO
12  BY: ANDREW S. BLAYLOCK, ESQ.
13      ablaylock@smithshapiro.com
14      3333 East Serene Avenue
15      Suite 130
16      Henderson, Nevada 89074
17      702.318.5033
18          On behalf of the Defendants.
19
20  ALSO PRESENT:
21  Luis Vega
22  Leslie Bruno
23          * * * * *
24
25
```

## Page 3

```
 1              I N D E X
 2  WITNESS: DON WRIGHT
 3  EXAMINATION                 PAGE
 4  BY MS. GREEN                  4
 5
 6
 7            E X H I B I T S
 8  NUMBER       DESCRIPTION         PAGE
 9  Exhibit No. 1   Verification        19
10  Exhibit No. 2   Verification        20
11  Exhibit No. 3   Defendants' Responses to  34
12                  Interrogatories
13  Exhibit No. 4   Defendants' Responses to  43
14                  Requests for Production
15  Exhibit No. 5   SIS 55-56           46
16  Exhibit No. 6   PRO-TECT 206-211    54
17  Exhibit No. 7   PRO-TECT 1-17       58
18  Exhibit No. 8   Defendants' Responses to  60
19                  Requests for Admission
20  Exhibit No. 9   PRO-TECT 18-27      75
21  Exhibit No. 10  E-mail              80
22
23
24
25
```

## Page 4

```
 1      LAS VEGAS, NEVADA, TUESDAY, JANUARY 15, 2019
 2              1:30 P.M.
 3              -OOo-
 4  WHEREUPON --
 5      (IN AN OFF-THE-RECORD DISCUSSION HELD PRIOR TO THE
 6  COMMENCEMENT OF THE PROCEEDINGS, COUNSEL AGREED TO
 7  WAIVE THE COURT REPORTER'S REQUIREMENTS UNDER NEVADA
 8  RULES OF CIVIL PROCEDURE, RULE 30(B)(4), OR FEDERAL
 9  RULES OF CIVIL PROCEDURE, RULE 30(B)(5), AS
10  APPLICABLE.)
11          (WITNESS SWORN.)
12  Whereupon,
13          DON WRIGHT,
14  having been first duly sworn to testify to the
15  truth, the whole truth, and nothing but the truth,
16  was examined and testified as follows:
17          DIRECT EXAMINATION
18  BY MS. GREEN:
19  Q.  Good afternoon, Don Wright.
20  A.  Good afternoon.
21  Q.  I'm going to reintroduce myself for the
22  record.
23  A.  Okay.
24  Q.  My name is Renee Green, and I represent
25  Trade Show Services d/b/a Pro-Tect Security.  From
```

3577ea0e-e3e3-4659-bb01-f8145cac45ab

Page 5

1   here on out, and throughout the deposition, I'll
2   likely refer to that company as Pro-Tect.
3          Is it okay if I call you Don?
4   **A.   It is.**
5   Q.   Okay, Don.
6   **A.   It's actually preferred.**
7   Q.   Okay.  Great.  This afternoon, the court
8   reporter had you take an oath in which you swore to
9   tell the whole truth.  As I explained to Luis Vega,
10  who you attended his deposition just earlier
11  today --
12  **A.   Right.**
13  Q.   -- an oath here in Nevada, you swear to
14  tell the whole truth.  Failure to do so can result
15  in a conviction of perjury, which here in Nevada is
16  a felony.
17         Do you understand?
18  **A.   I do.**
19  Q.   Have you ever had your deposition taken
20  before?
21  **A.   I have.**
22  Q.   When was the last time you had your
23  deposition taken?
24  **A.   Probably 10 years ago.**
25  Q.   Wow, 10 years ago, okay.

Page 6

1   **A.   I try and stay out of trouble.**
2   Q.   Which state were you?
3   **A.   The state of Washington.**
4   Q.   So I'm going to go over a few ground
5   rules here.  I'm sure your attorney went over some
6   of the ground rules.  If you have any questions
7   regarding those ground rules, please let me know.
8          As I stated before, you probably heard it
9   from Mr. Vega, but I just want to create a clear
10  record.
11  **A.   Sure.**
12  Q.   Everything you hear and say here today is
13  going to be transcribed by the court reporter.  As a
14  result thereof, even though I can see your nonverbal
15  communication, I ask that you verbalize any answer
16  that you have as it relates to the deposition.
17         Do you understand?
18  **A.   I do understand.**
19  Q.   Also, this deposition creates an
20  unnatural way of speaking.  Specifically, you will
21  likely be able to anticipate the question I ask
22  before I'm finished asking it; however, because I do
23  want to create a clear record, I ask that you allow
24  me to finish answering the question, and then you
25  provide an answer.

Page 7

1   Q.   Do you understand?
2   **A.   I do understand.**
3   Q.   Also, as you heard before, I do not want
4   you to guess; however, I am entitled to an estimate.
5   Since you were sitting in on Luis Vega's deposition,
6   you were able to hear the interpretation and the
7   definition of the difference between a guess versus
8   an estimate.
9   **A.   I did.**
10  Q.   Do you have any questions as it relates
11  to that difference?
12  **A.   None at all.**
13  Q.   Have you taken any substances within the
14  last 24 hours that would affect your testimony here
15  today?
16  **A.   No.**
17  Q.   Is there any reason why this deposition
18  cannot move forward today?
19  **A.   None.**
20  Q.   Also, please let me know if you do not
21  understand the questions that I ask.
22         If you fail to do so, I will assume that
23  you understood the question the way it was asked.
24         Do you understand?
25  **A.   I do understand.**

Page 8

1   Q.   Also, we could take breaks periodically
2   throughout the deposition.  The only thing that I do
3   ask is that if there is a question pending, I ask
4   that you answer the question before we do take the
5   break.
6          Do you understand?
7   **A.   I do.**
8   Q.   Okay.  Great.
9          You indicated that it's been about
10  10 years ago since you've been deposed, but have you
11  testified in court before?
12  **A.   Yes.**
13  Q.   When was the last time you testified in
14  court?
15  **A.   About 10 years ago.**
16  Q.   Okay.  It was about 10 years ago as well.
17         Was it for a civil or criminal --
18  **A.   Civil.**
19  Q.   It was a civil matter, okay.
20         Was it the same matter in the State of
21  Washington?
22  **A.   Mm-hmm.**
23  Q.   Okay.
24  **A.   Yes.  Sorry.**
25  Q.   Yes.  What, if anything, did you do to

Page 9

1   prepare for your deposition here today?
2       A.   Met yesterday with our attorney for about
3   40, 45 minutes in his office last night.
4       Q.   Did you speak to anyone as it relates to
5   your deposition testimony here today?
6       A.   No, just those two in his office then.
7   Those two being Luis Vega and our attorney.
8       Q.   Did you review any documents in
9   preparation for your deposition?
10      A.   Yes, the same documents Mr. Vega did in
11  the Exhibit 1, I think, at his office as well.
12      Q.   Okay.  So to clarify, the same documents
13  Luis Vega viewed, which is marked as Exhibit 1 in
14  Luis Vega's deposition; is that correct?
15      A.   That is correct.
16      Q.   Have you ever been convicted of a felony?
17      A.   No.
18      Q.   Have you ever pressed charges against
19  anyone?  You personally, I will clarify.
20      A.   The civil matter was deemed -- the city
21  prosecutor, or attorney, pressed the charges.  I
22  don't think technically we pressed the charges.  We
23  were witnesses, my wife and I.
24      Q.   That was the matter that occurred
25  10 years ago; is that correct?

Page 10

1       A.   Spite fence.  Yeah.
2       Q.   The name of the matter is spite fence?
3       A.   Well, it was -- he cut down a fence, and
4   did stuff like that on our property.
5       Q.   Oh, okay.  So what role, if any, did you
6   have with the company called Integrated Systems
7   Improvement Services?
8       A.   What role do I have?
9       Q.   Yes.
10      A.   I'm the chairman and CEO.
11      Q.   And in 2015, were you also the chairman
12  and CEO of Integrated System Improvement Services?
13      A.   Yes.
14      Q.   From here on out through the deposition,
15  I'm going to abbreviate Integrated System
16  Improvement Services and refer to them as SIS --
17      A.   Please do.  Just don't call us ISIS.
18      Q.   Other than yourself, who else was a
19  member and/or officer of SIS?
20      A.   Myself and Luis Vega.
21      Q.   Were you and Luis Vega the only two
22  officers?
23      A.   No, we had one other one for a while, a
24  Charles Miracle, just like it sounds.  He was our
25  CFO.  So those were the only three officers.

Page 11

1       Q.   And Charles Miracle is no longer an
2   officer with the company?
3       A.   No.  He's taken another job.  He does a
4   little for us part-time, but we ramped it way down.
5       Q.   When did Mr. Miracle leave the company?
6       A.   He's still doing some part-time work, but
7   slowed down about a year ago.
8       Q.   So in or around 2015, Mr. Miracle was an
9   officer of the company?
10      A.   Yes.
11      Q.   In 2015, were you an officer of any other
12  companies?
13      A.   An officer, no.  No.
14      Q.   Were you a member of any limited
15  liability companies in or around 2015?
16      A.   No.
17      Q.   Were you a sole owner or private business
18  owner of any companies in or around 2015?
19      A.   No.
20      Q.   Presently, are you an officer of any
21  companies?
22      A.   Yes.
23      Q.   Which companies are those?
24      A.   Tigua, Inc., which is a Native American
25  tribe.  I'm CEO of that to help them through some

Page 12

1   issues.
2       Q.   And when was Tigua, Inc., formed?
3       A.   They've been -- I've only been involved
4   with them for less than a year.  They've -- I think
5   they're at least 10 years old.
6            Probably -- that's probably pretty
7   accurate.  Probably about 10 years old.
8       Q.   Who are the other officers of
9   Tigua, Inc.?
10      A.   They have a president, Chris Munoz,
11  M-U-N-O-Z.
12           Even though I'm the CEO, I'm a
13  consultant, so it isn't intended to be forever.
14      Q.   Are there any other officers of
15  Tigua, Inc.?
16      A.   I don't think so.
17      Q.   Are you an officer of any other company
18  other than Tigua, Inc., and SIS?
19      A.   No.  I hesitated only because I'm the --
20  I'm a co-chairman of a public company, but I'm not
21  an officer.  It's not a -- it's a non-executive
22  director.
23           So technically not an officer, but...
24      Q.   Okay.  Which company are you co-chairman
25  on?

3577ea0e-e3e3-4659-bb01-f8145cac45ab

Page 13

1     A.   It's stem -- International Stem
2  Cell, Inc.
3     Q.   Do you know which state Stem Cell, Inc.
4  is incorporated in?
5     A.   They're located in California. I'm not
6  sure they're incorporated there. It might be
7  Delaware. I'm not sure.
8     Q.   Are you a member of any limited liability
9  companies presently?
10    A.   No.
11    Q.   Are you private owner of any other
12 businesses currently?
13    A.   No.
14    Q.   How long have you been an officer with
15 SIS?
16    A.   Since its -- well, since we got involved
17 in it. I think it's about eight years.
18    Q.   So would be about 2011?
19    A.   That sounds close. I think it's 2010.
20 No, this is 19. Probably about then, '10 or '11, I
21 think.
22    Q.   Earlier this morning, you were able to be
23 present for Mr. Vega's deposition; is that correct?
24    A.   That is correct.
25    Q.   What was your opinion of the questions --

Page 14

1  or of the answers that Mr. Vega provided in regards
2  to this matter?
3     A.   My opinion? My opinion? Well, I think
4  Luis -- I've always known Luis to be truthful.
5  There's a lot of things he didn't remember, but as
6  far as I know, he was being truthful in his
7  responses.
8         There's some things that I might
9  recollect different than him, but -- when we get to
10 them, I guess, I don't know.
11    Q.   Which specific --
12    A.   I don't have specific things. I'm just
13 saying, when we get to them, I might have a
14 different answer than him because I might recollect
15 it different.
16    Q.   Is there anything that points out at you
17 right now that you recollect differently from
18 Mr. Vega at this time as it relates to his
19 deposition testimony --
20    A.   One thing --
21    Q.   Wait.
22         -- as it relates to his deposition
23 testimony this morning?
24    A.   Yes, one thing I'd probably expand on is
25 the NDAs. You asked about the NDAs, and the reality

Page 15

1  is that the -- in a corporate -- in our industry,
2  they're fairly standard. The reason that his
3  in-training contract supervisor could do a block
4  signature on those, or a signature, is that they
5  don't change. They're a pre-approved thing. If
6  there was a change, it would have to come back and
7  get my approval or Luis', but they're all the same.
8  It's very rare that one would be different, so it's
9  a pre-approved document. I don't know if that helps
10 you any or not.
11    Q.   Was there anything else that jumped out
12 at you from Mr. Vega's deposition?
13    A.   No.
14    Q.   Okay. And included in preparing for your
15 deposition testimony today, you referenced that you
16 did refer to the documents marked as Exhibit 1.
17    A.   Yes, I saw the same documents Mr. Vega
18 saw.
19    Q.   In those documents that Mr. Vega saw, you
20 agree those were SIS's response to Pro-Tect's
21 propounded discovery?
22    A.   Yes, I do.
23    Q.   Do you have anything to change it as it
24 relates to SIS's responses to Pro-Tect's propounded
25 discovery, from what you reviewed and from which is

Page 16

1  referenced in Exhibit 1?
2     A.   You'd have to be a little more specific
3  because I can't remember everything you guys talked
4  about and said this morning, but if I have any
5  interpretation that's different, I'll be glad to
6  answer the question for sure.
7     Q.   However, when those -- well, let's strike
8  that.
9         Who verified the responses to SIS's --
10 specifically, to SIS's responses to Pro-Tect's
11 propounded discovery as it relates to the
12 interrogatories?
13    A.   I think mostly me. Luis did some, but I
14 think Luis was out of the country for some on other
15 business, so I think that it was mostly me. Not
16 completely, but mostly.
17    Q.   So in verifying those responses, who
18 signed the verification form?
19    A.   I don't remember for sure, but I suspect
20 it was me.
21    Q.   Okay. When the verification was
22 signed -- strike that.
23         When the verification form was signed as
24 it relates to SIS's responses, do you recall what
25 you and/or Mr. Vega swore under oath?

3577ea0e-e3e3-4659-bb01-f8145cac45ab

Page 17

1    A.   I don't understand that one.
2    Q.   Okay.  So do you recall -- we may have to
3 take a break so I can get the verification form --
4    A.   Sure.
5    Q.   -- but do you recall that when those
6 responses, specifically as it relates to Pro-Tect's
7 interrogatories, were responded to SIS, that you,
8 specifically, signed under oath that those responses
9 were truthful and accurate to the best of your
10 knowledge?
11   A.   Yes.
12   Q.   And is there any reason why today that
13 would be a different representation that those
14 verifications are truthful?
15   A.   Not at all.
16   Q.   When SIS did respond to Pro-Tect's
17 propounded discovery, what, if any, kind of
18 investigation did SIS perform in order to ascertain
19 the truthfulness of its responses?
20   A.   I know that one of the requests for the
21 e-mails, so we had IT run up all of our e-mails that
22 related to them and sent those along to you guys, or
23 I think it was a different attorney, but we sent
24 them along.
25      The -- other than that, we just went to

Page 18

1 counsel and read through, I think, on the phone,
2 because I was in Seattle or somewhere else, and they
3 were here.
4      I think over the phone we went through
5 line item by line item of the responses.
6    Q.   And you specifically approved to the
7 contents and the accuracy of the responses --
8    A.   I believe so.
9    Q.   -- that SIS provided as it relates to
10 Pro-Tect's propounded discovery; is that correct?
11   A.   I believe so.  Although, I don't know
12 that I did all of them.  Luis might have done some
13 of them, but I suspect I did most of them.
14   Q.   Okay.  However, did you sign the
15 verification form as it relates to SIS providing
16 truthful and accurate responses?
17   A.   I don't remember, but I'm assuming I did.
18 If someone had to do it, it was probably me, but I
19 just don't remember that form.
20   Q.   Okay.  So what we'll do is we'll go back
21 to it once we take a break, and then we'll go from
22 there.
23      Do you recall at all if -- when you
24 signed the verification form related to SIS's
25 responses to Pro-Tect's propounded discovery?

Page 19

1    A.   No, because I think there was several
2 requests for discovery, and I think this has been
3 going on for months and months, if not a year or
4 two.  So I don't remember exactly when.
5    Q.   Okay.  So right now, let's just take a
6 two-minute break.  I'll be right back.  What I'm
7 going to do is print the verification form, which
8 was signed on behalf of SIS, and then what we could
9 do is proceed from there.
10      (Short break was taken.)
11   MS. GREEN:  Back on the record.
12 BY MS. GREEN:
13   Q.   Don, do you understand that you're under
14 the same oath that you took earlier this afternoon?
15   A.   I do.
16   Q.   Okay.  Great.
17      I'm going to mark this exhibit here in
18 this matter as Exhibit 1.  I'll have your attorney
19 review that.
20      (Wright Exhibit No. 1 was
21       marked for identification.)
22 BY MS. GREEN:
23   Q.   When you're finished reviewing it, Don,
24 please let me know.
25   A.   Okay.

Page 20

1    Q.   Do you recognize this document?
2    A.   I do.
3    Q.   Will you please let me know what you
4 believe this document to be?
5    A.   Signature.  The verification for the
6 interrogatory -- second set of interrogatories with
7 Pro-Tect securities.
8    Q.   And is that your signature here
9 indicating that you signed the verification form?
10   A.   It is.
11   Q.   And do you agree that when you signed
12 this verification form, you declared, under the
13 penalty of perjury, that the same, as it relates to
14 SIS's responses, is true to your own knowledge?
15   A.   I do.
16   Q.   Okay.  Is there any reason why this
17 representation made in this verification form would
18 differ from that -- at that time to today?
19   A.   Not to my knowledge.
20   Q.   And your attorney can just review this
21 very quickly as well.
22      And this here, we'll mark these both as
23 Exhibit 2.
24      (Wright Exhibit No. 2 was
25       marked for identification.)

Page 21

1   BY MS. GREEN:
2       Q.   Please let me know when you're finished.
3       A.   Okay.  Okay.
4       Q.   And on both of those documents marked as
5   Exhibit 2, that is your signature as well; is that
6   correct?
7       A.   That is correct.
8       Q.   And the verification indicates that as to
9   your own knowledge, those are accurately SIS's
10  responses to Pro-Tect's propounded discovery,
11  correct?
12      A.   Correct.
13      Q.   Do you have any reason, at this time, to
14  change your representations made in those signed
15  verifications at this time?
16      A.   No.
17      Q.   Okay.  And so in 2015, did you have an
18  understanding as to the services that Pro-Tect
19  provided?
20      A.   Yes.
21      Q.   What was your understanding of those
22  services?
23      A.   I came into it later, after the initial
24  negotiations were done with Gene and Luis and
25  Leslie, but my understanding was that Pro-Tect would

Page 22

1   provide services, guard services, some security,
2   some executive protection services, for
3   Jackie Robinson and the All Net company, and that we
4   were also supplying a number of other types of
5   services as well, and that the deal that we had was
6   that we would both -- we were both attempting to get
7   the business.  They wanted to be in the business,
8   and they asked about jumping on board with us, which
9   was fine with us, but the comment at the time was
10  that they would have to -- they would bear their
11  costs until we got a contract from Jackie, and we
12  would bear our costs, then we would keep track of
13  those costs on both sides with the intent of Jackie
14  paying us, Jackie being All Net, when his funds came
15  in.
16      Q.   And you indicated that you entered the
17  agreement later on; is that correct?
18      A.   Yeah, it wasn't in the initial
19  negotiations.  I met Leslie later after Luis.  Gene,
20  I barely had met.
21      Q.   What was the month and year that you
22  entered into the agreement?
23      A.   I am not sure.  I would guess it to be --
24  this is a guess.  Must have been towards the first
25  part of '15.  I think you referenced the agreements

Page 23

1   in there around a June date, so it would have had to
2   have been before that.  So my best guess, and it is
3   a guess, would be maybe six months before that.
4           So towards the front of the year.
5       Q.   However, you can estimate that you coming
6   into -- in regards to any agreement between Pro-Tect
7   and SIS occurred in 2015, correct?
8       A.   I believe so, to the best of my
9   knowledge.
10      Q.   Just a little background.
11          So you testified earlier that
12  Charles Miracle was an officer of the company
13  in 2015; is that correct?
14      A.   Mm-hmm.  Yes.
15      Q.   To your knowledge, does he have any
16  knowledge as it relates to any agreements between
17  Pro-Tect and SIS in Las Vegas?
18      A.   No, because he's never -- he's never been
19  in front of the customers.  He's never been out of
20  Seattle.  He's never been here.  Strictly accounting
21  stuff.
22      Q.   What was your understanding of the
23  All Net company?
24      A.   Well, they were building the -- the
25  intent was they were building an arena to attract an

Page 24

1   NBA basketball team, also two hotels and stores and
2   restaurants that went along with it.  It was
3   estimated to be a $3.2 billion project of which they
4   would have needed security all over the place.
5       Q.   What was the location of this complex
6   and/or buildings where they were supposed to be?
7       A.   It's down at the -- up at the north end
8   of the Strip, close to the SLS Hotel.
9           The property sits between Las Vegas
10  Boulevard and Paradise Boulevard, at that end of the
11  Strip.
12      Q.   What is your understanding, if anything,
13  how Jackie Robinson fits into the picture in regards
14  to All Net services?
15      A.   He's the majority owner and chairman.
16      Q.   Did you negotiate any agreement, as it
17  relates to Pro-Tect and SIS?
18      A.   With?  Did I negotiate any agreement?
19      Q.   Any agreements that occurred between --
20      A.   Between them, you mean?
21      Q.   Correct.
22      A.   No, I didn't do that negotiation.
23      Q.   Who were the people who negotiated it?
24      A.   That would have been Luis, from our end,
25  and whoever Leslie and Gene had at their end.

1    Q.   So you agree that Luis Vega has the most
2 knowledge as it relates to any agreements made
3 between Pro-Tect and SIS; is that correct?
4    **A.   The initial agreements, yes.**
5    Q.   What do you refer to as the "initial
6 agreements"?
7    **A.   When we -- when they discussed who was**
8 **going to do what, when they discussed where the work**
9 **would be done, when they discussed rates, things**
10 **like that.**
11    Q.   Were you a part of any of those
12 negotiations -- strike that.
13      Were you in attendance for any of those
14 negotiations between Pro-Tect and SIS from which you
15 referred to as "early agreements"?
16    **A.   No.**
17    Q.   So is it true that you're basing the
18 representation of what you state the "early
19 agreements" based on what Luis Vega told you?
20    **A.   That's what I'm basing on now is what**
21 **Luis Vega told me and subsequent events, like the**
22 **letter from her attorney and things like that.**
23    Q.   And which letters from her attorney?  Are
24 you speaking of the letters in 2017?
25    **A.   Boy, the dates on those.**

1      **There was another attorney before you, a**
2 **man, who sent us a couple of letters, or e-mails,**
3 **that I responded to, and I don't remember his name,**
4 **and then the first time I saw the contract was when**
5 **they sent it -- when you guys sent it to me.**
6      **The -- we didn't get -- how do I say**
7 **that?**
8      **The -- we had asked -- through my**
9 **attorneys, we had asked for six months to a year.**
10 **They kept saying that they had a signed contract.**
11 **We kept asking, Well, send us a copy of the signed**
12 **contract, and we finally got that about a year**
13 **later. That's the first time I had seen it.**
14      **I had not seen it on my end.**
15    Q.   Did you inquire from any officers and/or
16 employees of SIS whether or not there was a written
17 agreement in existence?
18    **A.   I did after I got that.**
19    Q.   So when did you receive the agreement --
20 the written agreement?
21    **A.   That would have been -- the attorneys**
22 **received it from her attorneys.**
23 **I don't recall the exact date. I just**
24 **know that we had asked three or four times, and it**
25 **was probably six months to a year that we finally**

1 got it, so...
2    Q.   Do you recall the year that you claimed,
3 for the first time, that you received the written
4 agreement?
5    **A.   Do I recall what?  Sorry.**
6    Q.   The year that you received the written
7 agreement.
8    **A.   No. I just don't remember it. Might be**
9 **'17 or '18. I'm not sure.**
10    Q.   Okay. However, you agree that the issue
11 in dispute are for services that were provided
12 between 2014 to 2016, correct?
13    **A.   Yes.**
14    Q.   And it's your testimony here today that
15 before 2017 or '18, you personally have not seen any
16 written agreements between Pro-Tect and SIS; is that
17 correct?
18    **A.   It's correct, and not unusual, because I**
19 **usually wouldn't see them until I had to approve**
20 **them in the end.**
21    Q.   What kind of inquiries did you make in
22 order to ascertain whether or not there was a
23 written agreement sent to Pro-Tect?
24    **A.   Once I got the agreement, I went to Luis**
25 **and asked him about the agreement, and he said, No,**

1 **we never signed a contract because the contract**
2 **wouldn't be signed until Jackie got his -- had**
3 **funding, and the other reason for that is we**
4 **wouldn't know what the total scope of the security**
5 **services would be, to base a contract on, until he**
6 **got his funding and told us what he wanted.**
7    Q.   However, before receiving the contract in
8 2017 or '18, just as you testified to, you didn't
9 ask Luis Vega before that time whether or not
10 Pro-Tect sent a written agreement to or -- strike
11 that.
12      Before you received, as you testified, a
13 contract in '17 or '18, you didn't inquire from Luis
14 Vega whether or not SIS sent a written document
15 titled, "The subcontract agreement" to Pro-Tect; is
16 that correct?
17    **A.   That is correct.**
18    Q.   However, in the responses to SIS, that
19 SIS provided in their interrogatories, it was
20 represented differently that there was no contract
21 to be -- written contract that relates to the
22 services Pro-Tect provided to SIS; is that correct?
23      MR. BLAYLOCK:  Object to the form of the
24 question.
25      THE WITNESS:  I still -- at that point, I

Page 29

1  didn't believe there was a contract.
2  BY MS. GREEN:
3    Q.  Okay.
4    A.  And I still have questions about it.
5    Q.  And you indicated, too, that upon a
6  reasonable investigation, that there was no written
7  contract?
8    A.  Right.  On our end, there was no written
9  contract.
10   Q.  So other than asking Luis Vega about the
11 written contract when Pro-Tect -- or when SIS
12 received the contract in 2017 or '18, what other
13 investigative steps did SIS perform in order to
14 respond to Pro-Tect's interrogatory questions that
15 relate to the subcontract agreement?
16   A.  We asked more questions.  Actually, they
17 were more external.  We asked -- I had asked Luis
18 and -- I'm trying to think of who was there.  The --
19 basically, we were just looking, because we all had
20 the same understanding, that we never -- we
21 understand they were doing some work, but the work
22 was them.  We weren't directing the work.  We
23 weren't asking them what to do.  They were talking
24 to all of that.  So we were doing what we were doing
25 directly, and they were doing what they were doing

Page 30

1  directly.
2        What was your question again?  I think
3  I'm --
4    Q.  What investigative steps, other than
5  talking to Luis Vega in 2017 or '18, did SIS perform
6  in order to respond to Pro-Tect's propounded
7  discovery, which specifically requested what the
8  subcontract agreement entailed?
9    A.  I think all is we did is look at the --
10 look at the contract agreement that you sent us --
11 they sent us, and we determined, again, that we had
12 real questions and issues about that because we
13 didn't get a copy internally of what Gage allegedly
14 sent to them.
15        We also don't use a block signature.  We
16 also -- on all of our contracts, only the officers
17 can commit the company to contracts with customers
18 when there's money involved, particularly, and the
19 dates were strange in that -- I'm trying to
20 remember.  I think she signed it before Garylene --
21 supposedly Garylene sent it to her.  I had never
22 seen the block signature that she did again, and I
23 don't understand why she would use a block
24 signature.
25        A, she wasn't authorized to sign that

Page 31

1  agreement, and as -- as Leslie does.  I mean, she
2  signs as the president of her company.  We would
3  generally sign as president or CEO of our company.
4  So I don't know -- I'm still perplexed by that
5  document.
6    Q.  Okay.  So to answer -- ask the question
7  again because I will move to strike as
8  nonresponsive.
9        What else, other than speaking to Luis
10 Vega in 2017 or '18, did SIS do to investigate
11 whether or not a subcontract agreement, or any other
12 document, existed when it responded to Pro-Tect's
13 propounded discovery?
14      MR. BLAYLOCK:  Object as asked and
15 answered because I do think he did answer it.
16      MS. GREEN:  Okay.
17      MR. BLAYLOCK:  Go ahead.
18      THE WITNESS:  I was going to say, I
19 answered it, as well, and I looked at it.
20 BY MS. GREEN:
21   Q.  You just looked at the contract --
22   A.  Yes.
23   Q.  -- that Pro-Tect --
24   A.  The documents --
25   Q.  You just looked at the document that

Page 32

1  Pro-Tect provided more recently, in 2017 and '18,
2  that related to it, but other than that, SIS didn't
3  perform any other investigative services, other than
4  speaking to Luis Vega about the document; is that
5  correct?
6    A.  I think you asked me, and I didn't
7  perform any other services, or any other
8  investigation.
9    Q.  Okay.  And, however, you also were the
10 one who signed the verification on behalf of SIS?
11   A.  I'm not aware of any others.
12   Q.  Okay.  You were the one who signed the
13 verification form --
14   A.  Yes.
15   Q.  -- in regards to SIS providing
16 responses --
17   A.  Yes.
18   Q.  -- to Pro-Tect's propounded discovery; is
19 that correct?
20   A.  That is correct.
21   Q.  So I wanted to also clarify, as well, is
22 that other than seeing the document that's titled
23 "The subcontract agreement," you did not -- you
24 never saw this document before, at the time that
25 Pro-Tect provided it to us in litigation; is that

3577ea0e-e3e3-4659-bb01-f8145cac45ab

Page 33

1 correct?
2 A. That's correct.
3 Q. You never reviewed it in an attachment;
4 is that correct?
5 A. That is correct.
6 Q. And nobody ever sent you correspondence
7 in a document entitled, "The subcontract agreement";
8 is that correct?
9 A. I don't believe so. If they did, I don't
10 recall it.
11 Q. Did you make an inquiry in regards to
12 ascertaining whether or not you were copied on any
13 e-mails that relate to a document titled, "The
14 subcontract agreement"?
15 A. No.
16 Q. Okay. Why didn't you, on behalf of SIS,
17 make any inquiry in regards to looking at the
18 e-mails that relate to whether or not you personally
19 received any correspondence that relates to a
20 document titled, "The subcontract agreement"?
21 A. I'm running a company. I get 250 e-mails
22 a day. So I asked Luis, who I trust, if there was
23 anything else.
24 Q. And what was Luis' response?
25 A. No, there wasn't anything else.

Page 34

1 Q. However, does the representations made
2 stating that there's nothing else differ today?
3 A. Differ from?
4 Q. Differ from what was made in your
5 representations to SIS's responses to Pro-Tect's
6 propounded discovery?
7 A. I don't believe so.
8 Q. Okay. I do want to have you take a look
9 here at the responses that SIS provided to Pro-Tect.
10 Once your attorney's finished reviewing that, you
11 can pass that to him because I am starting to run
12 out of copies.
13 (Wright Exhibit No. 3 was
14 marked for identification.)
15 BY MS. GREEN:
16 Q. Please let me know, Don, when you're
17 finished reviewing it.
18 A. Okay.
19 Q. Do you recognize this document?
20 A. Yes, vaguely.
21 Q. Can you please identify what this
22 document is?
23 A. It looks like the request for discovery
24 in the lawsuit.
25 Q. You personally, on behalf of SIS,

Page 35

1 verified these responses; is that correct?
2 A. Yes.
3 Q. And one of the responses that SIS
4 provided to -- as it relates to one of the
5 interrogatories, indicates that a, quote/unquote,
6 oral agreement was performed in or around
7 May of 2015; is that correct?
8 A. You said -- the date again? You said --
9 Q. In May of 2015; is that correct?
10 A. I'm sorry, I'm looking for the date on
11 here. This says 13th of November, and 14th.
12 Q. I want to refer you, then, to,
13 specifically, SIS's answer to Interrogatory No. 21,
14 and let me know when you get there.
15 A. Okay.
16 Q. If you can just review that response, and
17 let me know when you're finished.
18 A. Okay.
19 Q. Do you agree that Pro-Tect requested SIS
20 to describe the oral agreement that SIS referred to
21 in one of its responses to Pro-Tect's
22 interrogatories?
23 A. Yes.
24 Q. Okay. And do you agree that SIS
25 responded that the only oral agreement that was

Page 36

1 formed was in May of 2015?
2 A. Yes.
3 Q. And do you agree that SIS also responded
4 that it was only Luis Vega and Leslie Bruno that
5 formed the oral agreement; is that correct?
6 A. I thought it mentioned Gene as well, Gene
7 Tosti, in the last line, Item 10.
8 Q. Can you please refer -- indicate where
9 Gene Tosti was on --
10 A. Page 4, about halfway down.
11 Q. So those are individuals who have
12 knowledge of the agreement; however, I asked the
13 only two people that formed the oral agreement was
14 supposedly Luis Vega and Leslie Bruno; is that
15 correct?
16 A. I don't know.
17 Q. Okay.
18 A. I don't know if Gene was involved or not.
19 Q. However, you did verify that unless the
20 response was based upon knowledge or belief, that
21 these responses were to the best of SIS's knowledge;
22 is that correct?
23 A. That is correct.
24 Q. However, do you agree that Mr. Vega's
25 testimony differed today in regards to any supposed

1 oral agreements being made as it relates to
2 contracts between Pro-Tect and SIS?
3    **A. It differed how?**
4    Q. I said, do you agree that his testimony
5 today differed in regards to SIS's response, as it
6 was to the oral agreements, and to what he testified
7 to today?
8    **A. No, I think you'd have to be more**
9 **specific. I think he said that there was -- that he**
10 **negotiated with them.**
11    Q. With whom?
12    **A. With Leslie and with Gene.**
13    Q. Okay. However, it only indicated May
14 of 2015 as the date; is that correct?
15    **A. You've lost me somewhere, so go -- the**
16 **date thing, I'm not sure what you're asking me.**
17    Q. The only time that an oral agreement was
18 made, as indicated in SIS's responses, was in May
19 of 2015. Is that a correct representation that SIS
20 responded to in Pro-Tect's interrogatories?
21    **A. I think that's correct, but I think it**
22 **was reaffirmed several times after that.**
23    Q. However, during Mr. Vega's deposition, he
24 testified that, actually, other agreements were made
25 before that time supposedly; is that correct?

1    **A. I'm not sure what other agreements, so...**
2    Q. So you don't -- you're lacking knowledge;
3 is that correct?
4    **A. That is correct.**
5    Q. However, you were in the room during
6 Mr. Vega's deposition testimony, which occurred
7 hours earlier today; is that correct?
8    **A. Right. That is correct.**
9    Q. Also, to refer you to --
10    **A. Done with this?**
11    Q. Yes, you can give that to the court
12 reporter, as well.
13    However, your testimony today, you
14 indicated that the only person who would have had
15 direct knowledge, as it relates to any agreements
16 that were formed, would be Mr. Vega and Leslie
17 Bruno; is that correct?
18    **A. Yes. Of the initial agreement, yes.**
19    Q. Were there any other subsequent
20 agreements that were made that you have knowledge
21 of?
22    **A. I don't have knowledge of additional**
23 **ones, only the reaffirmation of the original one.**
24    Q. And the reaffirmation of the original one
25 occurred at which time?

1    **A. I met Leslie, I think, twice, at the**
2 **Westin Hotel lobby. When I was in town, she came**
3 **over and talked with us, and we discussed that. I**
4 **think in all of our relationship, I think I've met**
5 **her twice, maybe three times, and I've talked to her**
6 **on the phone maybe twice.**
7    Q. Okay. And what consisted of those
8 conversations with Leslie?
9    **A. Mostly talking about Jackie, and is the**
10 **funding coming, what are we doing. I also said,**
11 **several times, I'm uncertain about the funding**
12 **because Jackie told us so many times that it was**
13 **here and coming, and it hadn't happened, that we --**
14 **both of us needed to be careful and maybe pull back.**
15    Q. And when was the first time that you told
16 Leslie Bruno that she needed to pull back?
17    **A. I think in the second meeting, and then I**
18 **think we discussed it on the phone a little bit. I**
19 **think that's right.**
20    Q. What was the date of the second meeting?
21    **A. I would think it would have been**
22 **somewhere between June and November of that**
23 **year, 2015.**
24    Q. By the time that meeting occurred in June
25 of 2015, did Pro-Tect already provide services?

1    **A. Yes.**
2    Q. So the first time that Pro-Tect was
3 informed that it needs to, quote/unquote, pull back,
4 it had already performed services? Do you agree?
5    **A. It had performed some services, yes.**
6    Q. And so the oral agreement that SIS
7 contends occurred, about how long was that oral
8 agreement supposed to last?
9    **A. Until we either got the contract from**
10 **Jackie, until Jackie got his funding and wrote us a**
11 **contract, or he didn't, and it was totally dead.**
12    Q. Okay. When was Jackie supposedly
13 supposed to receive the funding?
14    **A. About a dozen times between then and now.**
15    Q. Okay. For this, quote/unquote, oral
16 agreement, it was agreed that Pro-Tect was supposed
17 to provide services on behalf of SIS?
18    **A. No.**
19    Q. Okay. However, you do agree that you
20 still -- strike that.
21    SIS is still standing behind the
22 responses that it provided in its interrogatories,
23 which indicate the oral agreement was supposedly
24 formed in May of 2015; is that correct?
25    **A. To the best of my knowledge.**

3577ea0e-e3e3-4659-bb01-f8145cac45ab

Page 41

1    Q.   Okay.  Did SIS ever execute a contract
2  with All Net?
3    A.   No.
4    Q.   Okay.  Did SIS ever form an agreement
5  with All Net?
6    A.   We had a loose agreement that --
7  basically, that we would be the sole security group
8  if he got his funding.  I don't remember all the
9  details and the exact wording, but I think it was --
10  I don't remember if it was one page or an e-mail,
11  what it was, but it was something to the effect that
12  we would be the exclusive provider of security
13  services if and when he got his funding.
14    Q.   And this agreement was memorialized in
15  writing?
16    A.   I think so, but I haven't seen it lately.
17  I'm not sure.
18    Q.   So other than what you described, are
19  there any other agreements that All Net reached with
20  SIS?
21    A.   No.
22    Q.   Did you personally sign any documents
23  that relate to SIS providing services for All Net?
24    A.   No.
25    Q.   To your knowledge, did any officer of

Page 42

1  All Net sign any documents that relate to an
2  agreement formed with SIS?
3    A.   No.
4    Q.   To your knowledge, did Pro-Tect ever sign
5  any documents that relate to an agreement between
6  All Net and Pro-Tect?
7    A.   Not to my knowledge.
8    Q.   And how long was the agreement between
9  SIS and All Net supposed to last?
10    A.   I don't -- I think you asked that.  I
11  don't think it --
12    Q.   No, so I do want to clarify.  The
13  question I asked is how long the agreement between
14  Pro-Tect and SIS.
15       So I do want to make sure we have the
16  right testimony.
17    A.   I agree.
18    Q.   Do you recall how long the contract --
19  we're going to backtrack.
20       Do you recall how long the contract
21  between SIS and Pro-Tect was supposed to last?
22    A.   I don't believe there was a date on it.
23  I think our understanding was that it would last
24  until he got his funding and we got a contract or we
25  knew that it was dead.

Page 43

1    Q.   Okay.  And how long was the agreement
2  between All Net and SIS supposed to last?
3    A.   There was no agreement other -- it was
4  more a statement of where we were going than an
5  agreement.
6    Q.   Okay.  And you said that you were not
7  sure if this agreement was reduced to writing; is
8  that correct?
9    A.   That's correct.
10    Q.   What inquiry did SIS perform in order to
11  ascertain whether or not this agreement between
12  All Net and SIS was reduced to writing?
13    A.   We asked Luis and his people to pull any
14  documents related to them and any e-mails related to
15  them.
16    Q.   Do you recall whether or not any
17  documents were pulled?
18    A.   I don't.  I don't recall.
19    Q.   I want to introduce this exhibit as our
20  next one.  Your attorney can review it, and then
21  when he's finished, I'll review it -- I mean, just
22  let me know.  Excuse me.
23    A.   Okay.
24         (Wright Exhibit No. 4 was
25          marked for identification.)

Page 44

1  BY MS. GREEN:
2    Q.   What I want to refer you to, because it's
3  quite a long document, is SIS's responses to
4  Requests for Production No. 59 and 60.
5    A.   Okay.
6    Q.   Okay.  In this request, do you agree that
7  Pro-Tect requested any agreements or contracts
8  between SIS and All Net entered between
9  January 1st, 2014, to the present?
10    A.   Yes, All Net and Dribble Dunk, it says.
11    Q.   I'm looking at Request No. 59.
12    A.   Oh, 59, yes, All Net.
13    Q.   What was Pro-Tect -- or SIS's response?
14    A.   That we have none, I think.  Let me look
15  back.  It says, Refer to 58.  Yes.
16    Q.   So I'll ask again because I know you said
17  you had to refer.  What was SIS's response in
18  regards to that specific --
19    A.   That we had none.  Are you done with
20  this?
21    Q.   You can keep it for now, but we will give
22  it to the court reporter when she is finished.
23         However, do you agree that there is a
24  document, specifically, that's here -- I'll give it
25  to your attorney here -- from which we're going to

Page 45

1 mark as our next exhibit, that provides that SIS had
2 an agreement with All Net?
3     **A.   This is the document I was referring to,**
4 **correct.**
5     Q.   Okay.  However in the responses, SIS
6 claims, specifically as it relates to Request for
7 No. 59 and Request for No. 60, that it had no such
8 document?
9     **A.   We could not find this document.**
10     Q.   Okay.  What, if any, kind of
11 investigation did SIS perform in order to ascertain
12 whether or not there was any agreements and/or
13 written contracts between All Net, Dribble Dunk, and
14 SIS?
15     **A.   What I did was ask Luis and the people in**
16 **his department to pull any documents related to**
17 **All Net and Pro-Tect, et al., and any e-mails, and**
18 **this one didn't appear at that time.**
19     Q.   So do you agree that this response
20 provided by SIS is accurate as it relates to
21 requesting any agreements or contracts between
22 All Net, Dribble Dunk, and SIS?
23     **A.   No, now that we have this one, it should**
24 **be modified to include this document.**
25     Q.   Okay.  However, at this time, the

Page 46

1 response is not modified; is that correct?
2     **A.   That is correct.**
3     Q.   Okay.  So --
4     **A.   But it was accurate in the sense that we**
5 **didn't have it at the time.**
6     Q.   However, you testified earlier that
7 you -- that SIS stood by the responses that it
8 provided to Pro-Tect as it relates to the propounded
9 discovery; is that correct?
10     **A.   That is correct.**
11     Q.   Okay.  However, at this time, that is not
12 true; is that correct?
13     **A.   Yes, because now I see this document.**
14     Q.   Okay.
15          (Wright Exhibit No. 5 was
16          marked for identification.)
17 BY MS. GREEN:
18     Q.   Looking back at the document, you do
19 agree that the contract, or the written agreement
20 provided by All Net, was dated July 1st, 2015; is
21 that correct?
22     **A.   Yes.**
23     Q.   Okay.  And do you agree that the same
24 written agreement indicates that All Net Development
25 has engaged ISIS Global Holdings as its exclusive

Page 47

1 provider of security services and security
2 management services; is that correct?
3     **A.   Yes.**
4     Q.   And then also this agreement indicates
5 here, inn addition, Mr. Wright and/or his designee,
6 Mr. Luis Vega and SIS, will provide executive
7 security to Mr. Robinson and his executive staff, as
8 required, and report directly to Mr. Robinson on all
9 matters regarding security; is that correct?
10     **A.   Correct.**
11     Q.   Do you agree that, in this agreement,
12 there is nothing indicating whether or not SIS
13 agreed to provide security services if All Net was
14 funded?
15     **A.   It was -- not exactly.**
16     Q.   So you agree that there is no
17 contingency --
18     **A.   Well, the contingency is that a more**
19 **extensive detailed agreement will be created and**
20 **signed within 60 days of this --**
21     Q.   However, there's no explicit contingency
22 provision that's included in this agreement; is that
23 correct?
24     **A.   I'm sorry, explicit to do what?**
25     Q.   Contingency provision that is included in

Page 48

1 this agreement; is that correct?
2     **A.   No.  That's correct.**
3     Q.   And this agreement is the only agreement
4 that SIS has at this time that relates to All Net,
5 SIS, and/or Dribble Dunk; is that correct?
6     **A.   That is correct.**
7     Q.   And just to provide some background
8 information in regards to the deposition, do you
9 have an understanding what the company Dribble Dunk
10 is?
11     **A.   Yes.**
12     Q.   What is Dribble Dunk?  Are you an officer
13 of Dribble Dunk, or do you know who is -- who are
14 the officers of Dribble Dunk?
15          MR. BLAYLOCK:  Objection; compound.
16          MS. GREEN:  That's fine.
17          THE WITNESS:  Can I answer?
18 BY MS. GREEN:
19     Q.   You can answer.
20     **A.   My understanding is that Dribble Dunk is**
21 **the holding company for All Net, and that Jackie**
22 **asked me to be the treasurer when they got funded,**
23 **and I've never signed any documents or done anything**
24 **as the treasurer.**
25     Q.   Okay.  So you can hand the exhibit back

3577ea0e-e3e3-4659-bb01-f8145cac45ab

1  to her.
2      A.   I'm sorry?
3      Q.   Hand the exhibit back to her.
4           And you testified earlier that, to SIS's
5  knowledge, it never signed any written contract with
6  Pro-Tect; is that correct?
7      A.   Correct.
8      Q.   Okay.  And you -- did Garylene have you
9  work for SIS in or around July of 2015?
10     A.   I believe so.
11     Q.   What are you basing your belief on?
12     A.   When -- on the signature on the document
13  that you sent us, I know she was terminated, I
14  think, not long after that.
15     Q.   Did you personally work with
16  Garylene Javier when she was working for SIS in or
17  around July of 2015?
18     A.   No, other than to say hi to her when I
19  came to the office in Washington, D.C.
20     Q.   What was your understanding of Garylene
21  Javier's title with the company?
22     A.   Well, I think the title I had on her was
23  contract administrator.  She was trying to become a
24  contract administrator, so she had came there to
25  work under Luis's tutelage to understand contract

1  management, and she was also trying to become an
2  attorney, so one of the issues we had is she missed
3  a terrible amount of time due to her other
4  endeavors.
5      Q.   So Garylene Javier no longer works for
6  your company; is that correct?
7      A.   That is correct.
8      Q.   When was the last -- strike that.
9           When was the last month and year that she
10  worked for your company?
11     A.   I do not know, but I suspect it's been
12  several years, two to three years ago.
13     Q.   Did she sign contracts on the company's
14  behalf?
15     A.   No.
16     Q.   However, as indicated during Luis Vega's
17  deposition, you agree she did sign at least a
18  nondisclosure agreement on the company's behalf; is
19  that true?
20     A.   Right.  That is correct.  We didn't
21  consider it a contract.
22     Q.   Why don't you consider a nondisclosure
23  agreement a contract?
24     A.   Because it was -- it's consistent in the
25  industry; ours were exactly the same.  So even if it

1  was, it was a pre-approved one, so she didn't --
2  there was no negotiation done by her, or anyone, on
3  it.  It was accepted as-is.
4           So the reason she was allowed to send
5  that out is she didn't have to do anything but
6  follow Luis's instructions to send it out.
7      Q.   Okay.  So I'm going to ask again.
8           Move to strike as nonresponsive.
9           Why does SIS not believe the NDA is a
10  contract?
11          MR. BLAYLOCK:  Object to -- sorry.  It's
12  asked and answered.
13          Go ahead.
14  BY MS. GREEN:
15     Q.   You can answer.
16     A.   Let me rephrase that.
17          We don't believe it's the same as what
18  you're referring to as the contract with a customer.
19  We believe that a nondisclosure agreement is so
20  standard in the industry, that we don't view it as
21  something that's negotiated as a contract.  You
22  could say it's a contract because it has terms, but
23  it's not anywhere close to the same as a contract
24  with a customer which involves money.
25     Q.   However, you do agree that an NDA has

1  terms from which both parties must abide by; is that
2  correct?
3      A.   Mm-hmm.  I do.
4      Q.   And was it ever communicated -- well, and
5  you do agree, based off of Luis Vega's deposition,
6  that Garylene Javier did sign a nondisclosure
7  agreement as it relates to Pro-Tect and SIS; is that
8  correct?
9      A.   I didn't see that when you were passing
10  it around, but I assume that to be true.
11     Q.   Okay.  And at that time, was it -- and to
12  SIS's knowledge, was it communicated to Pro-Tect
13  that it could not rely upon Garylene Javier's
14  signature on any other documents, other than the
15  NDA?
16     A.   I have no knowledge of that.
17     Q.   Do you know who would have the most
18  knowledge in regards to that?
19     A.   It would be Luis I think.
20     Q.   So Luis did testify earlier that that was
21  not communicated.
22     A.   Okay.
23     Q.   So would that be a correct
24  representation?
25     A.   I think.  I believe Luis.

1    Q.   Okay.  Did Garylene Javier change any
2  terms to contracts between SIS and third parties on
3  the company's behalf?
4    **A.   Only if she was told — I'm making the**
5  **assumption, and I believe it to be true, that she**
6  **would only do that if she was told to do that by**
7  **Luis or myself.  Certainly we would have to approve**
8  **any changes, and that would generally be Luis,**
9  **unless he was unavailable, then it would be me.**
10   Q.   Okay.  So the answer to the question in
11  regards to whether or not she changed -- she did
12  change terms to contracts between SIS and third
13  parties is yes; is that correct?
14   **A.   Yes, if they were approved.**
15   Q.   Was it communicated to any third parties
16  that Garylene Javier's signature was not -- did not
17  bind the company unless it was specifically approved
18  from either you or Mr. Vega?
19   **A.   Not to my knowledge.**
20   Q.   Okay.  I'm going to mark this here as the
21  next exhibit.  I'm running out of exhibits, so,
22  Mr. Blaylock, if you can review that first and give
23  that to your client.
24   **A.   Am I still holding this one or should I**
25  **give it to her?**

1    Q.   You can give it to her.
2        (Wright Exhibit No. 6 was
3        marked for identification.)
4  BY MS. GREEN:
5    Q.   If you can review that e-mail?
6    **A.   This one?**
7    Q.   To be clear, it's the one -- it's the one
8  Bates numbered on the bottom right as Pro-Tect 209.
9    **A.   Okay.**
10   Q.   Are you finished reviewing it?
11   **A.   Yes.**
12   Q.   Okay.  So do you know what contents that
13  specific page entails?
14   **A.   Well, it's an e-mail from Leslie to**
15  **Garylene copied to me and Luis.  I don't remember**
16  **seeing it, but I'm sure it was sent if it's on here.**
17   Q.   However, you just testified that you
18  don't remember the contents of that e-mail; is that
19  correct?
20   **A.   That is correct.**
21   Q.   And if you could just read for the record
22  what exactly that e-mail states?
23   **A.   Yippee, here is the contract.  Please**
24  **forward executed copy to my attention.**
25   Q.   And that e-mail is from Leslie; is that

1  correct?
2    **A.   Yes.**
3    Q.   Who did Leslie send that e-mail to?
4    **A.   Garylene, with a copy to me and Luis.**
5    Q.   Okay.  And do you recall the contract
6  she's referring to in regards to her executing the
7  copy at that time?
8    **A.   I assume it's the same contract we got**
9  **from you that we've been talking about.**
10   Q.   However, you testified earlier, in SIS
11  providing its responses, that you had no knowledge
12  of such contract?
13   **A.   And I still do have no knowledge of that**
14  **contract until I got it from you guys.**
15   Q.   If you can, also please state what the
16  date of that e-mail indicates?
17   **A.   July 8th, 2015.**
18   Q.   However, you do agree that Leslie did
19  send a copy, from which she signed on July 8th of
20  2015, of the subcontract agreement; is that correct?
21   **A.   It's not as an attachment here.**
22   Q.   Okay.
23   **A.   Is that what you did?**
24   Q.   Are you disputing that a subcontract
25  agreement was sent?

1    **A.   No, I'm not disputing.  It's not here.**
2    Q.   You're stating that you have no
3  independent knowledge, other than any documents
4  provided from Pro-Tect, as it relates to a
5  subcontract --
6    **A.   That is correct.**
7    Q.   -- getting executed; is that correct?
8    **A.   That is correct.**
9    Q.   That is true, even though this particular
10  e-mail from 2015 was copied and sent to you --
11   **A.   Yes.**
12   Q.   -- is that correct?
13   **A.   That is also correct.**
14   Q.   And July 5th of 2015, do you agree that
15  that is four days after All Net provided SIS the
16  contract that indicates that SIS is All Net's
17  exclusive provider for security services?
18   **A.   Yes, with the exception that it's not a**
19  **contract.**
20   Q.   Well -- or it's an agreement, as you
21  stated?
22   **A.   Yes.**
23   Q.   And then four days later, Pro-Tect
24  provided SIS a copy of the subcontract agreement.
25      Do you agree?

1    A.   **That's what the dates look like.**
2    Q.   Okay.  Is there any reason that you
3  disputed that representation, that Pro-Tect --
4    A.   **No.**
5    Q.   -- provided SIS a copy of the signed
6  subcontract agreement four days after All Net
7  provided SIS with the agreement?
8    A.   **No.**
9    Q.   Did you have knowledge, as to when
10  Pro-Tect did send notice, that it was providing
11  it -- providing SIS with the executed subcontract
12  agreement, what was SIS's response to that?
13    A.   **I'm sorry, could you say that again?**
14    Q.   Okay.  What was SIS's response to
15  Pro-Tect providing SIS with the signed contract, as
16  provided in the July 5th e-mail?
17    A.   **I don't know.**
18    Q.   Okay.  And I just want to clarify, you
19  have no reason to dispute that the contract, from
20  which Pro-Tect indicated that it executed in the
21  e-mail provided, was the subcontract that we are
22  referring to, and from which is Bates numbered
23  Pro-Tect 1 through 17; is that correct?
24    A.   **Yes.**
25    Q.   I'm going to provide you with a copy of

1  the subcontract agreement.  It's the same, but he
2  can -- Mr. Blaylock can make sure to review that.
3        We're going to mark that as our next
4  exhibit.
5    A.   **Okay.**
6        **(Wright Exhibit No. 7 was**
7        **marked for identification.)**
8  BY MS. GREEN:
9    Q.   There's no reason for you, or SIS, to
10  dispute that a subcontract signed by Pro-Tect was
11  sent to SIS in 2015?  You didn't receive or have
12  notice of this document until litigation commenced;
13  is that correct?
14    A.   **Right.  I had no personal knowledge of**
15  **it.**
16    Q.   Okay.  Do you agree that the subcontract
17  agreement, which is Bates numbered 1 through 17, is
18  on SIS letterhead?
19    A.   **Yes.**
20    Q.   Do you agree that the contents and the
21  terms that are contained in the subcontract
22  agreement do not contain a contingency provision?
23    A.   **Do we -- I didn't negotiate it, so...**
24    Q.   So you can review the agreement if you
25  need to review it again.  Please, just let me know

1  when you're finished reviewing it.
2    A.   **Okay.**
3    Q.   So after reviewing the subcontract
4  agreement, you agree that there is no contingency
5  provision in that subcontract agreement; is that
6  correct?
7    A.   **By contingency, you mean?**
8    Q.   There's no contingency agreement that
9  relates to Pro-Tect being paid only if All Net was
10  funded; is that correct?
11    A.   **That is correct.**
12    Q.   Okay.  Rather, the subcontract agreement
13  explicitly states that SIS would pay Pro-Tect for
14  the securities services it provided on behalf of
15  All Net; is that correct?
16    A.   **Yes.**
17    Q.   I'm going to mark this here as our next
18  exhibit as well.  Your attorney can review that.
19  When he's finished reviewing it, I ask that you
20  review specifically -- well, what I'll state for the
21  record is these are SIS's responses to Pro-Tect's
22  second set of requests for admission.  I would like
23  you to refer to SIS's Response No. 67 and 68, as it
24  relates to Pro-Tect's requests for admission.
25

1        (Wright Exhibit No. 8 was
2        marked for identification.)
3        THE WITNESS:  Okay.
4  BY MS. GREEN:
5    Q.   Do you agree that Pro-Tect specifically
6  requested SIS to admit that the subcontract
7  agreement was the correct agreement which was
8  executed by Garylene Javier?
9    A.   **Yes.**
10    Q.   And do you agree that SIS's response was
11  that SIS's officers were unaware of the document
12  titled, "Subcontract agreement"?
13    A.   **Yes.**
14    Q.   And do you agree that the officers of SIS
15  also include Luis Vega?
16    A.   **Yes.**
17    Q.   Okay.  So based off of the testimony of
18  Luis Vega and the documents provided today, does --
19  do you -- SIS's preparations regarding knowledge of
20  a subcontract agreement changed from its responses
21  that it provided to Pro-Tect in its -- in Pro-Tect's
22  third set of requests for admission?
23    A.   **It changes in the sense that Luis said**
24  **there was a document, after he saw, which she**
25  **presented today.**

3577ea0e-e3e3-4659-bb01-f8145cac45ab

1    Q.    And then it also -- however, even though
2    the response has changed, SIS did represent, in its
3    responses to Pro-Tect's third set of requests for
4    admission, that it made a reasonable inquiry before
5    claiming that it was unaware of the subcontract
6    agreement; is that correct?
7    **A.    That is correct.**
8    Q.    And you testified earlier the reasonable
9    inquiry included just asking Mr. Vega for any
10   documents?
11   **A.    Yeah, and some of his staff, yeah.**
12   Q.    However, you do admit that you were
13   personally copied on an e-mail from which Pro-Tect,
14   signed through Leslie Bruno, provided SIS with an
15   executed copy of this subcontract agreement; is that
16   right?
17   **A.    Yes.**
18   Q.    So do you agree that Pro-Tect did provide
19   services to All Net?
20   **A.    Yes, we've always -- yes, they did**
21   **provide services to All Net.**
22   Q.    Do you agree that Pro-Tect provided
23   services on behalf of SIS to All Net?
24   **A.    No.**
25   Q.    Okay.  And why -- what do you base your

1    contention upon after reviewing the subcontract
2    agreement?
3    **A.    Because the oral agreement we have is the**
4    **subcontract agreement would not take force, and it**
5    **would have to be modified after Jackie got his**
6    **funding and told us what services he wanted.**
7    Q.    Even if that were true, however, the
8    subcontract agreement was signed and sent by Leslie
9    to SIS on or around July of 2015; is that correct?
10   **A.    That's what it says.  I'm suspicious of**
11   **it.**
12   Q.    What makes you suspicious of the
13   document?
14   **A.    Because the dates are different dates,**
15   **and we've never signed a document in that way, and**
16   **she wouldn't have been authorized to sign it on**
17   **behalf of the company.**
18   Q.    However you testified earlier that you do
19   not refute that Leslie Bruno sent you, Mr. Vega, and
20   Garylene Javier --
21   **A.    I don't.**
22   Q.    -- the subcontract agreement that was
23   signed by her; isn't that correct?
24   **A.    I don't refute that you showed me an**
25   **e-mail that says that she sent me a copy of it.**

1    Q.    Okay.  And I said did you refute --
2    **A.    I didn't refute she sent an e-mail.**
3    Q.    And you did not refute -- strike that.
4          You testified earlier that you did not
5    refute that the attachment that she sent in that
6    e-mail was the subcontract agreement; is that
7    correct?
8    **A.    I said I did not see it, but I assumed**
9    **that's what it was.**
10   Q.    Okay.  Do you have any reason to refute
11   that it was not the subcontract agreement that she
12   sent to you?
13   **A.    No.**
14   Q.    Okay.  And when you and Mr. Vega received
15   the subcontract agreement signed by Ms. Bruno, you
16   agree that either you or Mr. Vega never indicated
17   that that subcontract agreement was invalid; is that
18   correct?
19   **A.    Not to my knowledge.**
20   Q.    Okay.  You never indicated to Pro-Tect
21   that the subcontract agreement signed by Leslie
22   Bruno was void; is that correct?
23   **A.    We didn't see a need to because we**
24   **thought it was waiting on the contract from Jackie,**
25   **so no.**

1    Q.    However the terms of the subcontract --
2    of the subcontract agreement does not have a
3    contingency provision indicated that Pro-Tect was
4    providing services, which was contingency on All Net
5    being funded; is that correct?
6    **A.    That is correct.  We didn't think we**
7    **needed that.**
8    Q.    Okay.  So although Pro-Tect was providing
9    security services to All Net and signed a contract
10   with SIS in regards to providing such service to
11   All Net, is it SIS's position that Pro-Tect was not
12   providing services on behalf of SIS?
13   **A.    Yes, our understanding was that we were**
14   **providing an outline, a draft of an arrangement, so**
15   **when we got something from Mr. Robinson, so we**
16   **would, at that point, generate a go forward**
17   **contract.**
18   Q.    However, that understanding is not
19   memorialized in any writing; is that correct?
20   **A.    No, it is not.**
21   Q.    However, what is memorialized in writing
22   is a subcontract agreement from which at least SIS
23   admits Pro-Tect executed and provided back to SIS;
24   is that correct?
25   **A.    That is correct.**

1    Q.   And it is undisputed that Garylene
2  Javier, at the time, was an employee of SIS when
3  Pro-Tect provided the executed contract to --
4    **A.   Yes.**
5    Q.   -- SIS; is that correct?
6    **A.   That is correct.**
7    Q.   And it is -- is it disputed that Garylene
8  Javier signed the subcontract agreement?
9    **A.   Yes.**
10    Q.   And re-sent it back to Pro-Tect.
11         Why is that disputed?
12    **A.   Because it's so unusual.  We're not sure**
13  **because it's not how we would do business.  It's**
14  **totally out of the norm for us that a block**
15  **signature from someone that wasn't authorized would**
16  **go back, and we would get the copy of it from the**
17  **customer, or the alleged customer, and not from our**
18  **own people.**
19    Q.   But you did receive -- you did -- was it
20  unreasonable, in your opinion for Pro-Tect to assume
21  that when it signed the subcontract agreement and
22  provided it with its signed copy, that SIS would not
23  provide an executed copy as well?
24    **A.   Yes, it was unreasonable.**
25    Q.   Why was it unreasonable?

1    **A.   Because she knows, as we know, as almost**
2  **everybody in our industry knows, the only acceptable**
3  **subcontract is from the officer of the company.**
4         **That's why she signed it as president and**
5  **not one of her underlings.**
6    Q.   Is it your contention that an employee of
7  SIS cannot bind the company?
8    **A.   It depends on the employee.**
9    Q.   Okay.  Is it -- at the time of -- well,
10  in July of 2015, was Garylene Javier's position a
11  contract specialist?
12    **A.   Yes.**
13    Q.   Her --
14    **A.   I think so.  I'm not positive.  I think**
15  **so.**
16    Q.   Who would have the most information in
17  regards to that?
18    **A.   Luis.  She worked for Luis.**
19    Q.   Luis.  And was Garylene Javier also
20  identified as a legal analyst as it relates to SIS?
21    **A.   I'm not aware of that.**
22    Q.   Okay.  Who would have the most
23  information in regards to that?
24    **A.   Again, I would think Luis.**
25    Q.   Okay.  So at the time, even though

1  Garylene Javier was serving as a contract
2  specialist, you don't believe that Garylene Javier
3  had the power to bind the company by executing a
4  contract; is that correct?
5    **A.   She -- not that kind of a contract.  She**
6  **could do an NDA, but not that kind of a contract.**
7    Q.   However, that -- the difference in
8  between Garylene Javier executing certain contracts
9  was not communicated to Pro-Tect; is that correct?
10    **A.   I don't know.  I have no knowledge of**
11  **that.**
12    Q.   Okay.  Do you have any --
13    **A.   Not by me.**
14    Q.   So it was not by you, okay.
15         And when Pro-Tect did provide you with
16  its executed copy, did you ever inform Garylene
17  Javier not to provide Pro-Tect with the signed
18  executed copy from SIS as well?
19    **A.   Wouldn't have been possible because I**
20  **didn't see it until after she was gone from the**
21  **company.**
22    Q.   So even though Pro-Tect sent you a copy
23  of its signed subcontract agreement, you're
24  indicating that you never saw the subcontract
25  agreement until after Garylene Javier left?

1    **A.   That's correct.**
2    Q.   So, in essence, you're admitting you did
3  not review your e-mail that Leslie Bruno sent to
4  you; is that correct?
5    **A.   That is correct.**
6    Q.   However, is it reasonable for an officer
7  of the company to review its e-mails that it
8  provides?
9    **A.   I get over 250 a day.  That isn't in my**
10  **lane, so to speak.  Luis, in his department, would**
11  **review that, then they would generally get ahold of**
12  **me if they had any questions or needed anything.**
13    Q.   So if Luis does testify that he did have
14  knowledge that Javier did send Pro-Tect an executed
15  copy of the subcontract agreement, do you have any
16  reason to refute that representation?
17    **A.   No.**
18    Q.   Do you have any knowledge as to whether
19  SIS sent billing to All Net?
20    **A.   I'm not sure.  I think they might have,**
21  **but I'm not sure.  I know we were never paid**
22  **anything, so we might have sent a placeholder, so to**
23  **speak, to All Net to show them that the costs were**
24  **accumulating.**
25    Q.   If invoices were sent from SIS to

3577ea0e-e3e3-4659-bb01-f8145cac45ab

Page 69

1  All Net, did it indicate that these invoices were
2  just placeholders, or did it request payment?
3      A.   We had those conversations with
4  Jackie Robinson and his people. They -- I think it
5  asked what -- what was happening.
6      Q.   Did SIS have its own employees that it
7  employed, as it relates to providing security
8  services for All Net?
9      A.   Mm-hmm. Yes.
10     Q.   Okay. How many employees did SIS
11 directly employ in order to provide security
12 services to All Net?
13     A.   It varied from different times. We had
14 probably anywhere from two to twelve at different
15 times. Now, some of that goes back well beyond
16 Pro-Tect. We had provided other services along the
17 way.
18     Q.   Okay. So between March of 2015 to August
19 of 2015, how many employees were directly employed
20 by SIS to provide security services for All Net?
21     A.   I would guess, variably, between two and
22 six or eight, somewhere in there.
23     Q.   And the invoices, if any, that were
24 billed from SIS to All Net, were those only for
25 services that the two or six or eight employees

Page 70

1  provided to All Net?
2      A.   No, they would have included some of the
3  services from all -- from Pro-Tect because they had
4  asked for an idea of what it was costing, so when
5  they got their financing, they would know because
6  the deal was always when he's got his funding, he
7  would make it right for Pro-Tect and for us.
8      Q.   However, you do agree that the
9  contingency planning in regards to All Net not
10 paying until it received funding, even paying SIS,
11 is not memorialized in any writing; is that correct?
12         MR. BLAYLOCK: Objection; asked and
13 answered.
14         THE WITNESS: Yes.
15 BY MS. GREEN:
16     Q.   Okay. And although SIS was providing
17 invoices to All Net for services that Pro-Tect
18 provided, is it still SIS's contention that Pro-Tect
19 was not providing services on behalf of SIS?
20     A.   At that time, yes.
21     Q.   Why is it SIS's contention that although
22 it was providing invoices to All Net for services
23 that Pro-Tect provided, that Pro-Tect still was not
24 providing a service to SIS?
25     A.   Because we had discussed it with

Page 71

1  Pro-Tect, and some of the people they were directly
2  talking to All Net at that time on what people to
3  put where, which people they were using. They were
4  directing people on his personal security, and
5  stuff, so we weren't managing them at that time.
6      Q.   And what is the month and date of that
7  time that you're referring to?
8      A.   It's when they sent their invoices.
9  During that whole period. I don't know.
10     Q.   Do you have anything to memorialize,
11 during that period of when you discussed of when the
12 invoices were sent, that Pro-Tect was not providing
13 services on behalf of SIS?
14     A.   Just a number of witnesses who will say
15 that.
16     Q.   However, nothing had memorialized in
17 writing; do you agree?
18     A.   Right. Yes.
19     Q.   What number of witnesses will testify to
20 that?
21     A.   I would think three to five.
22     Q.   Can you please name each one of those
23 witnesses?
24     A.   I'll try. Gene, however you spell his
25 last name. You know that, right, Tosti?

Page 72

1          Okay. Tim.
2      Q.   What is Tim's last name?
3      A.   Can I get help on that? I don't
4  remember.
5      Q.   So you don't recall?
6      A.   I don't recall his last name; I don't
7  have it on the tip of my tongue.
8      Q.   Do you believe that Tim's name was
9  provided to Pro-Tect in SIS's initial disclosures?
10     A.   Both of these worked for Pro-Tect at the
11 time.
12     Q.   These are workers for Pro-Tect that
13 you're referring to?
14     A.   Yes.
15     Q.   Who is the third person?
16     A.   The -- I don't know. They're not on the
17 tip of my tongue, but we can probably get them and
18 get them to you. I think they were on the list
19 of -- witness list, potential witness list.
20     Q.   What I'll do is I will request that in
21 a -- well, either I will request that in regards to
22 SIS supplementing its Rule 26 disclosures and/or
23 providing that information.
24     A.   Okay. I think it was three to five, and
25 I think they were all on the witness list.

3577ea0e-e3e3-4659-bb01-f8145cac45ab

1    Q.   When was the last time that you
2  personally spoke to Gene as it relates to the
3  Pro-Tect matter?
4    A.   A long time.  Luis speaks to him more
5  than I do, so I probably had met Gene three times,
6  and none of them were long meetings.
7    Q.   When was the last time that you met with
8  Gene as relates to the Pro-Tect matter?
9    A.   Never, as it relates just to the Pro-Tect
10  matter.
11    Q.   So when was the last time that you
12  discussed this matter with Gene?
13    A.   I'm not trying to be cute; honestly, I'm
14  just trying to remember.
15    Q.   No, it's fine.
16    A.   I think it was at the SHOT Show last
17  year, if anybody remembers when that was.
18        MR. VEGA:  January 24th.
19        THE WITNESS:  I think that's in the
20  summer.
21  BY MS. GREEN:
22    Q.   So in 2017?
23    A.   Yes.
24        MR. BLAYLOCK 2:  No, it's the new year.
25  BY MS. GREEN:

1        (Wright Exhibit No. 9 was
2         marked for identification.)
3  BY MS. GREEN:
4    Q.   Do you recognize those?
5    A.   I don't know that I've seen them before.
6  I recognize them as invoices from Pro-Tect.  I
7  probably had seen them when we were doing our
8  discovery, and all that stuff.
9    Q.   However, before our litigation commenced
10  in this matter, had you seen those invoices --
11    A.   I don't remember seeing them before.
12    Q.   -- that Pro-Tect provided to SIS?
13        I'm just requesting because we do have to
14  create a clear record, so --
15    A.   And I interrupted, so I was asking you to
16  repeat.
17    Q.   No, but it's fine.
18        What I'm asking is before litigation
19  commenced in this matter, did you ever see those
20  documents or invoices before you today?
21    A.   Probably a little bit before that when I
22  got the nasty letters from the other attorney.  I
23  probably requested them and saw them at that time.
24    Q.   Okay.  However, before that time, other
25  than receiving the invoices, do you recall SIS

1    Q.   So in the beginning of 2018?
2    A.   That's probably right because he was at
3  the shot show, as well, and we ran into him, and he
4  was talking about it.
5    Q.   When was last time that you personally
6  spoke to Tim, the person you identified as Tim, as
7  it relates to this Pro-Tect matter?
8    A.   Not as it relates to Pro-Tect, but I
9  talked to him a couple weeks ago.
10    Q.   Did you discuss SIS being involved in
11  litigation with Pro-Tect at this time?
12    A.   Not -- we discussed that with him months
13  and months ago, but not recently.
14    Q.   And is your understanding that Tim will
15  testify that Pro-Tect was aware that it wasn't
16  getting paid until all -- until All Net was paid?
17    A.   Yes, it is.
18        MS. GREEN:  Okay.  I also want to
19  introduce this next exhibit here as well.  As I
20  stated before, I am running out of copies.  When
21  you're finished reviewing it, if you can have your
22  client review that.
23        We're going to mark this here as our next
24  exhibit, as well.
25

1  receiving any e-mails that relate to Pro-Tect not
2  being paid for the services it provided?
3    A.   SIS receiving any e-mails from who?
4    Q.   From Pro-Tect for not paying for services
5  that Pro-Tect provided.
6    A.   I'm sure that we got some.  I remember
7  getting a couple.  I don't remember specifics, but I
8  remember getting something from them or their
9  attorney, or somebody, so I don't remember who it
10  was.
11        Is that what you're asking?
12    Q.   Do you recall SIS's initial response to
13  Pro-Tect sending e-mails to SIS in regards to
14  nonpayment for services?
15    A.   Yeah, we were surprised, and I had asked
16  Luis about it, and he was going to call Leslie, and
17  then, I think, one or two others, and he said that
18  Leslie wasn't taking his phone calls.
19    Q.   And what was the month and date that you
20  inquired about Pro-Tect not being paid for its
21  services and Luis responding to you as a result
22  thereof?
23    A.   I'm going to assume it was within a few
24  months of these, that if she was calling.  So this
25  is dated August of 2015, so I'm guessing October,

3577ea0e-e3e3-4659-bb01-f8145cac45ab

1  November of 2015.
2      I'm not sure, though.
3      Q.   Do you have any personal knowledge as to
4  specifically when you inquired with Luis Vega as it
5  relates to Pro-Tect claiming there's nonpayment for
6  services?
7      A.   When -- no, I don't have personal
8  knowledge at the time, but I would assume it was
9  around -- in that time frame, and that's when I
10 got -- I just don't remember for sure who it was
11 from. I think it was from -- either her financial
12 person, or someone else, sent me something, and then
13 I turned it over to accounting and then to Luis.
14     Q.   Who is Denise Herndon who is referred to
15 in the invoices?
16     A.   She was accounts payable or accounts
17 receivable -- accounts payable and receivable, I
18 think. Accounting clerk.
19     Q.   Okay. And, as you testified, what
20 eventually was your response as it relates to
21 Pro-Tect claiming that it hadn't been paid for its
22 services?
23     A.   I believe I wrote an e-mail or a letter
24 or two back to -- I'm not sure if it went to Leslie,
25 or whoever sent it to me. Her attorney, perhaps,

1  outlining what we understood the relationship to be.
2      Q.   And what was that letter -- what did that
3  letter actually entail in regards to what SIS is
4  claiming the relationship was?
5      A.   That the agreement was that we would all
6  get paid when Jackie got his funding, and that, you
7  know, I responded directly to some other questions
8  they have. I don't remember exactly. It's been so
9  long ago.
10     Q.   However, you do agree that at the time
11 that the -- you sent a letter, as you indicated to
12 Pro-Tect's attorney, indicating that there was a,
13 quote/unquote, other agreement, which was based on a
14 contingency. There was nothing at that time that
15 was memorialized in writing?
16     A.   No, it was based on an oral agreement.
17     Q.   And you do agree that the subcontract
18 agreement that Pro-Tect executed and provided to you
19 indicates otherwise; is that correct?
20     A.   Correct.
21     Q.   Okay. What we'll do is take a ten-minute
22 break. I think after that, we can wrap everything
23 up and go from there.
24     A.   Okay. Sounds good. Thank you.
25          (Short break was taken.)

1          MS. GREEN:  Back on the record.
2  BY MS. GREEN:
3      Q.   Mr. Wright, you do realize that you're
4  still under the same oath that you took earlier this
5  afternoon?
6      A.   I do. I do.
7      Q.   Thank you. All right. You testified
8  earlier in this deposition that you do not have
9  notice of the subcontract agreement that was
10 specifically executed by Garylene Javier; is that
11 correct?
12     A.   Yeah, I had not seen it.
13     Q.   Okay. Did you receive any correspondence
14 that Javier -- that Ms. Javier sent to Pro-Tect that
15 relates to the executed subcontract agreement?
16     A.   I don't remember seeing it. I mean, like
17 this e-mail that you showed me, I'm sure it probably
18 came. I get so many -- I normally wouldn't peruse
19 it too much, unless there was a problem, then I
20 would ask the people whose job it is to do that.
21     Q.   Okay. Do you recall at all responding to
22 any e-mails, specifically from Garylene Javier, that
23 relates to what is titled, "The subcontract
24 agreement"?
25     A.   I don't recall it, no.

1      Q.   Okay. All right. So what I'll do is
2  introduce this last exhibit here, and then I'm going
3  to have counsel review it because it hadn't been
4  Bates numbered yet, and we would likely give this to
5  you in another format when we can get there, but if
6  you can have your client review that, and we'll mark
7  this as our next exhibit.
8          (Wright Exhibit No. 10 was
9           marked for identification.)
10         THE WITNESS:  Okay.
11 BY MS. GREEN:
12     Q.   Do you recognize the contents that are
13 contained in this document?
14     A.   You mean the sentence that she wrote,
15 yeah, I see it. I don't -- I don't remember seeing
16 this e-mail, and I don't remember an attachment
17 subcontract. Could have been there. I don't
18 remember seeing it.
19     Q.   However, this document, which is now
20 marked as an exhibit, does indicate that Garylene
21 sent Leslie Bruno an e-mail and copied you and
22 Mr. Vega on it; is that correct?
23     A.   Yeah. Is there a date on this? It
24 doesn't look like a normal e-mail.
25     Q.   Yeah, that's why I said we will be

3577ea0e-e3e3-4659-bb01-f8145cac45ab

Page 81

1 producing it in a different form. I do want to see
2 in this document, or the contents in this document
3 do refresh your recollection at all as it pertains
4 to any subcontract agreement that was sent to you
5 and to Mr. Vega that was executed by Garylene
6 Javier?
7    **A.   No, it does not.**
8    Q.   Okay. So do you have any reason to
9 refute that Garylene Javier sent an e-mail to Leslie
10 Bruno indicating that, here is a physically executed
11 copy of the subcontract agreement?
12    **A.   I have no reason to think one way or the**
13 **other, so no.**
14    Q.   Okay. Do you agree that before the
15 attorney for Pro-Tect, specifically Gary Schnitzer,
16 got involved in regards to requesting payment from
17 SIS, that Pro-Tect initially requested payment in
18 e-mails to SIS and copied you and/or Mr. Vega on
19 those?
20    **A.   I think that's probably true. I don't**
21 **remember specifically, but that would make sense.**
22    Q.   Okay. Do you agree that in the e-mail
23 correspondence that occurred before Gary Schnitzer
24 got involved, SIS never indicated that Pro-Tect was
25 not entitled to payment for the services that it

Page 82

1 requested payment for?
2    **A.   I disagree with that in the sense that we**
3 **thought we had a verbal agreement that when the**
4 **money came, that's when payment would be made.**
5    Q.   However, before Gary Schnitzer contacted
6 you -- strike that.
7       Before Gary Schnitzer contacted SIS, as
8 it relates to payment for the services that Pro-Tect
9 indicated it provided, was there anything
10 memorialized in writing from SIS that indicated that
11 Pro-Tect was not getting paid for the services it
12 provided to All Net unless All Net was funded?
13    **A.   Not to my knowledge. Is this a --**
14    MS. GREEN:  Yes, she can mark that as an
15 exhibit.
16       What I'll do is pass. I'm not sure if
17 you have any questions.
18    MR. BLAYLOCK:  No questions.
19    MS. GREEN:  Great. Thank you very much
20 for your time.
21    THE WITNESS:  Thank you for your
22 hospitality and your professionalism.
23    MS. GREEN:  Thank you.
24       If you look at SIS's responses to
25 Pro-Tect's first set of requests for production,

Page 83

1 there's a -- I'm not sure if you have that in front
2 of you.
3    MR. BLAYLOCK:  I don't.
4    MS. GREEN:  I'll provide you with a copy,
5 if I have it. There we go.
6       The only reason why, Andrew, I'm kind of
7 mentioning this now is because, as we know, the
8 Magistrate Judge is not going to continue discovery,
9 so...
10       So primarily, the issue that our office
11 does have is with SIS's response to Request for
12 Production No. 17.
13    MR. BLAYLOCK:  Mm-hmm.
14    MS. GREEN:  It indicates there are some
15 objections there, but what it does, it indicates
16 that it will supplement, it being SIS, will
17 supplement its responses.
18       And the issue that's on top of that is
19 that for multiple other responses to Pro-Tect's
20 RFPs, it indicates that Pro-Tect needs to refer to
21 Request No. 17.
22    MR. BLAYLOCK:  Mm-hmm.
23    MS. GREEN:  That goes into
24 Request No. 23, 24, 25, 26. So from 17 to 26, it's
25 stated that it would be produced, and we just

Page 84

1 haven't had it. So I am not sure if you want to
2 just take the time to review it, and then call me
3 later about it.
4    MR. BLAYLOCK:  I'm not sure why it's -- I
5 don't know if we need to put anything else on the
6 record.
7    MS. GREEN:  We can go off the record.
8    (Whereupon the deposition concluded
9     at 3:34 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3577ea0e-e3e3-4659-bb01-f8145cac45ab

Page 85

```
 1              CERTIFICATE OF DEPONENT
 2     PAGE LINE CHANGE              REASON
 3     _____
 4     _____
 5     _____
 6     _____
 7     _____
 8     _____
 9     _____
10     _____
11     _____
12     _____
13              * * * * *
14         I, DON WRIGHT, deponent herein, do hereby
       certify and declare the within and foregoing
15     transcription to be my deposition in said action;
       that I have read, corrected, and do hereby affix my
16     signature, under penalty of perjury, to said
       deposition.
17
18     _____
       DON WRIGHT
19     Deponent
20
21
22
23
24
25
```

Page 86

```
 1              REPORTER'S CERTIFICATE
 2     STATE OF NEVADA )
                       ) ss
 3     COUNTY OF CLARK )
 4         I, JENNIFER M. DALY, a duly commissioned
 5     and licensed Court Reporter, Clark County, State of
 6     Nevada, do hereby certify:  That I reported the
 7     taking of the deposition of the witness, DON WRIGHT,
 8     commencing on January 15, 2019, at the hour of 1:30
 9     p.m.
10         Prior to being examined, the witness was,
11     by me, duly sworn to testify to the truth.  That I
12     thereafter transcribed my said shorthand notes into
13     typewriting and that the typewritten transcript of
14     said deposition is a complete, true and accurate
15     transcription of my said shorthand notes.
16         I further certify that I am not a
17     relative or employee of an attorney or counsel of
18     any of the parties, nor a relative or employee of an
19     attorney or counsel involved in said action, nor a
20     person financially interested in the action.
21         IN WITNESS HEREOF, I have hereunto set my
22     hand, in my office, in the County of Clark, State of
23     Nevada, this 29th day of January, 2019.
24
       _____
25     JENNIFER M. DALY, CRR, RPR, CCR, CSR
```

3577ea0e-e3e3-4659-bb01-f8145cac45ab