# EXHIBIT 76-10

# EXHIBIT 76-10

# Condensed Transcript

# **Luis Vega**
Volume I

**Date:** January 15, 2019

Trade Show Services, Ltd. v. Integrated Systems Inprovement
Services, Inc., et al.
Case No. 2:17-cv-01685-JAD-NJK

Oasis Reporting Services, LLC
Phone: 702-476-4500
E-mail: info@oasisreporting.com
Internet: www.oasisreporting.com

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                   DISTRICT OF NEVADA
 3
 4   TRADE SHOW SERVICES, LTD.,   )
     a Nevada Corporation,        )
 5   d/b/a PRO-TECT SECURITY      )
     SERVICES,                    )
 6                                )
          Plaintiff,              )
 7                                )
     vs.                          )  CASE NO.
 8                                )  2:17-cv-01685-JAD-NJK
     INTEGRATED SYSTEMS           )
 9   IMPROVEMENT SERVICES,        )
     INC., an Arizona             )
10   Corporation; INTEGRATED      )
     SYSTEMS IMPROVEMENT          )
11   SERVICES, INC., d/b/a        )
     SPECIAL INTELLIGENCE         )
12   SERVICE, an Arizona          )
     Corporation; DOE             )
13   INDIVIDUALS I through X,     )
     inclusive; and ROE           )
14   BUSINESS ENTITIES I          )
     through X, inclusive,        )
15                                )
          Defendants.             )
16
17
18
              DEPOSITION OF LUIS VEGA
19
          Taken at the Law Offices of
20   KRAVITZ, SCHNITZER, & JOHNSON, CHTD.
      8985 South Eastern Avenue, Suite 200
21          Las Vegas, Nevada 89123
             On January 15, 2019
22               At 9:45 a.m.
23
24   Reported by:  JENNIFER M. DALY, CRR, RPR, CCR, CSR
25   License No.:  766
```

## Page 2

```
 1   APPEARANCES:
 2   KRAVITZ, SCHNITZER, & JOHNSON, CHTD.
 3   BY: L. RENEE GREEN, ESQ.
 4      rgreen@ksjattorneys.com
 5      8985 South Eastern Avenue
 6      Suite 200
 7      Las Vegas, Nevada 89123
 8      702.352.6666
 9          On behalf of the Plaintiff;
10
11   SMITH & SHAPIRO
12   BY: ANDREW S. BLAYLOCK, ESQ.
13      ablaylock@smithshapiro.com
14      3333 East Serene Avenue
15      Suite 130
16      Henderson, Nevada 89074
17      702.318.5033
18          On behalf of the Defendants.
19
20   ALSO PRESENT:
21   Don Wright
22   Leslie Bruno
23              * * * * *
24
25
```

## Page 3

```
 1              I N D E X
 2   WITNESS: LUIS VEGA
 3   EXAMINATION                     PAGE
 4   BY MS. GREEN                    4
 5
 6
 7            E X H I B I T S
 8   NUMBER        DESCRIPTION           PAGE
 9   Exhibit No. 1    Witness Documents      12
10   Exhibit No. 2    Responses to Plaintiff's  31
11       Interrogatories
12   Exhibit No. 3    Requests for Production   36
13   Exhibit No. 4    PRO-TECT 1 - 17        46
14   Exhibit No. 5    PRO-TECT 192          49
15   Exhibit No. 6    PRO-TECT 203-205       53
16   Exhibit No. 7    PRO-TECT 213          69
17   Exhibit No. 8    PRO-TECT 18-27        72
18   Exhibit No. 9    Mutual Nondisclosure    82
19       Agreement
20   Exhibit No. 10   E-mails            84
21   Exhibit No. 11   E-mail             87
22   Exhibit No. 12   Defendants' Responses to  90
23       Interrogatories
24
25
```

## Page 4

```
 1       LAS VEGAS, NEVADA, TUESDAY, JANUARY 15, 2019
 2           9:45 A.M.
 3           -oOo-
 4   WHEREUPON --
 5       (IN AN OFF-THE-RECORD DISCUSSION HELD PRIOR TO THE
 6   COMMENCEMENT OF THE PROCEEDINGS, COUNSEL AGREED TO
 7   WAIVE THE COURT REPORTER'S REQUIREMENTS UNDER NEVADA
 8   RULES OF CIVIL PROCEDURE, RULE 30(B)(4), OR FEDERAL
 9   RULES OF CIVIL PROCEDURE, RULE 30(B)(5), AS
10   APPLICABLE.)
11       (WITNESS SWORN.)
12   Whereupon,
13           LUIS VEGA,
14   having been first duly sworn to testify to the
15   truth, the whole truth, and nothing but the truth,
16   was examined and testified as follows:
17           DIRECT EXAMINATION
18   BY MS. GREEN:
19   Q.   Good morning, Luis Vega.
20   A.   Good morning.
21   Q.   My name is Renee Green.  I represent
22   Trade Show Services d/b/a Pro-Tect Security.
23   Throughout this testimony, I'm going to identify
24   that company as Pro-Tect.
25   A.   Okay.
```

1b8787ba-012e-4f9a-adda-ce8c760e628e

Page 5

1    Q.   Is it okay if I call you Luis?
2    **A.   Yes.**
3    Q.   Is it Luis or Luis?
4    **A.   Luis.**
5    Q.   Okay.  Is that fine if I call you Luis
6    then?
7    **A.   Yeah.**
8    Q.   Luis, have you ever had your deposition
9    taken before?
10   **A.   For this?**
11   Q.   At any time.
12   **A.   Not for this, no, but many times before.**
13   Q.   When was the last time you had your
14   deposition taken?
15   **A.   A couple months ago.**
16   Q.   Was it -- I'm assuming it was due to
17   litigation; is that correct?
18   **A.   Yeah, I was a law enforcement officer for**
19   **many years, so cases took a turn and come back up.**
20   Q.   So did you testify as a deponent due to
21   being a witness, or were you a party to a lawsuit?
22   **A.   This wasn't a lawsuit.  It was a criminal**
23   **case.**
24   Q.   Oh, okay.  So were you a witness to the
25   criminal case or were you a party?

Page 6

1    **A.   A party.**
2    Q.   You were a party?
3    **A.   Yeah.**
4    Q.   What was your role in that particular --
5    **A.   Undercover officer.**
6    Q.   Do you actually have the month and year
7    that you were deposed in that matter?
8    **A.   I think it was actually in 2017,**
9    **December 2017, or November.**
10   Q.   Which state were you deposed in?
11   **A.   Ohio.**
12   Q.   Have you ever had your deposition taken
13   before in Nevada?
14   **A.   No.**
15   Q.   What I wanted to do is I'm going to go
16   over a few general ground rules as it pertains to
17   getting your deposition taken here in Nevada.  I am
18   sure that your attorney advised you of some of those
19   ground rules, but I just wanted to make sure we're
20   clear.  I also do want to state for the record,
21   going back, is that I do have you here for your
22   deposition today, which was duly noticed, then
23   afterwards, we're going to be taking the deposition
24   of Mr. Wright, and at this time, Don Wright, or
25   Mr. Wright, is in the room with us as we speak,

Page 7

1    but do you agree that Mr. Wright is an officer of
2    Integrated -- well, I call you ISIS, but I want to
3    make sure we're clear for the record here, of
4    Integrated Systems Improvement Services?
5    **A.   Yes.**
6    Q.   And does Integrated Systems Improvement
7    Services go by any other name?
8    **A.   Yes, d/b/a Special Intelligence Service.**
9    Q.   Do you mind if I refer to Special
10   Intelligence Service as SIS --
11   **A.   Yes.**
12   Q.   -- throughout this deposition?
13        And you are here today due to a breach of
14   contract issue from -- which occurred in or
15   around 2015.
16        In 2015, were you an officer of SIS?
17   **A.   Yes.**
18   Q.   In 2015, was Don Wright an officer of
19   SIS?
20   **A.   Yes.**
21   Q.   So you took an oath here today from which
22   everything you say does have the same effect as if
23   giving testimony in a Court of law.
24        Here in Nevada, you swear to tell the
25   truth.  In Nevada, a failure to do so can result in

Page 8

1    a conviction of perjury, which is a felony in
2    Nevada.
3        Do you understand?
4    **A.   Yes.**
5    Q.   Everything you say here today is going to
6    be transcribed by the court reporter, so as a result
7    thereof, I do ask that even though I can view,
8    maybe, some of your responses if they're nonverbal,
9    the court reporter cannot transcribe them, so I ask
10   that you answer everything that I ask with a verbal
11   answer.
12        Do you understand?
13   **A.   Yes.**
14   Q.   Also, I know throughout the deposition
15   that you may be able to anticipate the question I
16   ask before I'm completely finished asking the
17   question; however, I do ask, in order to create a
18   clear record for the court reporter, that you allow
19   me to finish asking the question, and then from
20   there, you can provide an answer.
21        Do you understand?
22   **A.   Yes.**
23   Q.   Also, let me know if you don't understand
24   any of the questions that I ask.  If you don't let
25   me know, I'm going to assume that you understand the

1b8787ba-012e-4f9a-adda-ce8c760e628e

Page 9

1 question the way that I asked it.
2    Do you understand?
3    **A.  Yes.**
4    Q.   Also, I do not want you to guess, but I
5 do -- I am entitled to an estimate, if asked.
6    Do you know the difference between a
7 guess and an estimate?
8    **A.  Yes.**
9    Q.   What is your interpretation of what the
10 difference is between a guess and an estimate?
11   **A.   A guess is just off the top of my head of**
12 **what I believe.**
13   **An estimate is more actual, more factual.**
14   Q.   Okay.  Yes.  The schoolbook version for
15 lawyers is that an estimate is me asking you how
16 long this table is that we're sitting in front of;
17 you can provide me an estimate for that, but a guess
18 is me asking you how long my table is in my dining
19 room.  You shouldn't be able to answer that
20 question, and that's a guess, and I don't want you
21 to guess.
22   Do you understand?
23   **A.  Yes.**
24   Q.   Have you taken any substances within the
25 last 24 hours that you believe will affect your

Page 10

1 testimony here today?
2    **A.   No.**
3    Q.   Is there any reason why you believe that
4 this testimony cannot go forward today?
5    **A.   No.**
6    Q.   Also, please let me know if you do need
7 to take a break.  We could take breaks as needed.
8 The only thing that I ask is if there is a question
9 pending, I ask that you answer the question first,
10 and then afterwards, we can take a break.
11   Do you understand?
12   **A.   Yes.**
13   Q.   Luis, have you been known by any other
14 names?
15   **A.   No.**
16   Q.   Do you have any other nicknames?
17   **A.   No.**
18   Q.   Also, the last thing, and I'm sure your
19 attorney did let you know, is that you're going to
20 have the opportunity to review your deposition
21 testimony here today once the court reporter
22 provides that.
23   You are able to make changes to your
24 deposition testimony; however, those changes are
25 noted and will be noted and can be noted by a

Page 11

1 factfinder that those changes were made, and that
2 could affect your credibility as it pertains to your
3 deposition testimony.
4    Do you understand?
5    **A.   Yes.**
6    Q.   If we could take a break, I do believe
7 Leslie is here.
8    MR. BLAYLOCK:  That's fine.
9    (Short break was taken.)
10   (Ms. Bruno joined the deposition.)
11   MS. GREEN:  Back on.
12 BY MS. GREEN:
13   Q.   So we're back on record.
14   Luis, do you understand that you're under
15 the same oath that you took earlier today?
16   **A.   Yes.**
17   Q.   What, if any, documents did you review in
18 preparation for your deposition today?
19   **A.   The documents that were given to me by**
20 **the attorney.**
21   Q.   Which documents were those?
22   **A.   All the different documents, I guess that**
23 **was read back and forth between your firm and ours.**
24   Q.   Are those documents in front of you all
25 the documents that you reviewed in preparation for

Page 12

1 your deposition testimony here today?
2    **A.   Yes.**
3    Q.   May I please see those?
4    **A.   Sure.**
5    Q.   Other than the documents that you
6 provided here today, were there any other documents
7 that you reviewed in preparation for your deposition
8 testimony here today?
9    **A.   No.**
10   Q.   What I'll do is -- you can refer to those
11 documents in there, but what I do want to do is mark
12 those documents as Exhibit 1 for an exhibit.
13   So I can either have -- I don't have my
14 assistant here today, Mr. Blaylock.
15   What I can do, if your client doesn't
16 mind, if the court reporter can have it, have the
17 documents that we're marking here as Exhibit 1, then
18 provide you with those documents once she's finished
19 providing the deposition transcript.
20   MR. BLAYLOCK:  That's fine.
21   MS. GREEN:  Okay.
22   (Vega Exhibit No. 1 was
23   marked for identification.)
24 BY MS. GREEN:
25   Q.   What, if anything else, other than

1b8787ba-012e-4f9a-adda-ce8c760e628e

Page 13

1  reviewing those documents, did you do to prepare for
2  your deposition testimony today?
3       A.   Nothing else.
4       Q.   Did you speak to Mr. Blaylock, as it
5  relates to your deposition testimony here today?
6       A.   Yes.
7       Q.   Other than speaking to Mr. Blaylock, did
8  you speak to any other person, as it relates to your
9  deposition testimony here today?
10      A.   No.
11      Q.   You did not speak to Don Wright, as it
12 relates to your deposition testimony here today?
13      A.   Yes.
14      Q.   What day did you specifically speak to
15 Mr. Wright as it relates to your deposition
16 testimony here today?
17      A.   Yesterday.
18      Q.   Other than yesterday, is there any other
19 time that you spoke to Mr. Wright, as it relates to
20 your deposition testimony here today?
21      A.   No.
22      Q.   What did you two discuss, as it relates
23 to your deposition testimony?
24      A.   The documents before you --
25           MR. BLAYLOCK:  I'm going to object to the

Page 14

1  extent that they were discussions that were had
2  among the three of us.
3  BY MS. GREEN:
4       Q.   Okay.  So did you speak to Mr. -- when
5  you spoke to Mr. Wright, was anyone else present
6  with you?
7       A.   No.
8       Q.   Okay.  So at the time you spoke to
9  Mr. Wright, as it relates to your deposition
10 testimony and an attorney wasn't present, what did
11 you and Mr. Wright discuss?
12      A.   Private matters.
13      Q.   What were -- what were included in those
14 private matters?
15      A.   Me going to the gym this morning, what
16 time we're having breakfast.
17      Q.   Did it have anything to do with your
18 deposition testimony here today?
19      A.   No.
20      Q.   So yesterday, when you spoke to
21 Don Wright without an attorney present, you two did
22 not discuss what your deposition testimony would be
23 here today?
24      A.   No.
25      Q.   Have you ever been convicted of any

Page 15

1  felonies?
2       A.   Nope.
3       Q.   About how long do you believe it took you
4  to prepare for your deposition here today?
5       A.   I don't know.
6       Q.   So do you -- you're not sure.  Can you
7  provide an estimate in regards to how long you
8  believe it took you to prepare for your deposition
9  today?
10      A.   An hour.
11      Q.   Okay.  And in regards to the documents
12 you reviewed, which we marked as Exhibit 1, do you
13 agree that those documents included SIS's responses
14 to Pro-Tect's interrogatories, requests for
15 production, or requests for admission?
16      A.   Does -- say that again.
17      Q.   Okay.  In preparation for your
18 deposition, you indicated that you reviewed the
19 documents that we marked --
20      A.   Mm-hmm.
21      Q.   -- as Exhibit 1; is that correct?
22      A.   Yes.
23      Q.   Do you agree that those documents that
24 are marked as Exhibit 1 include SIS's responses to
25 Pro-Tect's interrogatories, requests for admission,

Page 16

1  and requests for production?
2       A.   Yes.
3       Q.   Okay.  At this time, do you believe that
4  those responses provided by SIS are accurate?
5       A.   Yes.
6       Q.   Is there anything that you do want to
7  change to those responses to Pro-Tect's requests for
8  production, requests for admission, or
9  interrogatories?
10      A.   No.
11      Q.   And you testified earlier that you, in or
12 around 2015, you were an officer for Integrated
13 Systems Improvement Services; is that correct?
14      A.   Yes.
15      Q.   Were there any other officers that were a
16 part of SIS?
17      A.   Don Wright.
18      Q.   And are there any officers presently that
19 are a part of SIS?
20      A.   No.
21      Q.   How long have you been an officer of SIS?
22      A.   Since 2010.
23      Q.   And between 2012 and 2017, did you
24 negotiate contracts on behalf of SIS with other
25 third parties?

Page 17

1   A.   **Give me the dates again.  Between -- yes.**
2   Q.   Okay.  Did you understand the question?
3   A.   **Yes.**
4   Q.   And between 2012 and 2017, did you sign
5   contracts on behalf of SIS?
6   A.   **Yes.**
7   Q.   To you knowledge, who, if anyone else,
8   signed contracts on behalf of SIS, between the years
9   of 2014 to 2017?
10   A.   **Don Wright.**
11   Q.   Is that the only party who also signed
12   contracts on behalf of SIS, to your knowledge?
13   A.   **Yes.**
14   Q.   Are you an officer of any other
15   companies, other than SIS?
16   A.   **Yes.**
17   Q.   Which companies are you an officer of?
18   A.   **Tigua, Inc.**
19   Q.   May you please spell that for the record?
20   A.   **T-I-G-U-A.**
21   Q.   What products or services does
22   Tigua, Inc., provide?
23   A.   **Technology services, operations and**
24   **maintenance, security.**
25   Q.   And was Tigua, Incorporated, in existence

Page 18

1   in or around 2015?
2   A.   **Yes.**
3   Q.   Is Tigua, Incorporated still in existence
4   now?
5   A.   **Yes.**
6   Q.   Are there any other officers that are
7   part of Tigua, Incorporated?
8   A.   **Yes.**
9   Q.   Who are they?
10   A.   **Don Wright.**
11   Q.   Any other officers other than Don Wright
12   a part of Tigua, Inc.?
13   A.   **Yes.**
14   Q.   Who else?
15   A.   **There's been a change, so I couldn't tell**
16   **you with accuracy.**
17   Q.   How many other officers, other than
18   Don Wright and yourself, are a part of Tigua, Inc.?
19   A.   **I don't know.**
20   Q.   Are you an officer of any other companies
21   other than Tigua, Inc. and SIS?
22   A.   **No.**
23   Q.   And you testified that Tigua, Inc.
24   provides security services for third parties; is
25   that correct?

Page 19

1   A.   **Correct.**
2   Q.   Okay.  So in your opinion, what's the
3   difference between Tigua, Inc. and SIS?
4   A.   **Tigua, Inc. is an 8A, a Native**
5   **corporation; SIS is not.**
6   Q.   Where is Tigua, Inc. domiciled?
7   A.   **El Paso, Texas.**
8   Q.   Okay.  We discussed whether you were an
9   officer of any other companies; however, are you an
10   owner of any other companies, such as any other
11   private companies?
12   A.   **No.**
13   Q.   Are you a member of any limited liability
14   companies?
15   A.   **No.**
16   Q.   And I'm assuming that you have knowledge
17   in regards to the services that Trade Show Services
18   Limited d/b/a Pro-Tect Security provides; is that
19   correct?
20   A.   **Not in its entirety, no.**
21   Q.   In 2015, what was your understanding of
22   the services that Pro-Tect provided?
23   A.   **Security services.**
24   Q.   Do you agree that Pro-Tect provided
25   security services to third parties?

Page 20

1   A.   **Yes.**
2   Q.   In 2015, did you have any understanding
3   of what Leslie Bruno's role was with the company?
4   A.   **Yes.**
5   Q.   What was your understanding of Leslie
6   Bruno's role at the company?
7   A.   **That she was president.**
8   Q.   And we are here due to allegations of a
9   breach contract issue.  Do you agree that Pro-Tect
10   had a contract with SIS in or around 2015?
11   A.   **No.**
12   Q.   Okay.  What, if any, relationship did
13   Pro-Tect have with SIS Holdings in or around
14   of 2015?
15   A.   **I don't remember.**
16   Q.   You don't recall?
17   A.   **No.**
18   Q.   Is there any reason or -- we discussed
19   earlier whether or not you took any medication that
20   may affect your memory today, and you indicated that
21   you have not; is that correct?
22   A.   **Yes.**
23   Q.   Do you have any medical condition that
24   you're aware of that may affect your testimony here
25   today?

Page 21

1   A.   No.
2   Q.   Okay.  Do you have any knowledge of
3   anything that transpired between Pro-Tect Services
4   and SIS between -- well, in the year of 2015?
5   A.   Yes, I do.
6   Q.   Okay.  And what, if anything, do you
7   believe transpired between Pro-Tect Services and SIS
8   in 2015?
9   A.   There were several that I was working
10  with.  Gene, Gene Tosti.
11  Q.   Will you please spell his name for the
12  record?
13  A.   T-O-S-T-I, Gene, G-E-N-E.
14  Q.   And who is Gene Tosti?
15  A.   An executive with Pro-Tect.
16  Q.   And what were you discussing, if
17  anything, with Gene Tosti in or around 2015?
18  A.   Federal Government contracts.
19  Q.   Other than discussing Federal Government
20  contracts, did you discuss anything else with
21  Gene Tosti?
22  A.   Yes, but I wouldn't recall.
23  Q.   Did you do -- you testified earlier that
24  there was no contract between Pro-Tect and
25  SIS Holdings; is that correct?

Page 22

1   A.   Correct.
2   Q.   Do you agree that -- do you believe that
3   there was any agreement between Pro-Tect Services
4   and SIS Holdings in or around 2015?
5   A.   Yes.
6   Q.   What was the agreement?
7   A.   That we would go after services together.
8   Q.   What kind of services?
9   A.   Security services.
10  Q.   Security services with whom?
11  A.   With either the Federal Government or any
12  other contract that we were pursuing together.
13  Q.   Was there a specific business that you
14  were -- well, that SIS was looking to form a
15  contract with?
16  A.   Well, there were numerous federal ones
17  there were federal contracts that we were going
18  after together.
19  Q.   Okay.  And what were the terms of any
20  agreement that SIS entered into with Pro-Tect
21  Services?
22  A.   I don't recall.  It's -- I don't recall.
23  Q.   And you indicated that you reviewed the
24  documents marked as Exhibit 1 in preparation for
25  your deposition testimony today; is that correct?

Page 23

1   A.   Yes.
2   Q.   Reviewing those documents in front of you
3   did not refresh your recollection in regards to any
4   agreements that you made with Pro-Tect in or
5   around 2015?
6   A.   Are you -- yes.  Are you speaking about
7   the agreement that we have with regards to Vegas or
8   any other --
9   Q.   I'm asking in general.  In 2015, what, if
10  any, agreements did SIS form with Pro-Tect?
11  A.   I'd have to recollect on the date, but if
12  we're speaking on the one here in Vegas, it was an
13  agreement that we would go after services together
14  for providing those services to a project here in
15  Nevada.
16  Q.   And when was this agreement formed?
17  A.   I -- I can't recall that.  I'd have to
18  look at the dates.
19  Q.   And who formed this agreement?
20  A.   Myself and Gene.
21  Q.   Okay.  Did you form this agreement with
22  any other party other than Gene?
23  A.   I know I had discussions with Leslie, but
24  I couldn't recall if they were actual agreements or
25  not.  I know we spoke on the phone many times as

Page 24

1   well as meeting in person.
2   Q.   Do you recall what you spoke with
3   Leslie Bruno about?
4   A.   No.
5   Q.   Do you recall the terms of the agreement?
6   A.   With regards to the arena, was that we
7   were going to try to get the contract for security
8   services for All Net.
9   Q.   And what were the details in regards to
10  trying to get the security services for All Net?
11  A.   Once the project was funded, once the
12  project started, that we would actually sit down and
13  discuss moving forward with an agreement with the
14  contract.
15  Q.   And who did you discuss that particular
16  detail with?
17  A.   Gene.  Not sure if it actually led into
18  Leslie or not, but most of it was Gene.
19  Q.   What was the date that you spoke to Gene
20  about in regards to whether All Net would be funded?
21  A.   I don't recall.  I'd have to look at the
22  notes.  I don't recall the exact date.
23  Q.   Do you recall the month that you --
24  A.   No.
25  Q.   -- spoke to Gene about it?

1b8787ba-012e-4f9a-adda-ce8c760e628e

Page 25

1    How did you speak to Gene about this?
2    What was the method of communication?
3        A.   Most on the phone.
4        Q.   Were there any notes to that, that
5    memorialized your interpretation of the agreement?
6        A.   No handwritten notes. Anything would
7    have been on e-mail.
8        Q.   Okay. Do you have any e-mails that
9    memorialize your version of the agreements?
10       A.   I -- I -- I don't know. I'd have to look
11   at what was produced.
12       Q.   In your opinion, what was Gene's role
13   with Pro-Tect Services in 2015?
14       A.   If I recall, he was a senior executive
15   for business development.
16       Q.   Did you officially form any agreement
17   with Leslie Bruno in 2015 that relates to any
18   business here in Las Vegas?
19       A.   No, I believe we sent on NDA. I don't
20   think there was anything else formal.
21       Q.   And upon reviewing the documents that are
22   marked here as Exhibit 1, does that refresh your
23   recollection whether or not there was any other
24   agreement that SIS formed with Pro-Tect as it
25   relates to any business dealings here in Las Vegas?

Page 26

1        A.   In the paperwork that I received, there
2    is a subcontract agreement in there.
3        Q.   Other than the subcontract agreement, was
4    there any other agreements besides the NDA that
5    Pro-Tect formed with SIS in 2015?
6        A.   Not that I can recall.
7        Q.   Other than yourself, did anyone else
8    negotiate the terms of any agreement with Pro-Tect
9    on behalf of SIS?
10       A.   Not that I'm aware of.
11       Q.   And so is it your testimony here today
12   that you formed an agreement with Pro-Tect, as it
13   relates to providing contract services here in
14   Nevada; is that correct?
15       A.   Yes.
16       Q.   Was there a specific business that SIS
17   and/or Pro-Tect sought to form a contract with, in
18   your opinion, as it relates to providing services in
19   Las Vegas?
20       A.   Security.
21       Q.   To a particular company in Las Vegas?
22       A.   To -- yes, both to All Net, as well as
23   one other that Leslie had.
24       Q.   Do you recall the name of the other
25   company?

Page 27

1        A.   I don't think it was a company. It might
2    have been. It was Tito Ortiz's company.
3        Q.   Whose company?
4        A.   Tito -- I don't remember the name of it.
5    It's an MMA fighter.
6        Q.   Okay. As it relates to All Net, was
7    there a specific time as to when the agreement
8    between Pro-Tect Services and SIS would end?
9        A.   Would end?
10       Q.   Yes.
11       A.   Not that I'm aware of.
12       Q.   Okay. Other than attempting to receive
13   contracts from other parties for security services
14   in Las Vegas, what were the other terms of the
15   agreement between Pro-Tect Services and SIS?
16       A.   That we would pay for each other's
17   business development until a project was funded to
18   move forward.
19       Q.   And what was entailed in regards to --
20   for paying for each other's business development?
21       A.   I don't -- I don't understand.
22       Q.   What exactly was entailed -- what does
23   business development exactly encompass in regards to
24   your terms of the contract?
25       A.   Doing what you do to seek business from

Page 28

1    other clients.
2        Q.   Such as? Name some expenses that you
3    would do?
4        A.   Dinners, attend events, perform services.
5        Q.   Did it include providing security
6    services?
7        A.   Yes.
8        Q.   Okay. Do you -- you also testified today
9    that spoke with Leslie Bruno specifically about
10   paying -- about the requisite companies paying for
11   their own business development expenses in order to
12   seek third-party contracts from other businesses in
13   Las Vegas; is that correct?
14       A.   Yes.
15       Q.   Do you recall the month and date that you
16   discussed with Leslie Bruno the agreement?
17       A.   No.
18       Q.   Do you recall the method of communication
19   from which you discussed with Leslie Bruno this
20   agreement?
21       A.   Most was on the phone.
22       Q.   Okay. About how many times in 2015 did
23   you discuss this with Leslie Bruno over the phone?
24       A.   I couldn't tell you.
25       Q.   Ultimately, which party in Pro-Tect did

Page 29

1  you form this supposed agreement with?  So which
2  individual did you supposedly form this agreement
3  with?  Was it Leslie?
4      **A.  Gene, but ultimately Leslie.  It -- I**
5  **mean, I assume she would have to approve anything**
6  **that happens with her own company.**
7      Q.  Did you have anything from Gene that
8  memorialized this supposed agreement that we just
9  discussed?
10     **A.  I don't know.  I'd have to look at**
11  **whatever him and I agreed to.**
12     Q.  Okay.  So you're not aware if SIS --
13     **A.  I believe there was something in e-mail.**
14     Q.  Okay.  Do you have the month and date of
15  that particular e-mail?
16     **A.  Not particularly.  I'd have to look at**
17  **the notes.**
18     MS. GREEN:  Okay.  So what I would
19  request, then, is -- and I will send a -- if your
20  client can supplement the RFPs that were sent that
21  relates to Mr. Vega's contention, that would be
22  great.
23     MR. BLAYLOCK:  He's asking to look at his
24  notes.
25  ///

Page 30

1  BY MS. GREEN:
2      Q.  Oh, you want to look at your notes?
3      **A.  Yeah.**
4      Q.  That's fine.  You can look at your notes
5  and go from there.
6      To make it clear for the record, you're
7  looking at Exhibit 1, what's marked as Exhibit 1?
8      **A.  Yes.**
9      **I have a date.**
10     Q.  Okay.  If you may please provide that
11  date?
12     **A.  October 26th, 2014.**
13     Q.  Okay.  So October 26th of 2014?
14     **A.  Mm-hmm.**
15     Q.  Are you testifying that Gene formed a --
16  or memorialized an agreement between SIS and
17  Pro-Tect?
18     **A.  Yes.**
19     Q.  Which document did you review in order to
20  testify to that fact?
21     **A.  It's listed as SIS 0066 in Exhibit 1.**
22     Q.  Okay.  So I have SIS 0066 here, and what
23  I'll do is I'll represent that SIS 0066 were the
24  documents that were provided by SIS in their
25  Rule 26 disclosures.

Page 31

1      May you please identify which e-mail
2  you're referring to that relates to your contention
3  that Gene memorialized an agreement between Pro-Tect
4  and SIS?
5      **A.  Well, it starts at the beginning of the**
6  **top of the page.**
7      Q.  Okay.  So are you referring to here, "We
8  understand that the funding is not available yet.
9  We're willing to support the project and move
10  forward as planned."
11     Is that correct?
12     **A.  Correct.**
13     Q.  Okay.  Is there any other documents, in
14  your opinion, that memorialize any agreement between
15  Pro-Tect Services and SIS Holdings that relate to
16  the agreement?
17     **A.  Not that I'm aware of.**
18     Q.  Okay.  What I want to do is mark this
19  next exhibit as Exhibit 2.  This is also probably in
20  your copy, as well.
21     What I'll do is have your attorney review
22  it, and then afterwards, you can review it, and then
23  let me know when you're finished.
24     (Vega Exhibit No. 2 was
25      marked for identification.)

Page 32

1      MR. BLAYLOCK:  Do you want me to give him
2  my --
3      MS. GREEN:  I made other copies.  Here
4  you go.
5      THE WITNESS:  Okay.
6  BY MS. GREEN:
7      Q.  Okay.  Do you recognize the document
8  that's marked as Exhibit 2?
9      **A.  As this is Exhibit 2?**
10     Q.  Correct.
11     **A.  Yes.**
12     Q.  May you please identify what that
13  document is marked as Exhibit 2.
14     **A.  Just the lawsuit, the case number.  Is**
15  **that what you're asking?**
16     Q.  No.  Do you recognize that this document
17  marked as Exhibit 2 is SIS's responses to Pro-Tect's
18  second set of interrogatories?
19     **A.  Yes.**
20     Q.  Were these part of the documents you
21  reviewed in preparation for your deposition
22  testimony here today?
23     **A.  Yes.**
24     Q.  And I would like to refer you to SIS's
25  responses to Interrogatory No. 21 and 22.  When

Page 33

1  you're done reviewing both, please let me know so I
2  can ask you questions in regards to this.
3      A.  Okay.
4      Q.  Are you finished reviewing the responses?
5      A.  Yes.
6      Q.  You testified earlier that Gene Tosti
7  negotiated, on behalf of Pro-Tect, as it relates to
8  an agreement between Pro-Tect and SIS; is that
9  correct?
10     A.  Correct.
11     Q.  However, in SIS's responses to
12 Interrogatory No. 21, do you agree that the
13 interrogatory specifically asked SIS to identify
14 each individual that entered into the oral
15 agreement?
16     A.  Yes.
17     Q.  Okay.  And do you agree that SIS's
18 response to Interrogatory No. 21 does not indicate
19 that Gene Tosti was part of the oral agreement?
20     A.  Yes.
21     Q.  Okay.  Is there any reason why your
22 answer here today differs from SIS's response to
23 this specific interrogatory?
24     A.  No.
25     Q.  Do you agree that your testimony earlier

Page 34

1  today in regards to Gene Tosti being a part of the
2  oral agreement in or around October 2014 differs
3  from SIS's response to the interrogatory asking the
4  same?
5      A.  Yes.
6      Q.  Okay.  And SIS's response to this
7  specific interrogatory asking when the oral
8  agreement was entered into indicates that the oral
9  agreement was entered into May of 2015; is that
10 correct?
11     A.  Yes.
12     Q.  However, your testimony earlier today,
13 when you referred to SIS -- well, Bates-stamp No.
14 SIS 66, speaks of an earlier discussion that
15 occurred in October of 2014; is that correct?
16     A.  Yes.
17     Q.  Do you have any opinion as to why the
18 date between October 2014 and May 2015 differ in
19 regards to SIS supposedly forming an oral agreement?
20     A.  I spoke to Gene more than I did Leslie.
21     Q.  Okay.
22     A.  I couldn't tell you when I did talk to
23 Leslie.
24     Q.  Okay.  So these responses provided by SIS
25 were verified under oath; is that correct?

Page 35

1      A.  Yes.
2      Q.  And you took an oath here today; is that
3  correct?
4      A.  Yes.
5      Q.  So in regards to the two facts
6  contradicting each other, which one is true as it
7  relates to SIS forming a supposed oral agreement
8  with Pro-Tect?
9          MR. BLAYLOCK:  Object to the form of the
10 question.
11         Go ahead.
12         THE WITNESS:  Both.
13 BY MS. GREEN:
14     Q.  So both are true?
15     A.  Yes, they are.
16     Q.  If both are true, why didn't SIS provide,
17 in its responses, that an oral agreement was formed
18 in or around October of 2014?
19     A.  I forgot.
20         I forgot.
21     Q.  Okay.  But you testified earlier, during
22 your deposition today, that you would not change any
23 of the responses to SIS's -- specifically, to SIS's
24 responses to Pro-Tect's propounded discovery; is
25 that correct?

Page 36

1      A.  Yes.
2      Q.  And before your deposition here today,
3  you were able to review SIS's responses to
4  Pro-Tect's propounded discovery; is that correct?
5      A.  Yes.
6      Q.  We're going to -- I'm going to have your
7  attorney review this document, which is going to be
8  marked Exhibit 3.  This one is titled, in short,
9  SIS's responses to Pro-Tect's second set of requests
10 for production of documents?
11         (Vega Exhibit No. 3 was
12          marked for identification.)
13 BY MS. GREEN:
14     Q.  When your attorney is finished, I'll
15 provide you with a copy.
16         Here you go.
17         Are you finished reviewing the document?
18     A.  I am.
19     Q.  Do you recognize this document marked as
20 Exhibit 3?
21     A.  I do.
22     Q.  May you please state what you believe
23 this document is marked as Exhibit 3?
24     A.  The responses.
25     Q.  And it specifies the responses to

1b8787ba-012e-4f9a-adda-ce8c760e628e

1 SIS's -- or it's SIS's responses Pro-Tect's second
2 set of requests for production of documents; is that
3 correct?
4     **A.   Correct.**
5     Q.   And if you may, please, look at SIS's
6 response to Pro-Tect's Request for Production No. 69
7 and 70, and let me know when you're finished
8 reviewing it.
9     **A.   Yes.**
10     Q.   Okay.  Do you agree that Pro-Tect's
11 request for number -- strike that.
12          Do you agree that Pro-Tect's Request for
13 Production No. 69 requests documents that
14 memorialized the terms of the oral agreement that
15 SIS referenced?
16     **A.   I didn't understand.**
17     Q.   Okay.  Do you agree that request
18 number -- Request for Production No. 69, propounded
19 by Pro-Tect, specifically requests all documents
20 from SIS that memorialize the terms of the,
21 quote/unquote, oral agreement?
22     **A.   Yes.**
23     Q.   Okay.  And do you agree that SIS's
24 response to that specific request for production
25 indicated that it does not have any responsive

1 documents?
2     **A.   Correct.**
3     Q.   However, your testimony here today
4 differed because you referenced Bates No. 66 from
5 SIS as a term -- as an e-mail that memorialized the
6 term of an oral agreement; is that correct?
7     **A.   Correct.**
8     Q.   And you agree that oral -- that
9 supposed -- well, strike that.
10          You agree that the supposed oral
11 agreement you were referencing occurred in 2014; is
12 that correct?
13     **A.   Correct.**
14     Q.   From which Pro-Tect failed to identify in
15 its interrogatory responses that were provided in
16 Exhibit 2; is that correct?
17     **A.   I'm sorry, I don't understand.**
18     Q.   Okay.  And you agree that -- strike that.
19          So you agree that the SIS -- that Bates
20 No. SIS 66, that you referenced, discussed certain
21 events that occurred in 2014; is that correct?
22     **A.   Yes.**
23     Q.   And you agree that SIS's responses to
24 Pro-Tect's interrogatories, which were referenced in
25 Exhibit 2, does not indicate that the quote/unquote

1 agreement existed in 2014; is that correct?
2     **A.   Yes.**
3     Q.   Is there a reason why SIS's responses to
4 the requests for production differ from your
5 testimony here today?
6     **A.   No.**
7     Q.   So here today, with you referencing Bates
8 No. SIS 66, would you supplement your responses to
9 Pro-Tect's second set of requests for production in
10 Exhibit 3 at all?
11     **A.   Would I supplement?**
12     Q.   Correct.
13     **A.   No.**
14     Q.   Do you have an opinion as to whether or
15 not All Net was aware of a contract -- of any
16 agreement between SIS and Pro-Tect?
17     **A.   No.**
18     Q.   Okay.  Do you have any knowledge as to
19 whether any officer of All Net knew that Pro-Tect
20 was providing services to that specific company?
21     **A.   Do I have any knowledge if any of the**
22 **officers -- repeat that.**
23     Q.   Do you have any knowledge as to whether
24 any of the officers of All Net knew that Pro-Tect
25 was providing any services on behalf of All Net

1 itself?
2     **A.   I -- I don't know.**
3     Q.   Do you know who would have the -- who
4 would know the answer to that question?
5     **A.   Mr. Wright.**
6     Q.   Okay.  Is there, to your knowledge, any
7 e-mail correspondence indicating whether or not
8 Pro-Tect provided services to any of the officers of
9 All Net, to your knowledge?
10     **A.   I don't know.**
11     Q.   Do you agree that Pro-Tect provided
12 security services to All Net --
13     **A.   Yes.**
14     Q.   -- in or around 2015?
15          Okay.  What made you come to that
16 conclusion?
17     **A.   Because they physically did.**
18     Q.   Did you physically observe Pro-Tect
19 providing security services to All Net?
20     **A.   No.**
21     Q.   So how do you know that Pro-Tect provided
22 security services to All Net?
23     **A.   Phone calls and e-mails.**
24     Q.   So you do have knowledge, in fact, that
25 Pro-Tect did provide security services to All Net?

Page 41

1   **A.   Yes.**
2   Q.   Okay.  Do you agree that you just
3   testified earlier that you had no knowledge whether
4   or not Pro-Tect provided security services to
5   All Net?
6   **A.   No.**
7   Q.   Okay.  Did SIS ever execute a contract
8   with All Net?
9   **A.   No.**
10   Q.   I'm going to get very specific.  So did
11   All Net ever execute a contract for SIS?
12   **A.   Not that I'm aware of.**
13   Q.   Was there ever an agreement formed
14   between All Net and SIS?
15   **A.   Yes.**
16   Q.   What was the agreement between SIS and
17   All Net?
18   **A.   That once they were funded, we would be**
19   **their security guard.**
20   Q.   Were there any documents memorializing
21   this agreement that you just testified to?
22   **A.   I don't know.**
23   Q.   And who formed this agreement with
24   All Net?
25   **A.   I believe Mr. Wright.**

Page 42

1   Q.   What do you believe -- base your belief
2   upon?
3   **A.   Discussions.**
4   Q.   Discussions between whom?
5   **A.   Don Wright and I.**
6   Q.   When did those discussions occur?
7   **A.   I couldn't tell you.**
8   Q.   Can you estimate what year those
9   discussions occurred?
10   **A.   No, it's been a long time since we've**
11   **been discussing it.**
12   Q.   Who would have the most knowledge in
13   regards to whether or not an agreement was
14   memorialized between All Net and SIS?
15   **A.   Mr. Wright.**
16   Q.   And you testified earlier that you did
17   not have knowledge whether or not a document
18   memorialized an agreement between All Net and SIS;
19   is that correct?
20   **A.   Yes, I don't remember.**
21   Q.   Other than Mr. Wright, would anyone else
22   have knowledge in regards to the agreement between
23   All Net and SIS?
24   **A.   No.**
25   Q.   Were there any documents that were

Page 43

1   prepared that formed an agreement between Pro-Tect
2   and SIS?
3   **A.   I believe so.**
4   Q.   What were those documents?
5   **A.   It was a draft subcontract agreement.**
6   Q.   Any other documents, other than the draft
7   subcontract agreement?
8   **A.   I don't recall.**
9   Q.   And who prepared the draft subcontract
10   agreement, to your knowledge?
11   **A.   A contract administrator.**
12   Q.   Who is the contract administrator?
13   **A.   Garylene Javier.**
14   Q.   When was this draft subcontract agreement
15   prepared?
16   **A.   I don't recall.  I don't recall the date.**
17   Q.   Do you recall the year?
18   **A.   No.  I'd have to look at the notes.**
19   Q.   Okay.  You can look in your notes, if
20   that would refresh your recollection.
21   **A.   June 1st, 2015.**
22   Q.   And in June of 2015, what was Garylene
23   Javier's title with SIS?
24   **A.   Contract specialist.**
25   Q.   Did she have any other title?

Page 44

1   **A.   I -- I don't remember.**
2   Q.   In 2015, what did Garylene Javier's job
3   duties as a contract specialist entail?
4   **A.   Review contracts, review documents for**
5   **me, for business development.**
6   Q.   Did Ms. Javier send contracts to third
7   parties on behalf of ISIS in 2015?
8   **A.   Yes.**
9   Q.   Was Ms. Javier responsible for receiving
10   contracts executed by third parties on behalf of SIS
11   in 2015?
12   **A.   Yes, she would have been copied on**
13   **e-mails.**
14   Q.   What were the circumstances of SIS
15   providing a draft subcontract agreement to Pro-Tect?
16   **A.   We believed, at the time, we were heading**
17   **toward funding, and in order to prepare for -- for**
18   **that to happen, we would have made drafts.**
19   Q.   Did you -- did SIS provide Pro-Tect with
20   a draft contract agreement?
21   **A.   I think so, yeah.**
22   Q.   Do you recall the date that SIS provided
23   Pro-Tect with the draft subcontract agreement?
24   **A.   Same date.**
25   Q.   So the same date being June 1st, 2015 --

1b8787ba-012e-4f9a-adda-ce8c760e628e

Page 45

1    A.   Yes.
2    Q.   -- is that correct?
3        And when you refer to a draft subcontract
4  agreement being sent to Pro-Tect, were you referring
5  to the subcontract agreement that is Bates numbered
6  on the bottom right as Pro-Tect 1 to --
7    A.   Yes.
8    Q.   I want to clarify for the record.
9    A.   501.
10   Q.   You're referring to the document that you
11  were referencing as the draft subcontract agreement
12  that is Bates numbered, on the bottom right, as
13  Pro-Tect 1 to Pro-Tect 17; is that correct?
14   A.   Yes.
15   Q.   And you agree that this agreement that is
16  Bates numbered Pro-Tect 1 to 17 was sent to
17  Pro-Tect?
18   A.   Yes.
19   Q.   Okay.  And do you agree that the
20  documents sent that's Bates numbered Pro-Tect 1 to
21  17 was sent after any discussions occurred with Gene
22  Tosti in 2014; is that correct?
23   A.   Yes.
24   Q.   What was your belief that Pro-Tect was
25  supposed to do with the draft subcontract agreement,

Page 46

1  that you title it, when it was sent to Pro-Tect?
2    A.   Review it.
3    Q.   Did you expect Pro-Tect to execute the
4  subcontract agreement?
5    A.   I would have expected them to review it
6  until the final one gets executed.
7    Q.   Okay.  Was there anything that was sent
8  to Pro-Tect, in forming it, that this was just a
9  subcontract agreement, and they were not to execute
10  this specific subcontract agreement?
11   A.   Not that I could recall.
12   Q.   Since we are speaking of this document, I
13  am going to provide your attorney with this
14  document, and when he's finished reviewing this
15  document, I'll provide you with the same.
16        (Vega Exhibit No. 4 was
17        marked for identification.)
18       MR. BLAYLOCK:  You can go ahead and
19  provide it to him.
20  BY MS. GREEN:
21   Q.   Here's the document.  Please let me know
22  when you're finished reviewing this document.
23   A.   I'm good.
24   Q.   Do you agree that that is the document
25  that we've been referencing -- the same document

Page 47

1  that we've been referencing as the subcontract
2  agreement, which is Bates numbered Pro-Tect 1
3  through 17?
4    A.   Correct.
5    Q.   Do you agree that SIS sent this
6  subcontract -- strike that.
7        Do you agree that SIS sent the document
8  titled, "The subcontract agreement," to Pro-Tect,
9  from which is marked as Exhibit 4?
10   A.   Yes.
11   Q.   Do you agree that -- strike that.
12        Do you agree that SIS sent this contract
13  to Pro-Tect to review?
14   A.   Yes.
15   Q.   Do you agree that SIS sent this
16  subcontract -- sent this contract to Pro-Tect to
17  sign?
18   A.   Say that again.
19   Q.   Do you agree that SIS sent this contract
20  for Pro-Tect to sign?
21   A.   Not sure if I understand the question.
22  If it was sent the day that it was drafted, then
23  it's a draft.
24   Q.   Is there anything that you have that
25  indicates that SIS was only sending the subcontract

Page 48

1  agreement as a draft?
2    A.   No, I don't have anything.
3    Q.   Do you have any documents that indicate
4  that Pro-Tect was not supposed to execute the
5  subcontract agreement that SIS sent to you?
6    A.   No.
7        (Short break was taken.)
8       MS. GREEN:  Back on the record.
9  BY MS. GREEN:
10   Q.   So we just took a break, and Luis, do you
11  understand that you're under the same oath that you
12  took earlier this morning?
13   A.   Yes.
14   Q.   So you testified earlier that SIS sent a,
15  quote/unquote, draft subcontract to Pro-Tect; is
16  that correct?
17   A.   Yes.
18   Q.   What, if any, response did Pro-Tect
19  provide in regards to the, quote/unquote, draft
20  subcontract?
21   A.   I don't -- I couldn't recall.
22   Q.   Do you recall if Pro-Tect desired to
23  alter any terms to the agreement of the draft
24  subcontract?
25   A.   Not that I remember.

1b8787ba-012e-4f9a-adda-ce8c760e628e

Page 49

1    Q.   Do you know which person would have the
2  most knowledge as it relates to that question that I
3  just asked?
4    A.   **Either Gene or Leslie, unless anything**
5  **was memorialized on e-mail that I don't remember.**
6    Q.   What I'll do is introduce this exhibit
7  here as Exhibit No. 5.
8         (Vega Exhibit No. 5 was
9          marked for identification.)
10 BY MS. GREEN:
11   Q.   Please let me know when you're finished
12 reviewing the document.
13   A.   **Okay.**
14   Q.   Do you recognize this document?
15   A.   **Yes.**
16   Q.   I'm sorry, yes or no?
17   A.   **Yes.**
18   Q.   May you please identify what this
19 document is?
20   A.   **An e-mail between Leslie and I.**
21   Q.   What I'll do is I'll represent that this
22 document is disclosed in Pro-Tect's disclosures.
23 It's Bates numbered on the bottom right as 192.
24       Do you agree that Leslie sent you an
25 e-mail on June 22nd, 2015, speaking about a

Page 50

1  contract?
2    A.   **Yes.**
3    Q.   Do you agree that the contract that
4  Leslie was referring to was the, quote, draft
5  subcontract agreement that was discussed earlier?
6    A.   **I assume, yes.**
7    Q.   Could it be any other contract other than
8  the draft subcontract agreement?
9    A.   **Yes.  As I stated earlier, we were in**
10 **discussions with several others.**
11   Q.   With others?
12   A.   **I'd have to -- contracts.**
13 **I don't know.  I'd have to see the chain**
14 **of e-mails that she gave you.  I'm assuming, but the**
15 **dates are throwing me off.**
16   Q.   Okay.  So do you have any reason to
17 dispute that the contract that Leslie was speaking
18 of in the June 22nd, 2015, e-mail, which was at the
19 time of 11:34, referred to the draft subcontract
20 agreement?
21   A.   **Yes.**
22   Q.   Okay.  What is your reason to dispute
23 that?
24   A.   **It's -- if this -- if this is**
25 **referring -- the dates that I have a concern with.**

Page 51

1         **This is June 22nd; that's going back and**
2  **forth.**
3    Q.   So what other date concerns you in
4  regards to this specific contract that Leslie's
5  referring to in her June 22nd, 2015, e-mail not
6  referring to the subcontract agreement?
7    A.   **I don't know what this subcontract is**
8  **for.  I'd have to see the rest of the e-mails.**
9    Q.   Okay.
10   A.   **I cannot tie this one to this one.**
11 **All Net wasn't the only contract that we were**
12 **pursuing.**
13   Q.   What were some of the other entities that
14 Pro-Tect and SIS were pursuing a contract with in or
15 around June 22nd of 2015?
16   A.   **Again, I don't know.  I'd have to see the**
17 **rest of the e-mails.**
18   Q.   Do you recall any other business entities
19 at all?
20   A.   **Business entities or opportunities?**
21   Q.   Any business entities that SIS and
22 Pro-Tect were contracting with as it relates to
23 providing security services in June of 2015?
24   A.   **Entities, no; opportunities, yes.**
25   Q.   What were those company's names, or what

Page 52

1  were those opportunities consist of in June of 2015?
2    A.   **Again, I don't know.  I'd have to look at**
3  **the rest of the e-mails.**
4    Q.   Do you agree that you responded to
5  Leslie's e-mail indicating that you see some issues
6  but agree to most of the changes indicated in the
7  contract?
8    A.   **Yes.**
9    Q.   Okay.  Did you ever request from
10 Garylene Javier to send Leslie Bruno contractor
11 documents.
12       Did you ever request from Garylene Javier
13 to send Pro-Tect a contract or subcontract agreement
14 in July of 2015?
15   A.   **Yes.**
16   Q.   What was that document?
17   A.   **The subcontract agreement.**
18   Q.   And it was substantially in the same form
19 as Exhibit 4, which is titled, "Subcontract
20 agreement."
21       Is that correct?
22   A.   **Yes.**
23   Q.   In fact, the subcontract agreement, which
24 is identified in Exhibit 4, is on SIS letterhead; is
25 that correct?

1    A.   Correct.
2    Q.   Did you request for Garylene Javier to
3 change certain terms of the subcontract agreement
4 and send it to Pro-Tect again in July of 2015?
5    A.   I don't remember.  I'm assuming, based on
6 this e-mail, I would have, yes.
7    Q.   Do you know if Garylene Javier resent a
8 contract to Pro-Tect?
9    A.   I don't remember.
10   Q.   So this document here I'm going to mark
11 as Exhibit 6, and this is Bates No. 203 to 205.
12 When your attorney is finished reviewing it, I'll
13 provide you with a copy.
14       (Vega Exhibit No. 6 was
15       marked for identification.)
16       THE WITNESS:  Okay.
17 BY MS. GREEN:
18   Q.   Do you recognize the content of this
19 exhibit that I've provided to you?
20   A.   Yes.
21   Q.   Will you please indicate what the content
22 of this exhibit entails?
23   A.   E-mails going back and forth between
24 Leslie, myself, and Gage.
25   Q.   And what, if anything, is being discussed

1 in these e-mails?
2    A.   I'm sorry?
3    Q.   What, if anything, is being discussed in
4 these e-mails that are marked as Exhibit 6?
5    A.   A security for Jackie Robinson's
6 residence.
7    Q.   To clarify, who is Jackie Robinson, as it
8 relates to All Net?
9    A.   He's the principal.
10   Q.   So if SIS was negotiating any terms of a
11 contract with All Net, would it be that it was
12 negotiating the terms with Jackie Robinson?
13   A.   No.
14   Q.   Who else would SIS be negotiating the
15 terms of any contract that may have been formed with
16 All Net?
17   A.   Don Wright.
18   Q.   As it relates to All Net security?
19   A.   I guess I don't understand the question.
20   Q.   So who would SIS be negotiating any terms
21 of a contract with as it relates to forming a
22 contract, or possible contract, with All Net?
23   A.   That would have been us, Don Wright.
24   Q.   Don Wright and who at All Net would be
25 negotiating the certain terms of the contract?

1    A.   I assume Jackie Robinson.  You'd have to
2 ask him.
3    Q.   Ask him, being Jackie Robinson?
4    A.   Ask Don Wright.
5    Q.   So Don Wright would have more information
6 as it relates to that fact; is that correct?
7    A.   Yes.
8    Q.   As a part of providing security services
9 to All Net, would some of that include providing
10 security services to Jackie Robinson's residence?
11   A.   Correct.
12   Q.   If you can go in the same exhibit to
13 Bates No. Pro-Tect 205 and take a look at the
14 July 5th, 2015, correspondence --
15   A.   Yeah.
16   Q.   -- from you?
17   A.   Yes.
18   Q.   And it's for the time that's numbered
19 5:31 a.m.
20       Do you agree that you wrote an e-mail
21 indicating that Don should be there again early next
22 week?
23       Did you get a response from Gage on your
24 e-mail for the contract?
25   A.   Yes.

1    Q.   Okay.  And the person "Don" referred to
2 in that e-mail, is Don Wright; is that correct?
3    A.   Correct.
4    Q.   The person Gage referred to in that
5 e-mail is Garylene Javier; is that correct?
6    A.   Yes.
7    Q.   In regards to the contract, was the
8 contract that you're referring to in the e-mail the
9 contract which is Bates numbered Pro-Tect 1 to 17?
10   A.   Yes.
11   Q.   Okay.  Then if you take a look at
12 Pro-Tect 204, it indicates that you wrote an e-mail
13 to Leslie dated July 5th, 2015, at 9:40 a.m.; is
14 that correct?
15   A.   I'm sorry?
16   Q.   In the Bates numbered page Pro-Tect 204,
17 it indicates that you wrote an e-mail to Leslie on
18 July 5th, 2015, at about 9:40 a.m.; is that correct?
19   A.   Yes.
20   Q.   And in that e-mail, you indicate, quote,
21 Might have been a mistake, comma, I asked last week,
22 and she indicated she sent it out.  Gage, question
23 mark; is that correct?
24   A.   Yes.
25   Q.   And do you agree that the term "it" that

Page 57

1   is defined in your e-mail, is the subcontract
2   referred to in Exhibit 4, which is Bates numbered
3   Pro-Tect 1 through 17?
4      A.   Yes.
5      Q.   And on the same Bates number, Page 204,
6   it indicates that Garylene Javier sent an e-mail to
7   Leslie on or around 9:11 a.m.; is that correct?
8      A.   I'm sorry, what number?  Yes.  Yes.  Yes.
9      On the same -- okay.
10        And the body of the e-mail specifically
11  states, I hope you have a nice weekend.  I sent the
12  revised contract last week, but I'm attaching again
13  just in case.
14        Is that correct?
15     A.   Yes.
16     Q.   And the revised contract that is referred
17  to in that particular e-mail is the subcontract
18  agreement that is Bates numbered 1 to 17; is that
19  correct?
20     A.   Yes.
21     Q.   And in this e-mail correspondence, nobody
22  from SIS indicated that Pro-Tect was not supposed to
23  execute the subcontract agreement, which is Bates
24  numbered Pro-Tect 1 to 17; is that correct?
25     A.   Correct.

Page 58

1      Q.   So seeing the e-mails provided in this
2   exhibit, coupled with the subcontract agreement that
3   is Bates numbered 1 to 17, refreshes your
4   recollection as to SIS sending the subcontract
5   agreement to Pro-Tect; is that correct?
6      A.   Yes.
7      Q.   However, in the responses that SIS
8   answered as it relates to Pro-Tect inquiring about
9   the same subcontract agreement, SIS represented that
10  it does not remember sending a subcontract
11  agreement; is that correct?
12     A.   Are you asking about the draft or the
13  actual subcontract agreement?
14     Q.   I'm asking about the subcontract
15  agreement that was sent to Pro-Tect.
16     A.   Mm-hmm.
17     Q.   So I'll start over.
18        So in SIS's responses to Pro-Tect's
19  propounded discovery that asked about the
20  subcontract agreement, SIS responded that it does
21  not remember ever providing SIS with a subcontract
22  agreement; is that correct?
23     A.   Correct.
24     Q.   However, your testimony today in regards
25  to having knowledge about the subcontract agreement

Page 59

1   differs from SIS responses; is that correct?
2      A.   Yes.
3      Q.   Is there a reason why those -- your
4   testimony today differs from SIS's responses?
5      A.   My recollection came from the e-mail.
6      Q.   With SIS forming these responses, did SIS
7   review any of the documents that Pro-Tect provided
8   to SIS that relates to this matter?
9      A.   I don't recall.
10     Q.   Did SIS look at its own e-mails that
11  relates to a document titled, "The subcontract
12  agreement," being sent to Pro-Tect before it
13  provided these responses to Pro-Tect's propounded
14  discovery?
15     A.   We did.  Yes, I did.
16     Q.   And in looking at these e-mails, would
17  you agree -- strike that.
18        You agree that the e-mails discussed in
19  Exhibit 6 were sent directly to you --
20     A.   Yes.
21     Q.   -- is that correct?
22        Okay.  So you would have been able to
23  have access to review some of the e-mails here that
24  are in Exhibit 6 from which were sent to Pro-Tect;
25  is that correct?

Page 60

1      A.   Correct.
2      Q.   Did you review those e-mails that you
3   sent to Pro-Tect from which encompass Exhibit 6
4   before you answered these --
5      A.   I don't think I've ever seen them.
6      Q.   -- these responses?
7        Okay.  However, your testimony here today
8   is that SIS did, in fact, send a document to
9   Pro-Tect that is titled, "The subcontract
10  agreement."
11        Is that correct?
12     A.   Yes.
13     Q.   And at no point is there any written
14  correspondence from SIS that indicates that Pro-Tect
15  is not to sign the subcontract agreement that was
16  sent; is that correct?
17     A.   Correct.
18     Q.   Okay.  In fact, you specifically
19  requested Garylene Javier to send the revised
20  contract, which is Bates numbered as Pro-Tect 1
21  through 17; is that correct?
22     A.   Correct.
23     Q.   Do you agree that Pro-Tect sent SIS the
24  subcontract agreement back, which was signed by the
25  officer of Pro-Tect?

1b8787ba-012e-4f9a-adda-ce8c760e628e

1    **A.   Yes.**
2    Q.   Okay.  Do you agree that Pro-Tect
3    requested the executed copy -- strike that.
4         Do you agree that Pro-Tect requested the
5    subcontract agreement back from which SIS also
6    signed?
7    **A.   I'm sorry?**
8    Q.   So do you agree that Pro-Tect, when it
9    provided its signed version of the subcontract
10   agreement, also requested SIS to provide it with the
11   same contract signed by SIS?
12   **A.   I assume so.**
13   Q.   So what do you base your assumption upon?
14   **A.   That the request would have to come from**
15   **her.  I don't --**
16   Q.   Do you have an independent recollection
17   of Pro-Tect requesting a signed copy of the
18   subcontract agreement from SIS?
19   **A.   No, other than the e-mails going back and**
20   **forth.**
21   Q.   Did you review any of those e-mails
22   before your deposition here today?
23   **A.   Just the ones this morning and yesterday.**
24   Q.   Did you review -- to specify, did you
25   review any of the e-mails from which Pro-Tect

1    requested --
2    **A.   Yes.**
3    Q.   -- SIS to provide a copy?
4    **A.   Yes.**
5    Q.   Do you have any reason to dispute the
6    genuineness of those e-mails that specifically ask
7    SIS to provide Pro-Tect with a signed copy of the
8    subcontract agreement?
9    **A.   No.**
10   Q.   So the document entitled, "The
11   subcontract agreement," which is Bates numbered 1 to
12   17, do you agree that this is the agreement that SIS
13   and Pro-Tect entered into on or around July of 2015?
14   **A.   No.**
15   Q.   Why don't you agree to that statement?
16   **A.   Because my signature or Don's signature**
17   **isn't on that agreement.**
18   Q.   Okay.  Whoever you directed -- however,
19   Garylene Javier was your employee at the time the
20   contract was executed; is that correct?
21   **A.   Correct.**
22   Q.   And Ms. Javier was responsible for
23   providing or sending contracts to third parties on
24   behalf of SIS; is that correct?
25   **A.   Correct.**

1    Q.   And Garylene Javier was also responsible
2    for revising contracts that were sent to third
3    parties on behalf of SIS; is that correct?
4    **A.   Correct.**
5    Q.   And you specifically directed
6    Garylene Javier to send Pro-Tect a revised contract,
7    which is titled in the document, "The subcontract
8    agreement."
9         Is that correct?
10   **A.   Correct.**
11   Q.   And there are no documents or written
12   correspondence that indicates that Pro-Tect was not
13   supposed to sign this subcontract agreement; is that
14   correct?
15   **A.   Correct.**
16   Q.   Is there any written correspondence from
17   SIS that indicates that Pro-Tect cannot rely upon
18   Garylene Javier executing a contract on behalf of
19   SIS?
20   **A.   Not that I can recall.**
21   Q.   Okay.  So do you believe that a
22   reasonable person would believe that Garylene Javier
23   had the authority to execute a contract on behalf of
24   SIS when she was the one who changed the terms of
25   the contract and re-sent it to Pro-Tect?

1    **A.   Repeat that.**
2    Q.   Do you believe a reasonable person would
3    believe that Garylene Javier had the authority to
4    sign on behalf of SIS when she was the person who
5    changed the terms of the subcontract agreement and
6    re-sent it to Pro-Tect?
7    **A.   No.**
8    Q.   Why do you believe a reasonable person
9    would not believe Garylene Javier had the authority
10   to sign on behalf of SIS when you directed her to
11   change the terms of the contract and re-extend to
12   Pro-Tect?
13   **A.   I -- I am a principal in SIS.  If I'm**
14   **working with a subcontract agreement with another**
15   **company, which I do most of the time, and it**
16   **normally comes from a principal of that company.**
17   Q.   However, Garylene Javier did send this
18   subcontract agreement for -- to Pro-Tect with the
19   expectation for Pro-Tect to sign it; is that
20   correct?
21   **A.   Correct.**
22   Q.   Okay.  Does Garylene Javier still work
23   for your company?
24   **A.   No.**
25   Q.   When did Garylene Javier cease working

1b8787ba-012e-4f9a-adda-ce8c760e628e

Page 65

1 for your company?
2 **A. I don't remember.**
3 Q. Do you have any knowledge as to why she
4 stopped working for your company?
5 **A. She -- we were helping her with getting**
6 **her law degree, and she severely destroyed a**
7 **contract in which we lost.**
8 Q. How, in your opinion, did she destroy a
9 contract from which SIS lost?
10 **A. She was getting responses from the --**
11 **from the government in which nobody else had access**
12 **to and declining to respond back to the government;**
13 **we lost the contract.**
14 Q. What was the month and date that
15 Ms. Javier was terminated -- strike that.
16 Let me go back.
17 Did Ms. Javier voluntarily leave the
18 company or was she fired?
19 **A. She was terminated.**
20 Q. What was the month and year that
21 Ms. Javier was terminated?
22 **A. I have no idea.**
23 Q. After Ms. Javier was terminated, have you
24 communicated with Ms. Javier since that time?
25 **A. No.**

Page 66

1 Q. And which -- which business is it SIS's
2 position that Garylene Javier failed to respond to?
3 **A. I'm sorry?**
4 Q. What was the name of the business from
5 which SIS contends that Ms. Javier failed to respond
6 to?
7 **A. Like, the name of our business?**
8 Q. No, what was the name of the entity
9 and/or business firm that SIS contends Ms. Javier
10 did not respond to?
11 **A. The U.S. Government.**
12 Q. Was there a specific -- particular branch
13 of the U.S. Government.
14 **A. Office of Inspector General.**
15 Q. Office of?
16 **A. Inspector General.**
17 Q. In July of 2015, how long was Garylene
18 Javier working for your company?
19 **A. I don't remember.**
20 Q. Do you generally remember how long
21 Ms. Javier was employed for your company?
22 **A. No.**
23 Q. Had she been in your company in July 2015
24 for more than a year?
25 **A. Yes.**

Page 67

1 Q. So is it SIS's contention that Ms. Javier
2 does not sign contracts on behalf of SIS?
3 **A. No.**
4 Q. It is not SIS's contention?
5 **A. The only people that can sign with**
6 **regards to the company are the officers of the**
7 **company.**
8 Q. Okay. And where -- so to clarify, to
9 make sure the deposition transcript is clear, it is
10 actually SIS's position that Ms. Javier did not sign
11 contracts on behalf of SIS, correct?
12 **A. Correct.**
13 Q. Okay. I want to make it clear.
14 And you testified just now that only the
15 officers of the company signed contracts on behalf
16 of SIS; is that correct?
17 **A. Correct.**
18 Q. Is that noted in any handbooks or
19 training manuals?
20 **A. Not that I'm aware of.**
21 Q. Okay.
22 **A. I don't know. You would have to ask Don.**
23 Q. Who would have that information?
24 **A. Mr. Wright.**
25 Q. And was it ever communicated to Pro-Tect

Page 68

1 that Ms. Javier could not sign contracts on behalf
2 of SIS?
3 **A. Not that I'm aware of.**
4 Q. Who would have the most information as it
5 relates to that question I just asked you?
6 **A. As to?**
7 Q. As to whether or not it was communicated
8 to Ms. -- or to Pro-Tect that Ms. Javier could not
9 sign contracts on behalf of SIS?
10 **A. Either Mr. Wright or myself.**
11 Q. Okay. But you're testifying right now
12 that you have no knowledge --
13 **A. No.**
14 Q. -- as to whether or not SIS communicated
15 to Pro-Tect that Ms. Javier could not sign contracts
16 on behalf of SIS; is that correct?
17 **A. That's correct.**
18 Q. Okay. Did you personally ever review the
19 subcontract agreement from which was signed by
20 Leslie Bruno?
21 **A. Yes.**
22 Q. When did you first review the contract?
23 **A. I guess at the beginning.**
24 Q. Did you actually see that the -- that
25 Leslie Bruno signed the document entitled, "The

Page 69

1  subcontract agreement"?
2  **A.  Did I actually see it?**
3  Q.  Yeah.
4  **A.  I didn't recall.**
5  Q.  So I want to introduce this exhibit here.
6  Once your attorney is finished reviewing this, I'll
7  provide you with a copy.
8  MR. BLAYLOCK:  Go ahead.
9  BY MS. GREEN:
10  Q.  When you're finished reviewing it, please
11  let me know.
12  I'm going to mark this exhibit as Exhibit
13  No. 7.
14  (Vega Exhibit No. 7 was
15  marked for identification.)
16  BY MS. GREEN:
17  Q.  Do you recognize the content located in
18  this document that is Bates numbered 213?
19  **A.  I recognize it, yes.**
20  Q.  Okay.  And will you please state for the
21  record what you believe this document encompasses?
22  **A.  E-mails between Leslie and Javier.**
23  Q.  Were you copied on any of those e-mails?
24  **A.  Yes.**
25  Q.  And I do want to direct your attention to

Page 70

1  the July 8th, 2015, e-mail, around 12:15 p.m.  Do
2  you agree that Leslie sent Garylene Javier, you, and
3  Mr. Wright, an e-mail at that time?
4  **A.  Yes.**
5  Q.  Okay.  And in the e-mail, it specifically
6  states, Yippee, here is the contract, comma, please
7  forward executed copy to my attention.
8  Is that correct?
9  **A.  Yes.**
10  Q.  Do you agree that the contract that
11  Leslie Bruno is referring to in this e-mail is the
12  contract that is in Exhibit 4 that is titled, "The
13  subcontract agreement"?
14  **A.  That is correct.**
15  Q.  And you received this -- you agree that
16  you did receive this e-mail; is that correct?
17  **A.  Yes.**
18  Q.  And at the time that you received the
19  e-mail, you had knowledge that Pro-Tect actually
20  executed the subcontract agreement at that time; is
21  that correct?
22  **A.  Yes.**
23  Q.  And then I would like you to just look
24  above a little bit.  It states here, On
25  July 10th, 2015, at 12:41, Garylene Javier wrote,

Page 71

1  Please see the attached fully executed copy of the
2  subcontract agreement.  Have a nice weekend.
3  Do you agree with the representation made
4  in this e-mail?
5  **A.  Yes.**
6  Q.  Okay.  And at no time in between Leslie
7  sending the e-mail to you, Ms. Javier, and Mr. Vega,
8  and Ms. Javier re-sending the executed copy of the
9  subcontract agreement, did SIS indicate that
10  Garylene Javier could not sign the agreement; is
11  that correct?
12  **A.  Correct.**
13  Q.  Okay.  And at no time in between Leslie
14  sending the executed contract to Pro-Tect, to you,
15  Mr. Wright, and Ms. Javier, and Ms. Javier sending
16  the executed copy of the same, did it indicate that
17  Pro-Tect could not rely upon the subcontract
18  agreement; is that correct?
19  **A.  Correct.**
20  Q.  And if you can -- if you do have
21  Exhibit 4 in front of you again, I just would like
22  to refer you to the subcontract agreement.
23  **A.  Yes.**
24  Q.  This is not your first time reviewing
25  this subcontract agreement, correct?

Page 72

1  **A.  Correct.**
2  Q.  So do you agree that this subcontract
3  agreement does not make it contingent that Pro-Tect
4  is to be paid only if All Net pays SIS?
5  **A.  Say again.**
6  Q.  Do you agree that there is nothing in the
7  subcontract agreement that states that Pro-Tect is
8  not to be paid unless All Net pays SIS?
9  **A.  Correct.**
10  Q.  In fact, there is no contingency
11  agreement in this subcontract agreement.  Do you
12  agree?
13  **A.  Correct.**
14  Q.  I do want to introduce -- I'm going to
15  introduce this exhibit here as Exhibit 8.  Once your
16  attorney is finished reviewing, I'll provide you
17  with a copy.
18  MR. BLAYLOCK:  Go ahead.
19  (Vega Exhibit No. 8 was
20  marked for identification.)
21  THE WITNESS:  Okay.
22  BY MS. GREEN:
23  Q.  So what I'll represent is that these
24  documents were provided in Pro-Tect's Rule 26
25  disclosures.  They're Bates numbered Pro-Tect 18 to

Page 73

1  27.
2       Do you recognize these documents provided
3  in this exhibit?
4    A.  Yes.
5    Q.  What are these documents?
6    A.  Invoices.
7    Q.  And what are these invoices for?
8    A.  For security services.
9    Q.  Did you receive these invoices?
10   A.  I believe so.
11   Q.  What do you base your belief upon?
12   A.  I remember -- I remember seeing them, so
13  whether I was copied on the e-mail or they were sent
14  to me directly, but I remember them.
15   Q.  And we could first take a look at one of
16  the invoices, and we'll look at, first, the one
17  that's Bates numbered Pro-Tect 18 at the bottom
18  right.
19   A.  Mm-hmm.
20   Q.  This invoice specifically states that the
21  executive protection provided was billed to Special
22  Intelligence Service; is that correct?
23   A.  Yes.
24   Q.  And that is from which you're an officer
25  of the company; is that correct?

Page 74

1    A.  Yes.
2    Q.  And these were for services that were
3  provided in June of 2015.
4       Do you agree?
5    A.  Yes.
6    Q.  And then also, too, I would like you to
7  take a look at Pro-Tect -- at the document that's
8  Bates numbered on the bottom right, Pro-Tect 20.
9  Let me know when you're finished reviewing that.
10   A.  Yes.
11   Q.  Do you agree that this is an invoice that
12  was billed to Special Intelligence Service; is that
13  correct?
14   A.  Yes.
15   Q.  And these were for services that Pro-Tect
16  provided to is states -- strike that.
17       These were for services from which
18  Pro-Tect provided that was billed to SIS; is that
19  correct?
20   A.  Correct.
21   Q.  And these were for services provided in
22  July of 2015; is that correct?
23   A.  Correct.
24   Q.  And for the services here provided in
25  July of 2015, those services, in part, progress

Page 75

1  report provided after the subcontract agreement, was
2  signed by Leslie and Ms. Javier; is that correct?
3    A.  Correct.
4    Q.  And you -- did you personally receive
5  this invoice that's Bates numbered Pro-Tect 20?
6    A.  I don't remember specifically, but I
7  assume so.
8    Q.  Did SIS have notice that Pro-Tect was
9  billing it for services provided in July of 2015?
10   A.  Yes.
11   Q.  What, if anything, was SIS's response to
12  the invoices that relate to the services Pro-Tect
13  billed SIS?
14   A.  I'm sorry, say that again.
15   Q.  What was the response that SIS sent --
16  communicated to Pro-Tect as it relates to the
17  services that Pro-Tect provided to SIS in or around
18  July of 2015?
19   A.  I remember we had to -- both our
20  companies had to keep a tallying role of what we
21  were spending on ourself.  We had been doing it a
22  number of years.  When she provided services, we
23  asked her to do the same.
24   Q.  Okay.  Was Pro-Tect supposed to be paid
25  for these invoices from which it was billed to SIS

Page 76

1  for the services it provided?
2    A.  When the contract was funded, yes.
3    Q.  Do you have anything after July of 2015
4  that indicates that Pro-Tect is only to be paid only
5  if the contract is funded?
6    A.  I don't recall.  You're asking about if
7  it was written or e-mailed or anything?
8    Q.  Anything.
9    A.  I remember oral conversations that we
10  had, yes.
11   Q.  Okay.  However, and you do agree that the
12  responses that SIS provided, which contradicted each
13  other, indicated that the only oral agreement that
14  was made was in May of 2015; is that correct?
15       MR. BLAYLOCK:  Object to the form.
16  BY MS. GREEN:
17   Q.  You can answer that.
18   A.  I don't remember.
19   Q.  You don't remember?
20   A.  Yeah.
21   Q.  Okay.  Okay.  If you can take a look at
22  Exhibit 2, please, sir.  Look at your responses or
23  look at SIS's responses to Pro-Tect's second set of
24  interrogatories.
25   A.  Which number?

Page 77

1    Q.   Both.  There should be two of them, I
2  think.
3    A.   Okay.
4    Q.   Let me know when you're finished
5  reviewing it.
6    A.   Okay.
7    Q.   So it is SIS's position that a,
8  quote/unquote, oral agreement was formed in
9  May of 2015; is that correct?
10   A.   Yes.
11   Q.   However, a subcontract agreement was
12 signed by Garylene Javier and Leslie Bruno in July
13 of 2015.
14        Do you agree?
15   A.   Yes.
16   Q.   Do you agree that invoices were sent
17 to -- I'll make it clear.  Strike that.
18        And you agree that Pro-Tect sent invoices
19 to SIS that relates to services provided in July
20 of 2015; is that correct?
21   A.   Correct.
22   Q.   And you agree that SIS does not have any
23 documents or any other evidence that indicates that
24 any other agreements were formed after July of 2015
25 that relates to Pro-Tect only being paid if, quote,

Page 78

1  the project was funded; is that correct?
2    A.   Not that I recall.
3    Q.   Okay.  Do you believe that you would be
4  the person that would have the most information that
5  relates to my previous question?
6    A.   Yes.
7    Q.   And did you ever personally communicate
8  to Leslie Bruno that, although future contracts may
9  be canceled, that SIS would be making payment for
10 security services that Pro-Tect provided?
11   A.   Say -- repeat that.
12   Q.   Do you agree that you personally informed
13 Ms. Bruno that SIS would be making payment for the
14 services that Pro-Tect provided?
15   A.   No.
16   Q.   Okay.  Do you agree that Pro-Tect
17 provided services on -- provided security services
18 to All Net?
19   A.   Yes.
20   Q.   Do you agree that Pro-Tect provided
21 security services -- strike that.
22        Do you agree that Pro-Tect provided
23 security service -- security services in reliance of
24 the subcontract agreement that was executed?
25   A.   Yes.

Page 79

1    MS. GREEN:  Okay.  We'll take a
2  ten-minute break, and then I think I'm almost
3  finished.  After we're finished taking your
4  deposition, we can either do a 30-minute break, or I
5  could follow up behind; it's up to you.
6    MR. BLAYLOCK:  Is it going to be similar
7  length?
8    MS. GREEN:  Similar length, maybe even
9  shorter.
10   MR. WRIGHT:  I want to go get a
11 hamburger.
12   MS. GREEN:  Let's take a ten-minute
13 break; I'll finish his depo.
14   MR. BLAYLOCK:  Sound good.
15   MS. GREEN:  Ten minutes, then we'll come
16 back here.
17        (Short break was taken.)
18   MS. GREEN:  Back on the record.
19 BY MS. GREEN:
20   Q.   So Luis, do you still understand that
21 you're under the same oath that you took this
22 morning?
23   A.   Yes.
24   Q.   You testified earlier that Ms. Javier
25 normally doesn't sign contracts on behalf of SIS; is

Page 80

1  that correct?
2    A.   Say again.
3    Q.   You testified earlier that Ms. Javier
4  normally doesn't sign contracts on behalf of SIS; is
5  that correct?
6    A.   Correct.
7    Q.   You specifically indicated that
8  Ms. Javier does not have SIS's authority to sign
9  contracts on behalf of SIS; is that correct?
10   A.   Correct.
11   Q.   Okay.  So other than the subcontract
12 agreement that is Exhibit 4 in this matter, to your
13 knowledge, has Ms. Javier signed any other contracts
14 on behalf of SIS?
15   A.   Not that I'm aware of.  Nondisclosure
16 agreements.
17   Q.   So she does sign nondisclosure
18 agreements?
19   A.   Yes.
20   Q.   So, in fact, she is able to sign
21 contracts on behalf of SIS; is that correct?
22   A.   Nondisclosure agreements.
23   Q.   So your testimony earlier is that she
24 didn't sign any contracts on behalf of SIS; is that
25 correct?

1b8787ba-012e-4f9a-adda-ce8c760e628e

Page 81

1    A.   **Nondisclosure agreements.  You --**
2    Q.   I'm asking the questions.
3         Your testimony earlier is she didn't sign
4    any contracts on behalf of SIS; is that correct?
5    A.   **Correct.**
6    Q.   Okay.  However your testimony now, today,
7    right now is that she, in fact, does sign
8    nondisclosure agreements on behalf of SIS; is that
9    correct?
10   A.   **Correct.**
11   Q.   And she sends the nondisclosure
12   agreements that she signs on behalf of SIS to third
13   parties, including companies; is that correct?
14   A.   **Correct.**
15   Q.   Okay.  And is it your opinion that a
16   nondisclosure agreement is actually a contract?
17   A.   **No, it's an agreement for sharing**
18   **information.**
19   Q.   Okay.  So you do not believe that a
20   nondisclosure agreement has terms to a contract that
21   each party must abide to?
22   A.   **It does, yes.**
23   Q.   So do you agree that Ms. Javier signed
24   any other agreements on behalf of SIS as it relates
25   to doing business with Pro-Tect?

Page 82

1    A.   **Not that I recall.**
2    Q.   Okay.  And -- we'll go to -- here, if you
3    can -- I don't have as many copies.  I apologize.
4         Once you review that, Mr. Blaylock, if
5    you can have Luis also review that, then I can
6    question him from there.
7         THE WITNESS:  Yes.
8    BY MS. GREEN:
9    Q.   Please review this document, and let me
10   know when you're finished reviewing the document?
11        (Vega Exhibit No. 9 was
12         marked for identification.)
13        THE WITNESS:  Yes.
14   BY MS. GREEN:
15   Q.   Do you recognize this document?
16   A.   **Yes.**
17   Q.   Can you please let us know what this
18   document is?
19   A.   **A mutual nondisclosure agreement.**
20   Q.   And do you agree that this nondisclosure
21   agreement is the one -- strike that.
22        Do you agree that the nondisclosure
23   agreement is on SIS letterhead?
24   A.   **Yes.**
25   Q.   And looking at the last page, do you

Page 83

1    agree that Garylene Javier signed the nondisclosure
2    agreement?
3    A.   **Yes.**
4    Q.   And she signed the nondisclosure
5    agreement on behalf of SIS?
6    A.   **Yes.**
7    Q.   Do you agree that the signature block
8    from which Ms. Javier signed the nondisclosure
9    agreement is in the exact form as the signature
10   block that is provided in the subcontract agreement
11   that was Exhibit 4?
12   A.   **Signature or signature block?**
13   Q.   The signature block on behalf of SIS.
14   A.   **Yes.**
15   Q.   Okay.  And you're testifying here today,
16   under oath, that Ms. Javier did have the authority
17   to sign this nondisclosure agreement; is that
18   correct?
19   A.   **Yes.**
20   Q.   However, you're stating now, under the
21   testimony, that Ms. Javier did not have the
22   authority to sign the subcontract agreement,
23   although she had the authority to sign the
24   nondisclosure agreement; is that correct?
25   A.   **Correct.**

Page 84

1    Q.   However, this nondisclosure agreement
2    that Ms. Javier signed was sent to Pro-Tect,
3    correct?
4    A.   **Correct.**
5    Q.   And do you recall being copied on the
6    e-mail indicating that Garylene Javier signed the
7    nondisclosure agreement on behalf of SIS?
8    A.   **I don't recall.  I probably would have,**
9    **or maybe not.  I don't recall.**
10        MS. GREEN:  Once you're finished
11   reviewing, give that to your client.
12        (Vega Exhibit No. 10 was
13         marked for identification.)
14   BY MS. GREEN:
15   Q.   Once you're finished reviewing it, please
16   let me know.
17   A.   **Okay.**
18   Q.   Do you recognize the content that's
19   contained in those documents?
20   A.   **Yes.**
21   Q.   What are those -- do those documents
22   entail?
23   A.   **E-mails going back and forth from Gage to**
24   **Leslie and I.**
25   Q.   Do you agree that those e-mails going

1  back and forth between Leslie, you, and Gage show
2  that the nondisclosure agreement was sent to
3  Pro-Tect?
4      **A.   Yes.**
5      Q.   And the nondisclosure -- to clarify, the
6  nondisclosure agreement that was sent to Pro-Tect
7  was the one signed by Garylene Javier, correct?
8      **A.   Correct.**
9      Q.   Do you agree that the e-mail
10  correspondence that is sent in the -- that is
11  entailed in the documents labeled Exhibit 10 mirror
12  the same discussions that was mirrored in the
13  e-mails relating to signing the subcontract
14  agreement?
15     **A.   I'd have to look.**
16     Q.   That should be Exhibit 7.
17     **A.   What was your question again?**
18     Q.   Do you agree that the e-mails that were
19  exchanged between Leslie, you, and Gage, as it
20  relates to the subcontract agreement, and from which
21  is Exhibit 10, are similar to the e-mail exchange
22  relating to the subcontract agreement in Exhibit 7?
23     **A.   No.**
24     Q.   Okay.  How do you believe those two are
25  different?

1      **A.   Well, this is in reference to the
2  subcontract.  This is in reference to the
3  nondisclosure agreement.**
4      Q.   Do you agree that the subcontract
5  agreement, that's in Exhibit 7, there's an e-mail
6  from Leslie to, specifically, you and Gage that
7  state this is Pro-Tect's signed version of the
8  subcontract agreement?
9      **A.   Yes.**
10     Q.   Okay.  And do you agree that Gage then
11  sent Pro-Tect, in the e-mail, July 10th, 2015, a
12  signed copy of the subcontract agreement from her
13  indicating that's an executed copy of the
14  subcontract agreement?
15     **A.   Yes.**
16     Q.   And do you agree that in the
17  nondisclosure agreement -- Gage provided Leslie with
18  the signed copy of the nondisclosure agreement, as
19  well?
20     **A.   Yes, with us, attached to it.**
21     Q.   Okay.  And you were attached also to the
22  e-mail exchange with Pro-Tect stating, This is my
23  signed copy of the subcontract agreement, as well;
24  is that correct?
25     **A.   From Leslie to us, yes.**

1      Q.   Okay.  And at no -- and you did testify
2  earlier that at no point when Leslie provided you
3  with the signed subcontract agreement, that ISIS was
4  not going to sign the subcontract agreement or that
5  it did not intend to sign it; is that correct?
6      **A.   Correct.**
7      Q.   And then -- once you're finished
8  reviewing, if you can provide that to your client,
9  and we're going to mark this one as Exhibit 11.
10         (Vega Exhibit No. 11 was
11          marked for identification.)
12  BY MS. GREEN:
13     Q.   When you finish reviewing the document,
14  please let me know.
15     **A.   Okay.**
16     Q.   Do you recognize the contents contained
17  in the document?
18     **A.   Yes.**
19     Q.   Will you please identify what this
20  document means to you?
21     **A.   It's just an update from Leslie to both
22  Don and I.**
23     Q.   And do you agree that, in that update,
24  Leslie indicated that the invoices that relate to
25  Pro-Tect providing services exceeded more than

1  $157,000 at that time?
2      **A.   Yes.**
3      Q.   And this e-mail is dated
4  August 1st, 2015; is that correct?
5      **A.   Yes.**
6      Q.   Do you recall your response in regards to
7  Leslie sending this e-mail?
8      **A.   My response, no.**
9      Q.   Okay.  Did you ever indicate -- do you
10  recall ever indicating to Leslie that Pro-Tect
11  should not be seeking payment from ISIS once she
12  sent this e-mail to you?
13     **A.   No.  But -- no, I remember telling her to
14  pull her people off.**
15     Q.   Did you ever indicate to her that she
16  should not be asking you specifically, or the
17  company, SIS, for payment for the $157,000?
18     **A.   No.**
19     Q.   Okay.  And you testified just now that
20  you told Ms. Bruno to pull her people off; is that
21  correct?
22     **A.   Yes.**
23     Q.   What was the first date that you told her
24  to pull her people off?
25     **A.   I don't remember.**

1b8787ba-012e-4f9a-adda-ce8c760e628e

Page 89

1    Q.   Do you recall the year?
2    A.   **I assume it's 2015.**
3    Q.   Do you recall the month?
4    A.   **No.**
5    Q.   Do you recall the first time you told her
6    to turn to -- to pull her people off?
7    A.   **No.**
8    Q.   At the time that you testified that you
9    told her to, quote/unquote, pull her people off, did
10   Pro-Tect already provide security services to
11   All Net at that time?
12   A.   **Yes.**
13   Q.   So do you agree that SIS did have
14   knowledge that Pro-Tect was providing security
15   services to All Net?
16   A.   **Yes.**
17   Q.   Now, what I will represent -- and to
18   clarify, at that time means in 2015.  So to clarify,
19   SIS did have knowledge that Pro-Tect was providing
20   services on behalf of All Net, correct?
21   A.   **Yes.**
22   Q.   And at that time, the subcontract
23   agreement, which is Bates numbered Pro-Tect 1 to 17,
24   provided terms in the agreement from which Pro-Tect
25   was to provide services on behalf of All Net; is

Page 90

1    that correct?
2    A.   **Correct.**
3    Q.   And the subcontract agreement indicated,
4    as well, that Pro-Tect was serving as a subcontract
5    representative for SIS; is that correct?
6    A.   **Yes.**
7    Q.   So this should be our last one here.
8        What I'll do is I'm going to mark this
9    exhibit as Exhibit 12.  If you can just review that
10   and pass it to your client.
11           (Vega Exhibit No. 12 was
12           marked for identification.)
13   BY MS. GREEN:
14   Q.   Please let me know when you're finished
15   reviewing this document.
16   A.   **Yes.**
17   Q.   You recognize this document; is that
18   correct?
19   A.   **Yes.**
20   Q.   What I'll do is I'll represent that this
21   exhibit is SIS's responses to Pro-Tect's first set
22   of interrogatories.
23        I would like to have you refer to SIS's
24   response to Interrogatory No. 4.
25   A.   **Yes.**

Page 91

1    Q.   And in that, it states that Pro-Tect did
2    not provide any services for the benefit of SIS;
3    however, you just testified under oath today that
4    Pro-Tect did, in fact, provide services on behalf of
5    SIS; is that correct?
6    A.   **On behalf of SIS, yes.**
7    Q.   Correct.  So is there a reason why SIS's
8    response here today is different from the response
9    that it provided in its interrogatory responses?
10   A.   **A mistake.**
11   Q.   Okay.  However, you did testify earlier,
12   under oath, that you did review SIS's responses to
13   Pro-Tect's propounded discovery, and that you would
14   not change any of the responses at that time; is
15   that correct?
16   A.   **Correct.**
17   Q.   Okay.  I don't have any further
18   questions.
19        MS. REPORTER:  Would you like this
20   written?
21        MS. GREEN:  I get a copy.
22        MS. REPORTER:  Mr. Blaylock, a copy?
23        MR. BLAYLOCK:  Condensed and regular.
24        (Whereupon the deposition concluded
25        at 12:16 p.m.)

Page 92

1            CERTIFICATE OF DEPONENT
2    PAGE  LINE  CHANGE           REASON
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13           * * * * *
14        I, LUIS VEGA, deponent herein, do hereby
     certify and declare the within and foregoing
15   transcription to be my deposition in said action;
     that I have read, corrected, and do hereby affix my
16   signature, under penalty of perjury, to said
     deposition.
17
18   _____
     LUIS VEGA
19   Deponent
20
21
22
23
24
25

1b8787ba-012e-4f9a-adda-ce8c760e628e

Page 93

```
 1          REPORTER'S CERTIFICATE
 2   STATE OF NEVADA )
              ) ss
 3   COUNTY OF CLARK )
 4          I, JENNIFER M. DALY, a duly commissioned
 5   and licensed Court Reporter, Clark County, State of
 6   Nevada, do hereby certify:  That I reported the
 7   taking of the deposition of the witness, LUIS VEGA,
 8   commencing on January 15, 2019, at the hour of 9:45
 9   a.m.
10          Prior to being examined, the witness was,
11   by me, duly sworn to testify to the truth.  That I
12   thereafter transcribed my said shorthand notes into
13   typewriting and that the typewritten transcript of
14   said deposition is a complete, true and accurate
15   transcription of my said shorthand notes.
16          I further certify that I am not a
17   relative or employee of an attorney or counsel of
18   any of the parties, nor a relative or employee of an
19   attorney or counsel involved in said action, nor a
20   person financially interested in the action.
21          IN WITNESS HEREOF, I have hereunto set my
22   hand, in my office, in the County of Clark, State of
23   Nevada, this 29th day of January, 2019.
24
      _____
25          JENNIFER M. DALY, CRR, RPR, CCR, CSR
```

1b8787ba-012e-4f9a-adda-ce8c760e628e